SO ORDERED.

SIGNED this 15th day of January, 2013.



*Dale L. Somers*

Dale L. Somers
United States Bankruptcy Judge

_____

**Designated for print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In Re:

**BROOKE CORPORATION,**

                **DEBTOR.**

**CASE NO. 08-22786**
**CHAPTER 7**

**CHRISTOPHER J. REDMOND,**
**Chapter 7 Trustee of Brooke**
**Corporation, Brooke Capital**
**Corporation (f/k/a Brooke Franchise**
**Corporation), and Brooke Investments,**
**Inc.;**

              **PLAINTIFF,**

**v.**

**NCMIC FINANCE CORPORATION,**

              **DEFENDANT.**

**ADV. NO. 12-6043**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART**
**THE PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM COMPLAINT**

Plaintiff Christopher J. Redmond, Chapter 7 Trustee (Trustee) of Debtors Brooke

Corporation, Brooke Capital Corporation, and Brooke Investments, Inc., moves under

Federal Rule of Civil Procedure 12(b)(6) and (c), made applicable to this proceeding by

Federal Rule of Bankruptcy Procedure 7012(b), to dismiss the counterclaims asserted by

Defendant NCMIC Finance Corporation (NCMIC or Defendant).  The motion presents

the question whether a creditor's claims for damages allegedly caused by the tortious acts

of a custodian, who was superseded by the filing of a petition under Chapter 11 and the

appointment of a Chapter 11 Trustee, are entitled to administrative priority under 11

U.S.C. § 503(b)(1)(A) or (b)(3)(E).[1]  After carefully considering the pleadings and the

oral arguments of counsel,[2] the Court finds that only the claims arising from postpetition

conduct are eligible for administrative expense status, but that, except for the one claim

that was asserted in NCMIC's proof of claim, administrative expense status for those

claims is barred by a prior order of the Court.  As to NCMIC's prayer that the

counterclaims defeat the Trustee's fraudulent conveyance claims against it, the Court

finds that only the counterclaims arising from postpetition conduct are eligible for offset

under § 553 and that recoupment is not available for any of the counterclaims.  Based on

these rulings, the Trustee's motion is granted in part.

**BACKGROUND FACTS.**

The Brooke group of companies was involved in many aspects of insurance and

---

[1] Future references to Title 11 in the text shall be to the section number only.

[2] The Trustee appears by Michael D. Fielding of Husch Blackwell LLP.  NCMIC appears by Paul D. Sinclair of Polsinelli Shughart PC.

2

insurance-related businesses, including a network of insurance franchisees and agents. The parent company was Debtor Brooke Corporation (Brooke Corp.). Debtor Brooke Capital Corporation (Brooke Capital), a majority-owned subsidiary of Brooke Corp., owned 100% of Brooke Capital Advisors, Inc. (BCA), which has not filed bankruptcy but was involved in events relevant to this proceeding. Brooke Capital also owned 100% of Debtor Brooke Investments, Inc. The three Brooke Debtors will be referred to collectively as Debtors.[3] Another relevant majority-owned subsidiary of Brooke Corp. was Brooke Credit Corporation, d/b/a Aleritas Capital Corporation (Aleritas), which has not filed bankruptcy. Aleritas was engaged in lending money to Brooke franchisees and other insurance agents.

Defendant NCMIC, which began its relationship with Brooke in 1998, initially fulfilled a "warehouse" financing role for Brooke agency franchise loans, holding the loans until they were securitized or sold to community banks. Later, NCMIC provided insurance premium financing and merchant credit card processing services to Brooke agents/franchisees. In addition, NCMIC purchased various participation interests in loans which Aleritas made to Brooke agents.

Brooke's business did not flourish. The Trustee alleges that the Brooke business model was unsustainable. On September 11, 2008, the Bank of New York Mellon, as trustee, filed an Emergency Motion for the Appointment of a Receiver with the United

---

[3] The bankruptcies of the three Debtors are being jointly administered. In re Brooke Corp., Case no. 08-22786, is the lead case.

States District Court for the District of Kansas.[4]  The Brooke defendants opposed the

motion and sought the appointment of a Special Master instead.  A hearing was held, and

the parties agreed the District Court should enter a Consent Order Appointing a Special

Master.  Pursuant to that order, Albert A. Riederer (Riederer) was appointed Special

Master of the "Special Master Entities," defined to be Brooke Capital, Brooke Corp., and

BCA.  The Special Master had authority to administer and manage the Special Master

Estate, including the following power and authority:

> to take custody, control and possession of all records, assets,
> funds, bank accounts, brokerage accounts, premises and other
> materials of any kind in the possession of or under the direct
> or indirect control of the Special Master Entities related to the
> Special Master Estate, and to direct the application thereof as
> set forth in the agreements of the Special Master Entities and
> their subsidiaries governing the same.[5]

Brooke Corp. and Brooke Capital filed voluntary Chapter 11 petitions on October 28,

2008, and Brooke Investments, Inc., filed a voluntary petition under Chapter 11 on

November 3, 2008.  Riederer was appointed as Chapter 11 Trustee of the three Debtors.

On June 29, 2009, the Chapter 11 proceedings were converted to Chapter 7.  Riederer

initially served as Chapter 7 Trustee.  On November 3, 2011, Plaintiff Christopher J.

Redmond was appointed as successor Chapter 7 Trustee.

The Trustee filed this adversary proceeding against NCMIC on May 5, 2012.  His

Complaint alleges five counts:  Count I for avoidance of a security interest; Counts II and

---

[4] Bank of New York Mellon v. Aleritas Capital Corp., D. Kan. Case no. 2:08-cv-02424-JWL.

[5] Case no. 2:08-cv-02424-JWL, Dkt. 23 at 4.

4

III for recovery of allegedly preferential transfers; and Counts IV and V for recovery of allegedly constructively fraudulent transfers.[6] Counts I, II, and III were dismissed by consent, after NCMIC filed a motion for summary judgment.[7] Defendant describes the Trustee's pending claims to avoid fraudulent transfers[8] as seeking recovery of the following: (1) $5.6 million in loan payments made by Aleritas on loans to franchisees that were assigned to NCMIC; (2) $17 million in loan payments to other lenders which allegedly benefitted NCMIC; and (3) $22.3 million in franchisees' operating expenses that were paid to third parties, such as landlords and utility companies, which allegedly benefitted NCMIC.[9] NCMIC responded to the Complaint with an answer denying the allegations and asserting its "Counterclaim for Purposes of Recoupment, Offset and/or Administrative Claim" (the Counterclaim Complaint).[10] Under various tort theories, NCMIC seeks compensation for multi-million dollar losses allegedly relating to the following described activities engaged in during the period that the Special Master was in charge of the Debtors' estates, plus limited claims for the conduct of Riederer as Chapter 11 Trustee.

Some of the claims asserted by NCMIC arise from NCMIC's relationship with

---

[6] Adv. no. 12-6043, Dkt. 1.

[7] Dkt. 8.

[8] The claims are asserted under 11 U.S.C. §§ 544, 548(a)(1)(B), and 550 and K.S.A. 33-204(a)(2), 33-205(a), and 33-207. Dkt. 1.

[9] Dkt. 9 at 2-3.

[10] Dkt. 5.

Case 12-06043   Doc# 25   Filed 01/15/13   Page 5 of 30

CJD & Associates, LLC (CJD), a limited liability company which was a wholly-owned subsidiary of Brooke Brokerage Corporation, which, in turn, was wholly owned by Brooke Corp. On September 13, 2005, NCMIC purchased a 74.803% interest in a $2.525 million loan from Aleritas to CJD. In the spring of 2008, NCMIC loaned $2.5 million to Brooke Corp., secured by an assignment of Brooke Brokerage's 100% interest in CJD. NCMIC alleges that on September 17, 2008, the first day Riederer served as Special Master, unbeknownst to CJD and NCMIC, $1.38 million was transferred from CJD's bank account to Brooke Corp., and that an additional $428,000 was transferred from CJD to Brooke on the following day. CJD's financial condition deteriorated, and Brooke Corp. defaulted on the CJD loan. On December 22, 2008, after Brooke Corp. filed for bankruptcy relief, Riederer, as Trustee, filed an emergency motion requesting permission to abandon the stock of CJD to NCMIC. The motion was granted. Thereafter, NCMIC entered into an "Agreement to Accept Collateral in Satisfaction of Obligations" and, in accord with that agreement, made two $25,000 payments to the Trustee and became the owner of CJD. In an effort to prop up CJD, NCMIC alleges it incurred obligations of approximately $2.94 million and also paid $25,000 to acquire the remaining 25.197% participation interest in the loan from Aleritas to CJD.

Some elements of NCMIC's counterclaim arise out its longstanding relationship in providing commercial insurance premium financing to Brooke Capital, Brooke franchisees, and insureds who dealt with Brooke franchisees. Under this arrangement, NCMIC advanced funds for premium payments, and the insureds assigned to NCMIC as

6

security all unearned premiums and dividends which became payable under the financed policies. If financed policies were cancelled, NCMIC was entitled to the return of any unearned premiums and commissions. NCMIC claims that Riederer as Special Master wrongfully retained $178,541.20 in unearned premiums and $17,517.85 in unearned commissions. NCMIC also seeks to recover $170,724.86 as amounts which it advanced to Brooke for financed premiums but which it alleges Brooke failed to remit to the insurance carriers. In addition, NCMIC financed Brooke Capital's purchase of errors and omissions policies for its franchisees. Despite Brooke Capital's failure to make timely payment of the funds due to NCMIC under this arrangement, on September 25, 2008, upon receipt of partial payment, NCMIC alleges it honored Trustee Riederer's request not to cancel the policies and continued to make payments that allowed the policies to stay in effect until December 2008. NCMIC asserts a loss of $126,000 stemming from its financing of the E&O policies.

NCMIC also seeks to recover various payments made to Riederer as Special Master and as Chapter 11 Trustee. These include payments related to FTI Consulting, which was utilized by Riederer with respect to Brooke Corp. issues, and Silverman Consulting, which was utilized by Riederer with respect to Aleritas issues. In addition, NCMIC asserts a claim based upon its purchase of 100% participation interests in one loan from Aleritas to Midwest Funeral Real Estate Management Company and another to RKC Financial Corporation, a Brooke franchisee. As to the RKC loan, it is alleged that Riederer defaulted by failing to appear for an arbitration scheduled for October 21, 2008,

thereby precluding NCMIC's collection from RKC based upon its participation interest.

The Trustee responded to the Counterclaim Complaint with a motion to dismiss, the matter which is the subject of this opinion. The Trustee's motion and supporting memorandum includes the following chart of NCMIC's counterclaims, which the Court has edited to remove notes commenting about the claims. The columns are self-explanatory, except for column three, labeled "counts." It identifies the legal theories of recovery for each claim using numbers defined as: (1) breach of fiduciary duty; (2) conversion; (3) fraudulent transfer; (4) negligence; (5) money had and received; and (6) unjust enrichment. The paragraph numbers in the "Description" column refer to paragraphs in the Counterclaim Complaint.

| Claim | Amount | Counts | Description |
|-------|--------|--------|-------------|
| CJD Loan Losses | $3,314,000.00 | 1, 4 | Pre-petition debt obligation due to pre-petition loans made to CJD. *See* ¶¶ 29-36. |
| CJD Capital Infusions | $2,949,000.00 | 1, 4 | Monies which NCMIC infused into CJD after NCMIC acquired the CJD stock from Brooke Brokerage. *See* ¶ 59. Note: NCMIC has not alleged in its Counterclaims that any of these moneies when to or for the benefit of the Debtors' estates. |
| CJD Consideration Payments | $ 50,000.00 | 1, 4 | Monies transferred by NCMIC to the Debtors post-petition. *See* ¶ 44. |
| CJD Farmers Payment | $ 25,000.00 | 1,4 | Monies paid by NCMIC to Farmers and Merchants Bank of Hill City ("Farmers") to acquire the participated loan interest on which CJD was obligated. *See* ¶ 54. The Farmers participation interest related to a November 2003 loan. *See* ¶ 30. |
| CJD Transfers | $3,895,784.00 | 3 | Pre-petition debt obligation stemming from the alleged transfer of funds from CJD to Brooke. *See* ¶ 58, 65, 164. |
| Wrongfully Withheld Unearned Premiums | $ 178,541.20 | 1, 2, 4 | Pre-petition debt obligation stemming from Brooke's alleged failure to remit or turnover unearned premiums it had allegedly received from cancelled policies where NCMIC had provided premium financing. *See* ¶¶ 79-80. |

8

| | | | |
|---|---|---|---|
| Wrongfully Withheld Unearned Commissions | $ 17,517.85 | 1, 2, 4 | Pre-petition debt obligation stemming from Brooke's alleged retention of unearned commissions due to unearned premiums that had been returned to NCMIC. *See* ¶¶ 86-87. |
| Wrongfully Withheld Financed Amounts | $ 170,724.86 | 1, 2, 4 | Pre-petition debt obligation stemming from Brooke's receipt of financed premium which Brooke allegedly failed to remit to the appropriate carrier or general agent. *See* ¶¶ 93-94. |
| Unearned Premium E&O Loss | $ 126,000.00 | 5, 6 | Pre-petition debt obligation stemming from an E&O policy which was financed pre-petition. *See* ¶¶ 101-109; 111-113; 117. |
| FTI Related Payment | $ 150,000.00 | 5, 6 | Pre-petition debt obligation due to NFC's wire transfer of $150,000 to Brooke on October 10, 2008, with the monies being intended to begin winding down Brooke. *See* ¶¶ 110; 119-120. |
| Silverman Related Payment | $ 40,435.00 | 5, 6 | Monies transferred on November 5, 2008, due to a request for funds "to keep Aleritas alive after the Debtors filed for bankruptcy." ¶ 122; *see also* ¶ 123. |
| Silverman Related Retention | $ 114,577.00 | 5, 6 | Amounts allegedly owed by Aleritas to NCMIC for loan payments. *See* ¶¶ 124-125. |
| Midwest Funeral Proceeds | $ 105,511.89 | 2, 4 | Amounts allegedly owed by Aleritas to NCMIC on a loan in which NCMIC held a participated interest, and on which Aleritas allegedly foreclosed and obtained gross sales proceeds in October 2008. *See* ¶¶ 127-131. |
| RKC Loss | $1,146,508.00 | 1, 4 | Pre-petition debt obligation due to a 100% participated loan interest which NCMIC owned where the Brooke franchisee (i.e., the borrower) filed an arbitration proceeding against Brooke Corp., Aleritas (f/k/a Brooke Credit Corp.) and BASC and others, and obtained an arbitration award on October 21, 2008. *See* ¶¶ 133-146. |
| Merchant Fee Loss | $ 42,555.00 | 1, 2, 4 | Pre-petition debt obligation which occurred in October 2008 due to fees and losses which Brooke was allegedly responsible to pay NCMIC due to rejected ACH transactions. *See* ¶¶ 148-156. |

## ANALYSIS.

### A. NCMIC's counterclaims are for the purposes of recoupment, offset, and/or administrative expense status.

NCMIC asserts its counterclaims only for the purposes of recoupment, offset,

9

and/or administrative expense status[11] as a means to defeat recovery on the Trustee's fraudulent transfer claims alleged in the Complaint. The Trustee's motion to dismiss is therefore directed at these purposes — the Trustee's primary position is *not* that the tort claims fail to state claims for which relief may be granted; rather, it is that NCMIC's tort claims are not entitled to administrative expense status, and further, that neither recoupment nor offset apply. The Trustee's motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of NCMIC's allegations.

**B. Whether any of NCMIC's counterclaims may be entitled to administrative expense status.[12]**

**1. Applicable Code provisions.**

Allowance of administrative expenses is addressed by § 503. Subsections (b)(1)(A) and (b)(3)(E) are relied upon by NCMIC. They provide in relevant part as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . . , including —
>> (1)(A) the actual, necessary costs and expenses of preserving the estate . . . [and]
>>> . . .
>> (3) the actual, necessary expenses . . . incurred by —
>>> . . .

---

[11] Dkt. 5.

[12] As an alternative to the position that none of the counterclaims are administrative expenses of the Debtors' estates, the Trustee argues that certain claims, identified as third-parry claims, fail to state claims against the estates. The counterclaims included in this category are: CJD Capital Infusions; CJD Farmers Payment; Silverman Related Payment; Silverman Related Retention; and Midwest Funeral Proceeds. The Court does not address this issue because doing so would be mere dicta, in light of the Court's resolution of the other issues.

10

(E) a custodian superseded under section 543 of this
title, and compensation for the services of such
custodian.

Under §§ 507(a)(1)(C) and (a)(2) and 726(a)(1), administrative expenses are entitled to
priority. "Statutory priorities are to be narrowly construed '[b]ecause the presumption in
bankruptcy cases is that the debtor's limited resources will be equally distributed among
his creditors.'"[13] The question here is whether any of the tort claims alleged in the
Counterclaim Complaint satisfy the foregoing definitions of administrative expenses.

**2. With minor exceptions, NCMIC's claims are not administrative expenses
under § 503(b)(1)(A).**

Generally, administrative expense priority under § 503(b)(1)(A) is given to claims
that "satisfy two elements: (1) the claim resulted from a post-petition transaction, and
(2) the claimant supplied consideration which was beneficial to the debtor-in-possession
(or trustee) in the operation of the company's business."[14] "Thus at first blush, it would
appear that postpetition tort claims could never gain administrative status because it is
difficult to envision a tort 'benefiting' the bankruptcy estate."[15] However, in *Reading*,[16] a
1968 case decided under the Bankruptcy Act, the United States Supreme Court held that

---

[13] *Isaac v. Temex Energy, Inc., (In re Amarex, Inc.)*, 853 F.2d 1526, 1530 (10th Cir. 1988)
(quoting *Trustees of Amalgamated Ins. Fund v. McFarlin's*, 789 F.2d 98, 100 (2d Cir. 1986)).

[14] *Peters v. Pikes Peak Musicians Ass'n (In re Colorado Springs Symphony Orchestra Ass'n)*, 462
F.3d 1265, 1268 (10th Cir. 2006).

[15] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy L. & Prac. 3d*, § 49:25
at 49-169 (Thompson Reuters/West 2012).

[16] *Reading Co. v. Brown*, 391 U.S. 471 (1968).

damages resulting from the negligence of a receiver appointed under Chapter XI acting within the scope of his authority as receiver gave rise to actual and necessary costs of administration in a Chapter XI arrangement, entitling the claim to priority.  The Court reasoned as follows:

> Petitioner [the tort claimant whose property was destroyed by fire] suffered grave financial injury from what is here agreed to have been the negligence of the receiver and a workman.  It is conceded that, in principle, petitioner has a right to recover for that injury from their 'employer,' the business under arrangement, upon the rule of respondeat superior.
>                             .   .   .   .
> . . . The 'master,' liable for the negligence of the 'servant' in this case was the business operating under a Chapter XI arrangement for the benefit of creditors and with the hope of rehabilitation.  That benefit and that rehabilitation are worthy objectives.  But it would be inconsistent both with the principle of respondeat superior and with the rule of fairness in bankruptcy to seek these objectives at the cost of excluding tort creditors of the arrangement from its assets, or totally subordinating the claims of those on whom the arrangement is imposed to the claims of those for whose benefit it is instituted.[17]

"Although *Reading* involved interpretation of § 64a of the Bankruptcy Act, subsequent decisions have recognized that *Reading's* analysis carries over to Code § 503(b)."[18]

The *Reading* rationale has been expanded to apply to statutory penalties incurred postpetition, in addition to tortious damages incurred postpetition.[19]  But the Tenth Circuit

---

[17] *Id*. at 477-79.

[18] 3 *Norton Bankruptcy L. & Prac. 3d*, § 49:25 at 49-171.

[19] *In re CF&I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1298 (10th Cir. 1998).

12

has held that it does not extend to such claims when they arise from prepetition conduct. In *CF&I Fabricators,* the debtors sponsored a pension plan subject to the standards of the Internal Revenue Code and ERISA, but failed to meet their funding obligations before filing under Chapter 11. The Pension Benefit Guarantee Corporation asserted claims against the estate and sought priority status for them as tax claims or, alternatively, as administrative expenses. After rejecting the assertion that the claims were tax claims, the Tenth Circuit considered and rejected the position that the claims were entitled to administrative priority under the *Reading* rationale. "Even if we were to assume the contributions were statutory in nature [so that the *Reading* rationale applied], the *Reading* line of cases only allows administrative priority for post-petition expenses."[20] Because the claims were derived from pension credits relating to work performed prepetition, the postpetition requirement was not satisfied; for purposes of *Reading,* liabilities are not incurred postpetition simply because they become due postpetition. Other circuit courts of appeal also limit the *Reading* rationale to expenses arising from postpetition conduct.[21]

To summarize, administrative expense status under § 503(b)(1)(A) is generally limited to claims which result from postpetition transactions which benefitted the debtor-in-possession (or trustee) in the operation of the company's business. Under *Reading,*

---

[20] *Id*. at 1299.

[21] *E.g., In re Hemingway Transport, Inc.*, 954 F.2d 1, 6-7 (1st Cir. 1992); *Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811. 817 (6th Cir. 1997); *In re Jartran, Inc.*, 732 F.2d 584, 588-90 (7th Cir. 1984); *In re Abercrombie*, 139 F.3d 755, 758 (9th Cir. 1998).

13

which may be viewed as an exception to the benefit rule for purposes of § 503(b)(1)(A), the scope of § 503(b)(1)(A) is expanded to encompass tort claims arising from postpetition conduct undertaken in the operation of the estate's business.

Under these standards, as a matter of law, most of NCMIC's claims are not administrative expenses under § 503(b)(1)(A). The only claims which relate to postpetition conduct are those seeking recovery of: (1) a postpetition payment to the Brooke estates of $50,000 as CJD-acquisition consideration, alleged to be damages for the Trustee's breach of fiduciary duty and negligence[22]; (2) the postpetition portion (which the Trustee contends is $16,772.99) of NCMIC's $178,541.20 claim for allegedly Wrongfully Withheld Unearned Premiums, as damages for the Trustee's breach of fiduciary duty, conversion, and negligence; and (3) the postpetition portion (which the Trustee contends is $913.59) of NCMIC's $17,517.85 claim for Wrongfully Withheld Premiums, as damages for the Trustee's breach of fiduciary duty, conversion, and negligence. All of the other claims are excluded from § 503(b)(1)(A) as a matter of law because they relate solely to prepetition conduct.

**3. NCMIC's claims which relate to Riederer's prepetition conduct as Special Master are not entitled to administrative expense status under § 503(b)(3)(E).**

NCMIC's primary argument for administrative expense priority for the damages

---

[22] The Court does not address the Trustee's contention that to allow the counterclaim to recover $50,000 paid to the Debtors' estates postpetition would result in NCMIC receiving a double recovery at the expense of other creditors. The motion to dismiss can be resolved without addressing this fact-based question.

14

alleged to have been caused by the torts of Riederer as Special Master[23] relies upon

§ 503(b)(3)(E), quoted above.  That provision defines administrative expenses to include

the actual and necessary expenses incurred by a custodian superseded under § 543,[24]

thereby including some claims arising from prepetition conduct within the definition of

administrative expenses.  But, as examined below, one requirement for such expenses is

that they provided a benefit to the bankruptcy estate.  The Court concludes that NCMIC'S

claims based upon the allegedly tortious conduct of the Special Master fail to satisfy this

requirement.

The concept of using estate funds to compensate a superseded custodian but

limiting such expenses to those benefitting the estate has its origins in *Randolph &*

*Randolph v. Scruggs*,[25] a 1903 decision of the Supreme Court, which allowed a

bankruptcy claim for compensation for services rendered by a superseded assignee for the

benefit of creditors which were beneficial to the bankruptcy estate.  The Supreme Court

stated:

---

[23] As to the liability of the estate for the torts of the Special Master, NCMIC relies on *McNulta v. Lochridge*, 141 U.S. 327 (1891), which allowed, under nonbankruptcy law, a claim for negligence against the current receiver of a railroad when the wrong had occurred while the railroad was in the possession of a former receiver.  When moving to dismiss the Counterclaim Complaint, the Trustee does not challenge the position that the Brooke estates have liability for wrongs of the Special Master.

[24] The Trustee does not challenge NCMIC's position that Riederer is a superseded custodian under the Code.  "Custodian" is defined by § 101(11) to include a "receiver or trustee for any of the property of the debtor, appointed in a case or proceeding not under this title."  Although the Trustee points out that Riederer was appointed as a special master under the authority of Federal Rule of Civil Procedure 53(a)(1)(A) and not as a receiver under the authority of Federal Rule of Civil Procedure 66, he fails to identify any limitation on the Special Master's authority which would remove him from the Code's definition of custodian.

[25] 190 U.S. 533 (1903).

> We are not prepared to go further than to allow
> compensation for services which were beneficial to the estate.
> Beyond that point we must throw the risk of his conduct on
> the assignee, as he was chargeable with the knowledge of
> what might happen.[26]

The legislative history of § 503(b)(3)(E) reflects an intent to codify *Randolph* by giving administrative expense status only "to the extent such services actually benefit the estate."[27]

Courts generally require a benefit to the estate when finding that expenses of a superseded custodian are entitled to administrative expense status.[28] In addition to the legislative history, this construction is supported by the use of the phrase "actual, necessary expenses" in § 503(b)(3)(E). The general administrative expense provision, § 503(b)(1)(A), uses the similar phrase "actual, necessary costs and expenses." The Tenth Circuit construes § 503(b)(1)(A) to require that the consideration supplied by the claimant was "'beneficial to the debtor-in-possession in the operation of the business.'"[29] As the Fifth Circuit has found, the benefit requirement is "'merely a way of testing whether a particular expense was truly "necessary" to the estate: If it was of no "benefit,"

---

[26] *Id.* at 539.

[27] *In re Kenval Marketing Corp.*, 84 B.R. 32, 34 (Bankr. E.D. Pa. 1988) (quoting 124 Cong. Rec. H 11094-95 (daily ed. Sept. 28,1978) (remarks of Rep. Edwards); S 17411 (daily ed., Oct. 6, 1978) (remarks of Sen. DeConcini)).

[28] 4 *Collier on Bankruptcy* ¶ 503.10[6] (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2012).

[29] *Amarex*, 853 F.2d at 1530(quoting *Trustees of Amalgamated Ins. Fund v. McFarlin's*, 789 F.2d 98, 101 (2d Cir.1986), which was quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)).

16

it cannot have been "necessary.""[30]  NCMIC's tort claims based upon alleged misconduct by the Special Master are not typical of claims arising from actions which benefitted the estate.

Nevertheless, according to NCMIC, such claims are "actual and necessary expenses" for purposes of § 503(b)(3)(E) under *Reading*, discussed above. Alternatively, NCMIC argues that the custodianship estate and, ultimately, the bankruptcy estate benefitted from the conduct at issue. The Court rejects these rationales for finding that damages allegedly caused by the tortious acts of the special master are eligible for administrative expense treatment.

The parties agree, and this Court's research has confirmed, that there are no cases applying *Reading* to allow administrative expense status to tort claims which arose prepetition.  As discussed above, courts applying *Reading* for purposes of § 503(b)(1)(A) restrict administrative expense treatment to claims based upon postpetition conduct. Further, contrary to NCMIC's arguments, the Court finds the rationale of *Reading* does not support the expansion of administrative expense status to tort claims arising from prepetition conduct of a superseded custodian.  The primary rationale of *Reading* was recognition of the benefit to creditors from reorganization and the unfairness of subordinating the claims of those injured as a result of the operation of a debtor's business to the claims of creditors for whose benefit the reorganization was instituted.

---

[30] *Szwak v. Earwood (In re Bodenheimer, Jones, Szwak, & Winchell, L.L.P.)*, 592 F.3d 664, 672 (5th Cir. 2009) (quoting *In re H.L.S. Energy Co.*, 151 F.3d 434, 437 (5th Cir. 1998)).

17

Therefore, under *Reading*, "[i]n order for a tort damage or other similar claim to be accorded administrative priority, it should arise from the operation of the debtor's business."[31]  But NCMIC's tort claims alleged against the Special Master did not arise from the operation of Brooke's business under the protection of Chapter 11.  There is no unfairness in giving NCMIC's claims for tort damages the same status as other prepetition claims.  To argue benefit to the estate based upon the operation of Brooke's business by the Special Master would move the line of demarcation created by the filing of a Chapter 11 proceeding from the date of filing to the date of the appointment of the superseded custodian.  If this is to be the law, Congress, not a court, would be the proper body to so provide, and Congress has not done so.

Further, the Court rejects NCMIC's alternative contention that benefit to the estate for purposes of § 503(b)(3)(E) is present based upon the specific Special Master transactions which are the basis for the tort claims.  For example, NCMIC argues that the Special Master estate, and therefore the bankruptcy estate, benefitted when the Special Master allegedly tortiously transferred funds from CJD to Brooke.  It is true that the estate allegedly received the funds, but NCMIC's focus is misdirected.  Under § 503(b)(1)(A), administrative expense status requires that the *consideration supporting the claimant's right to payment* must have been beneficial to the trustee or debtor-in-possession.[32]

---

[31] Daniel Morman, *The Legacy of* Reading Co. v. Brown[:]  *Claims Arising from Trustee or DIP Misconduct*, 23 Am. Bankr. Inst. J. 1, 40 (2004).

[32] *In re Amarex*, 853 F.2d at 1530.

18

Similarly, under § 503(b)(3)(E), the claimant must have benefitted the estate. Here NCMIC is not claiming that it conferred a benefit on the estate; it is alleging the Special Master's wrongful acts benefitted the estate. NCMIC is claiming it was injured, and is attempting to recover from the Trustee the losses that it alleges it suffered because of the acts of the Special Master. Whether those acts benefitted the Special Master estate or ultimately the bankruptcy estate is not the issue.

For the foregoing reasons, the Court finds that the claims asserted by NCMIC against the estate are not entitled to administrative expense status under § 503(b)(3)(E). There is no precedent extending the *Reading* rule allowing administrative expense status under § 503(b)(1)(A) for damage claims for torts committed by a bankruptcy trustee during the operation of the debtor's business to § 503(b)(3)(E) for expenses incurred by a superseded custodian. Further, apart from *Reading*, NCMIC has not shown that its claims arise from its own, in contrast to the Special Master's, prepetition activities which conferred a benefit on the estate, as required for administrative expense status under § 503(b)(3)(E).

### 4. Administrative expense status of NCMIC's Counterclaims is barred by a prior order of the Court.

Alternatively, the Trustee argues that even if NCMIC's claims were viable administrative expense claims, NCMIC would not be entitled to judgment for any administrative expense claims against the Debtors' estates because NCMIC's purported administrative expense claims have been barred and discharged by a prior order of the

19

Court.  On October 13, 2009, an order was entered in the main bankruptcy case

establishing November 30, 2009, as the bar date for all holders of any Chapter 11

administrative expense claims.[33]  The order provided in part:

> Any person or entity that is required, but fails, to file an
> Administrative Expense Request for its Chapter 11
> Administrative Expense in accordance with the procedures set
> forth in this Order on or before the Administrative Bar Date
> (a) shall be forever barred, estopped, and enjoined form
> asserting any Chapter 11 Administrative Expense against the
> Debtors and the Debtors shall be forever discharged from any
> and all indebtedness or liability with respect to such Chapter
> 11 Administrative Expenses, and (b) shall not be permitted to
> receive payment from the Debtors' estates or participate in
> any distribution in the Debtors' Chapter 7 cases on account of
> such Chapter 11 Administrative Expense.[34]

On October 16, 2009, a Notice of Deadline to File Administrative Expense Requests was

filed.[35]  It is undisputed that NCMIC received both the October 13, 2009, order and the

October 16, 2009, notice.  NCMIC did not file an administrative expense claim in

accordance with the orders by the November 30, 2009, bar date.  The administrative

claims were asserted in the Counterclaim Complaint filled on June 25, 2012.  The Trustee

contends the estates are therefore discharged from any liability for the administrative

claims asserted by NCMIC.

---

[33] Case no. 08-22786, Dkt. 831, Order (I) Establishing Administrative Bar Date and Procedures for Filing Administrative Expense Requests and (II) Approving Form and Manner of Notice of the Bar Date.

[34] *Id*. at ¶ 10.

[35] Case no. 08-22786, Dkt. 854.

NCMIC responds that the argument fails because: (1) the claims arising from Riederer's acts or omissions as Special Master are viable because Riederer as a superseded custodian has not filed a § 543 accounting; (2) there are numerous exceptions to claim bar dates and proofs of claim may be amended; and (3) the administrative bar date does not apply. Of course, the Trustee argues none of NCMIC's positions are valid.

Section 543 imposes three duties upon a custodian with knowledge of the commencement of a bankruptcy case: (1) not to take any action in the administration of the property of the debtor; (2) to deliver the property to the trustee; and (3) to file an accounting of any property of the debtor. Bankruptcy Rule 6002(a) provides that the custodian shall "promptly" file a report and account, and transmit it to the United States Trustee. Subsection (b) provides that after the report and account is filed and an examination has been made into the superseded administration, "after notice and a hearing, the court shall determine the propriety of the administration, including the reasonableness of all disbursements."

The only authority provided by NCMIC in support of its position that Riederer's failure to promptly file an accounting renders the administrative claim bar date ineffective is *American Bridge Products.*[36] The court in that case held that under state law, the statute of limitations did not begin to run on a bankruptcy trustee's claims to impose personal liability on the debtor's prebankruptcy state court receiver for negligence and

---

[36] *Riley v. Decoulos (In re American Bridge Products, Inc.)*, 599 F.3d 1 (1st Cir. 2010).

breach of duty until the receiver had rendered a final accounting or been discharged in either state or federal court. But *American Bridge Products* does not address a bar date established by the bankruptcy court; it is concerned with tolling of the state law limitation period on state law causes of action asserted by a bankruptcy trustee. Likewise, neither the Code nor bankruptcy rules provide any basis for finding that a failure to promptly file an accounting affects the enforcement of a bar date for claiming administrative expense status for claims against a bankruptcy estate as the successor to the official-capacity liability of a superseded custodian.

Second, NCMIC points out that its proof of claim, claim number 1073, was filed on November 2, 2009, before the administrative claim bar date. It included a claim for $178,541.20 for conversion of Wrongfully Withheld Unearned Premiums, and a statement that a portion of this claim might be entitled to administrative expense priority. NCMIC argues that creditors may amend proofs of claim and those amendments generally relate back so they are deemed timely filed. Contemporaneously with filing its objection to the Trustee's motion to dismiss, NCMIC filed an amended proof of claim which includes a priority claim of $8,430,370.80, comprised of all the claims alleged in the Counterclaim Complaint. It therefore asserts its administrative claims were timely filed.[37]

But NCMIC's argument overlooks § 503(a), which provides: "An entity may

_____

[37] The Court at this time does not address whether the amended proof of claim relates back for purposes other than the filing of administrative claims.

timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause." NCMIC has failed to show cause for its untimely filing. Although the Court does not doubt that NCMIC did not seriously evaluate the possibility it might have claims against the estate until after it was sued by the Trustee on May 5, 2012, this circumstance does not constitute cause for allowing an untimely filing of an administrative claim.

Finally, NCMIC argues that the administrative bar date order is ineffective to discharge the estate's liability for NCMIC's claims because the definition of an administrative expense included in the October 16, 2009, notice of the October 13, 2009, order relates only to those claims arising from the date of filing to the date of conversion to Chapter 7. The only claims which the Court has found not to be precluded from administrative expense status as a matter of law arose during the defined period and are therefore included within the scope of the order. As discussed above, the remaining claims, those arising from allegedly wrongful acts of the Special Master, even though arguably outside of the time frame to which the order applies, are nevertheless barred from administrative expense status as a matter of law.

The only counterclaim arising postpetition which is not excluded from administrative expense status by the prior order is the postpetition portion of the claim for Wrongfully Withheld Unearned Premiums.

**C.  Most of NCMIC's Counterclaims are not eligible to be offset against the Trustee's claims.**

**1. NCMIC's counterclaims which arose prepetition may not be offset against the Trustee's claims against NCMIC.**

NCMIC's Counterclaim Complaint seeks a judicial determination that it has the right to offset the amount of its alleged injuries against any monies that the Trustee may recover from it. The Trustee argues this relief must be denied because under § 553, the Code section addressing offset, NCMIC's prepetition claims may not be offset against the Trustee's postpetition claims.

The parties agree that under § 553, four elements are generally required for offset: (1) the creditor holds a claim against the debtor that arose before the commencement of the case; (2) the creditor owes a debt to the debtor that also arose before the commencement of the case; (3) the claim and the debt are mutual; and (4) the claim and the debt are each valid and enforceable.[38] For debts to be mutual, "[t]he parties must owe the debts to one another in the same capacities or relationships and the debts must be of the same character."[39] The controversy in this case is about the second and third elements. The Trustee asserts mutuality is lacking because NCMIC's claims (its counterclaims) are prepetition and its debts (the Trustee's Uniform Fraudulent Transfer Act (UFTA) claims[40]) are postpetition. NCMIC responds that since the Trustee is asserting fraudulent conveyance claims under state law by stepping into the shoes of

---

[38] 5 *Collier on Bankruptcy* at ¶ 553.01[1].

[39] 4 *Norton Bankruptcy L. & Prac. 3d*, § 73:5 at 73-35 to 73-36.

[40] These claims are asserted under 11 U.S.C. §§ 544(b) and 550, and K.S.A. 33-204(a)(2), 33-205(a), and 33-207.

24

prepetition creditors of NCMIC, the Trustee's claims arose prepetition.

Courts generally hold that a prepetition claim against the debtor may not be set off against a trustee's preferential transfer or fraudulent transfer claim.[41] With respect to preferential transfer claims, the Fifth Circuit Court of Appeals in a 1924 case stated:

> The reason is, to permit this to be done would defeat the right to recover the preference and render the statute futile. In such a case the transaction is single, and results in a depletion of the fund that would otherwise have gone to creditors to the extent of the preferential payments. Allowing the creditor to set off the debt due him against the payments received by him would leave the preference unremedied. In this class of cases, the right to offset is denied, because the estate has been depleted to the detriment of creditors of like class, and to allow the right of set-off would perpetuate the depletion.[42]

It applied the same reasoning to a claim of fraudulent transfer under the 1898 Bankruptcy Act.[43] In 1991, the Ninth Circuit Court of Appeals agreed the rule applied to a fraudulent conveyance claim under § 548 of the Code,[44] and in 1994, applied it to a fraudulent conveyance claim under state law.[45]

Nevertheless, NCMIC asserts it may offset its prepetition claims against any recovery on the Trustee's UFTA claims. NCMIC would have this Court rule that,

---

[41] 5 *Collier on Bankruptcy* at ¶ 553.03[3][e][v]; 4 *Norton Bankruptcy L. & Prac. 3d*, § 73:4 at 73-31 to 73-33.

[42] *Walker v. Wilkinson*, 296 F. 850, 852 (5th Cir. 1924).

[43] *Mack v. Newton*, 737 F.2d 1343, 1366 (5th Cir. 1984).

[44] *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir. 1991).

[45] *Acequia, Inc., v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 817 (9th Cir. 1994).

25

although preferential transfer claims under § 547 and fraudulent transfer claims under § 548 arise postpetition for purposes of § 553, state law fraudulent conveyance claims asserted under § 544(b) do not.[46] According to NCMIC, this is so because the state law UFTA claims arose entirely separately and independently of the bankruptcy and, under § 544, the Trustee steps into the shoes of an actual creditor who, prepetition, could have brought the alleged fraudulent transfer claim against NCMIC.

The Court rejects NCMIC's attempt to distinguish claims under §§ 547 and 548 from claims under § 544. NCMIC cites no case authority and no commentators supporting its position. The Trustee's rights under § 544, just like his rights under §§ 547 and 548, did not exist until the bankruptcy was filed. Section 544 "creates a status and allows applicable nonbankruptcy law to determine the rights that accrue as a result of the created status."[47] Although generally, § 544(b) confers upon the trustee no greater rights of avoidance than a creditor would have had if it were asserting invalidity on its own behalf, there are exceptions.[48] For example, the trustee is not denied relief because of the prepetition wrongful conduct of the debtor.[49] Also, the trustee may avoid the entire transfer for the benefit of the estate, without regard to the size of the claim of the creditor

---

[46] In addition to asserting state law fraudulent conveyance claims under § 544, the Trustee also cites § 548(a)(1)(B), the Bankruptcy Code's constructive fraudulent transfer provision, as a statutory basis for recovery. NCMIC presents no argument that such claims arose prepetition.

[47] 4 *Norton Bankruptcy L. & Prac.*, ¶ 63:7 at 63-36 to 63-37.

[48] 5 *Collier on Bankruptcy*, ¶ 544.06[3].

[49] *Id.*

whose rights and powers the trustee is asserting.[50]  And § 502(d) specifically requires

disallowance of any claim of an entity from which property is recoverable under a

Chapter 5 cause of action, including claims under § 544.  It would render § 502(d)

meaningless if a setoff of prepetition claims could be effectuated as a defense against

Chapter 5 causes of action.

The Court therefore rejects NCMIC's contention that its counterclaims which

arose prepetition can be offset against the Trustee's UFTA claims.  The Trustee's motion

to dismiss should be granted on this issue.

**2.  NCMIC's counterclaims which arose postpetition are not as matter of law precluded from offset.**

NCMIC's only counterclaims which relate to postpetition conduct seek recovery

of:  (1) the CJD-consideration payment of $50,000 as damages for the Trustee's alleged

breach of fiduciary duty and negligence; (2) the postpetition portion (which the Trustee

contends is $16,772.99) of the $178,541.20 claim for allegedly Wrongfully Withheld

Unearned Premiums, as damages for breach of fiduciary duty, conversion, and

negligence; and (3) the postpetition portion (which the Trustee contends is $913.59) of

the $17,517.85 claim for Wrongfully Withheld Premiums, as damages for breach of

fiduciary duty, conversion, and negligence.  The Trustee does not argue that these claims

as a matter of law are outside the offset allowed by § 553.

**3.  NCMIC's failure to include all of its prepetition claims in its timely filed**

---

[50] 5 *Collier on Bankruptcy*, ¶ 544.06[4].

Case 12-06043    Doc# 25    Filed 01/15/13    Page 27 of 30

**proof of claim does not preclude offset of the Trustee's claims against the omitted claims.**

The Trustee argues that most of NCMIC's prepetition claims are time barred. On July 20, 2009, the Court entered on order establishing November 9, 2009, as the deadline for filing claims against the Debtors' estates. On November 2, 2009, NCMIC filed a proof of claim, but it included only a small portion of the claims asserted in the Counterclaim Complaint. In response to the Trustee's motion to dismiss, NCMIC filed an amended proof of claim and argues that amendments of claims are freely granted and that such amendments relate back.

Both parties have overlooked the rule in the Tenth Circuit that "timely filing of a proof of claim is not a prerequisite to asserting a right of setoff under 11 U.S.C. § 553."[51] This rule is based on the fact that offset is "a universally recognized right grounded in principles of fairness that [is] not, with a few limited exceptions, affected by the Bankruptcy Code."[52] The Court therefore finds that NCMIC's failure to file a timely proof of claim for all of the damages alleged in the Counterclaim Complaint does not provide a basis for denial of offset.

**D. Recoupment is not a legally valid defense to the Trustee's claims.**

The Counterclaim Complaint seeks a court determination that NCMIC is entitled to use the doctrine of recoupment to defeat recovery on the Trustee's claims against it. In

---

[51] *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1539 (10th Cir. 1990) (citing *Turner v. United States (In re G.S. Omni Corp.)*, 835 F.2d. 1317, 1317 (10th Cir. 1987)).

[52] *Id.*

bankruptcy, the common law doctrine of recoupment is distinct from setoff. For setoff, the mutual debts need not have arisen out of the same transaction, but for recoupment, the same transaction requirement does apply.[53] When moving to dismiss, the Trustee argues that none of NCMIC's counterclaims arise out of the same transactions as the estate's claims. When responding to the motion, NCMIC agrees. The Trustee is entitled to dismissal of NCMIC's allegation that recoupment is available as a defense to the Trustee's claims.

**CONCLUSION.**

For the foregoing reasons, the Court grants the Trustee's motion to dismiss in part. NCMIC's tort claims which arise from prepetition conduct of the Special Master are not entitled to administrative expense status under § 503(b)(1)(A) or (b)(3)(E). NCMIC's counterclaims which relate to postpetition conduct of the Chapter 11 Trustee are not precluded from administrative expense status under § 503(b)(1)(A) as a matter of law. They seek recovery of: (1) the CJD-consideration payment of $50,000 as damages for the Trustee's alleged breach of fiduciary duty and negligence; (2) the postpetition portion (which the Trustee contends is $16,772.99) of the $178,541.20 claim for allegedly Wrongfully Withheld Unearned Premiums, as damages for breach of fiduciary duty, conversion, and negligence; and (3) the postpetition portion (which the Trustee contends is $913.59) of the $17,517.85 claim for Wrongfully Withheld Premiums, as damages for

---

[53] *Id*. at 1537.

Case 12-06043    Doc# 25    Filed 01/15/13    Page 29 of 30

breach of fiduciary duty, conversion, and negligence. However, except for the postpetition portion of the claim for Wrongfully Withheld Unearned Premiums, administrative expense status of these counterclaims is barred by the Court's administrative bar date order. As to offset, as a matter of law, none of NCMIC's counterclaims, except the three claims which arise from postpetition conduct, as enumerated above, are eligible to be set off against the Trustee's claims. Recoupment is not a valid defense to the Trustee's claims. In short, the only counterclaims which are not subject to dismissal under Rule 12(b)(6) and (c) are the ones for offset of the postpetition counterclaims; as to those claims, administrative expense status is precluded as a matter of law for all except the one for Wrongfully Withheld Unearned Premiums.

IT IS SO ORDERED.

###

30