**SO ORDERED.**

**SIGNED this 13th day of March, 2013.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge

_____

**Designated for print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et al.,** | **CASE NO. 08-22786** |
| **DEBTORS.** | **CHAPTER 7** |
| **CHRISTOPHER J. REDMOND, Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation (f/k/a Brooke Franchise Corporation), and Brooke Investments, Inc.,** | |
| **PLAINTIFF,** | |
| **v.** | **ADV. NO. 12-6043** |
| **NCMIC FINANCE CORPORATION,** | |
| **DEFENDANT.** | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING NCMIC FINANCE CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT ON COUNT V**

In Counts IV and V of the Complaint, Plaintiff Christopher J. Redmond, Chapter 7 Trustee (Trustee) of Debtors Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc., seeks to avoid allegedly fraudulent transfers made by the Debtors and to recover the value thereof from NCMIC Finance Corporation (NCMIC). NCMIC moves for summary judgment under Federal Rule of Civil Procedure 56, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, on Count V of the Complaint.  The motion presents the question whether, under the facts alleged in the Complaint, NCMIC is "an entity for whose benefit" the allegedly fraudulent transfers were made, within the meaning of 11 U.S.C. § 550(a)(1).[1]  After carefully considering the pleadings and the oral arguments of counsel,[2] the Court finds that summary judgment on Count V should be granted.

**THE COURT WILL REGARD THE MOTION AS ONE FOR SUMMARY JUDGMENT.**

Before reaching the merits, the Court must decide whether the motion should be regarded as one for summary judgment under Rule 56 or as one for judgment on the pleadings under Rule 12.  NCMIC filed the motion under Rule 56 before any discovery was completed and relied almost exclusively upon the allegations of the Complaint.  In response, the Trustee contended that the motion should be considered as one for judgment on the pleadings under Rule 12(c) and presented additional allegations from the

---

[1] Future references to Title 11 in the text shall be to the section number only.

[2] The Trustee appears by Michael D. Fielding of Husch Blackwell LLP.  NCMIC appears by Paul D. Sinclair of Polsinelli Shughart PC.

2

Complaint. But, recognizing that the Court could consider the motion as one for summary judgment as presented by NCMIC, the Trustee also included additional statements of allegedly uncontroverted facts supported by copies of the contracts which determined the relevant relationships between Brooke, its franchisees, Aleritas (who loaned money to the franchisees), and NCMIC, who purchased interests in the Aleritas loans.

As urged by the Trustee, because NCMIC relies upon the allegations of the Complaint (with the exception of paragraph 23 of the statement of uncontroverted facts, which the Court finds to be irrelevant), the motion could be regarded as one for judgment on the pleadings under Rule 12(c). However, NCMIC characterizes the motion as one for summary judgment, and when responding to the motion, the Trustee provided facts not included in the Complaint, to be considered if the Court treats the motion under Rule 56. Rule 12(d) provides that if, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and are not excluded by the court, the motion must be treated as one under Rule 56. The Court wishes to consider the contracts submitted by the Trustee in his response to NCMIC's motion and therefore will treat the motion under Rule 56.

The Court will therefore apply the well-known standards for ruling on motions for summary judgment. Contrary to the Trustee's argument, the decision to treat the motion under Rule 56 rather than Rule 12 does not impact the applicable standard as "the

3

standard applied by the court appears to be identical under" either Rule 12(c) or Rule 56.[3] Since the issue presented is the construction of § 550 in light of the uncontroverted facts regarding the conduct of Brooke's franchise business, summary judgment is appropriate if NCMIC is entitled to judgment as a matter of law.[4]

This ruling that the motion shall be governed by Rule 56 makes it necessary for the Court to consider NCMIC's objections to the Trustee's additional statements of fact. NCMIC objects to the additional statements from the Complaint on the grounds they are irrelevant and were not submitted in compliance with Rule 56. The Court overrules these objections. It finds the statements from the Complaint are relevant to understanding Brooke's franchise operations, and they are not controverted by NCMIC. The additional portions of the Complaint would clearly be properly before the Court if the Court were proceeding under Rule 12. Also, under Rule 56(c)(3), the Court could consider the additional allegations from the Complaint even if they had not been cited by either of the parties. The Court will therefore consider the additional allegations as providing a fuller background for understanding the allegations of the Complaint on which NCMIC relies, and the transactions in issue.

NCMIC also objects to the Trustee's statements of fact discussing the contracts, copies of which are attached to the Trustee's response. Those contracts, alleged to be

---

[3]  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil*, § 1369 at 261-62 (3rd ed. 2004).

[4]  Rule 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); note: in 2010, the "entitled to judgment" language was moved from subdivision (c) to (a).

4

representative of many others, are a franchise agreement, a promissory note between Aleritas and a franchisee, a security agreement executed in conjunction with the note, a collateral preservation agreement, and a participation agreement. NCMIC contends the statements are not submitted in accord with the requirements of Rule 56. This objection is well founded. The Trustee did not support his discussion by affidavit, deposition testimony, or other materials of evidentiary value. Those purported statements of fact will be stricken. However, because, as NCMIC has acknowledged, the contract documents speak for themselves, the documents will be considered.

**THE UNCONTROVERTED FACTS.**

Although there are many unknown or disputed issues of fact about the very large numbers of transfers which the Trustee seeks to avoid, the motion presents only a question of law about the construction of § 550(a)(1). This determination can be made based upon the facts as alleged in the Complaint and as shown in the contract documents. They are as follows.

The Brooke group of companies was involved in many aspects of insurance and insurance-related businesses, including a network of insurance franchisees and agents. The parent company was Debtor Brooke Corporation (Brooke Corp.). Debtor Brooke Capital Corporation (Brooke Capital), a majority-owned subsidiary of Brooke Corp., owned 100% of Debtor Brooke Investments, Inc. The three Brooke Debtors will be referred to collectively as Debtors. Another relevant majority-owned subsidiary of Brooke Corp. was non-debtor Brooke Credit Corporation, d/b/a Aleritas Capital

5

Corporation (Aleritas). Aleritas was engaged in lending money to Brooke franchisees and other insurance agents.

Defendant NCMIC, which began its relationship with Brooke in 1998, initially fulfilled a "warehouse" financing role for Brooke agency franchise loans, holding the loans until they were securitized or sold to community banks. Later, NCMIC provided other services and purchased various participation interests in loans which Aleritas made to Brooke agents.

Brooke conducted its insurance business through a network of franchise and company-owned locations. The franchise agreement provided by the Trustee is representative of the arrangements. Brooke Capital acted as franchisor. Pursuant to the franchise agreements, the franchisees agreed to pay franchise fees and to provide Brooke a percentage (usually 15%) of their sales commissions going forward. In return, Brooke agreed to provide ongoing franchise services throughout the life of the franchise relationship, including, but not limited to, "cash managements services" such as billing and collecting insurance premiums, remitting premiums to the respective carriers, receiving and allocating commission revenues, and receiving and processing agency-related bills (including bills relating to rent, utilities, advertising, service providers, etc.). Brooke controlled most of the cash flows for its franchise agencies. Its business practice was to pay most of the rent and other operating expenses for its agents, including loan payments, and to charge those payments (along with the percentage of ongoing

6

commission revenues and recurring franchise fees) to the agents' monthly statements as offsets to the commission revenues earned.

When franchise agencies were acquired, the acquisition costs, the franchise fees, and, often, additional working capital would typically be financed through Brookes' lending subsidiary, Aleritas. Each loan was evidenced by a promissory note, such as the one provided by the Trustee, and under the terms of a commercial security agreement, was secured by all of the assets of the franchisee. In conjunction with each loan, Brooke Capital and Aleritas entered into a Collateral Preservation Agreement, under which Brooke Capital would provide services to franchisees to assure that they continued in business, thereby preserving the value of Aleritas' collateral. After Aleritas made loans to franchisees, it would sell the loans in one of two ways: (1) by selling participation interests in the individual loans to local banks or investors; or (2) by bundling loans and selling them as part of securitizations.

Under the terms of the participation agreements, Defendant NCMIC purchased various participation interests in Brooke franchisee/agent loans originated by Aleritas. Aleritas continued to service the loans after selling them to NCMIC. Aleritas repurchased some participation interests from NCMIC; some loans remain outstanding and are owed by the franchisees/agents.

Brooke was under "tremendous pressure" for all the loans to perform because its business model depended on a continuous stream of willing buyers for its loans. But a large number of Brooke franchisees either underperformed or completely failed to

7

perform in the months preceding the Debtors' bankruptcy filings. The Trustee alleged that when a franchisee underperformed or had insufficient commission income to cover its loan payments, Brooke Capital transferred its own funds to Aleritas, which, acting as a mere conduit, made monthly loan payments that the underperforming or non-performing agents owed on the various participated loans. The Trustee estimates that the total amount of money transferred by Brooke Capital (via Aleritas) to NCMIC for payments on loans which NCMIC owned in whole or in part was $5,682,083.97 (NCMIC Loan Payments). With respect to the Brooke franchisees whose loans were held at least in part by NCMIC, the Trustee alleges that Brooke Capital paid expenses (Operating Expense Transfers) totaling $22,306,633.62. The Trustee alleges that Brooke Capital also paid loan obligations of these Brooke franchisees to lenders other than NCMIC (Other Lender Transfers) totaling $17,005,570.89.

Details concerning these transfers are shown in Exhibit 1 to the Complaint. In 211 pages, it sets forth with respect to each loan in which NCMIC held a participation interest, the related agency number and the relevant transfers. The first 41 pages cover 41 agencies, so the total number of agencies is estimated to be 211. Each page contains about 25 transfers, so the total number of transfers in issue is approximately 5,275.[5] The information is detailed. For example, for agency number 801, the exhibit reflects that it operated from two locations, and was obligated on Aleritas loan number 3694 for

---

[5] The exhibit lists the transfers by month but does not reveal whether each monthly amount is itself comprised of more than one transfer.

Case 12-06043   Doc# 37   Filed 03/13/13   Page 8 of 23

$476,044, in which NCMIC purchased an interest on December 28, 2004. For each of the 25 months between January 15, 2005, and January 15, 2007, the exhibit shows the agency revenue, franchise fee, adjusted revenue, net revenue, loan payments, net cash flow, Operating Expense Transfers, Other Loan Transfers, and NCMIC Loan Payments. In just one month, January 2005, the transfers on behalf of agency 801 for the three categories of transfers which the Trustee seeks to recover are alleged to total $116,072.73, comprised of $76,607.00 for Operating Expense Transfers, $35,144.75 for Other Lender Transfers, and $4,320.98 for NCMIC Loan Payments.

Count IV of the Complaint alleges that the NCMIC Loan Payments totaling $5,682,083.97 were transferred by Brooke Capital to NCMIC (via Aleritas) and were constructively fraudulent transfers under §§ 544 and 548(a)(1)(B) of the Bankruptcy Code and under K.S.A. 33-204(a)(2)[6] and 33-205(a). Recovery from NCMIC is sought under Bankruptcy § 550 and K.S.A. 33-207, as the initial transferee or a subsequent transferee. In Count V, the Trustee alleges that the Operating Expense Transfers totaling $22,306,633.62 and the Other Lender Transfers totaling $17,005,570.89 were likewise constructively fraudulent transfers under §§ 544 and 548(a)(1)(B) of the Bankruptcy Code and under K.S.A. 33-204(a)(2)[7] and 33-205(a). It is alleged that even though the payments were made to third parties, these transfers may be recovered from NCMIC

---

[6] The Complaint actually gives 33-204(2) — which does not exist — as the statute number, but clearly intends to cite 33-204(a)(2).

[7] Again the statute number is given as 33-204(2) instead of 33-204(a)(2).

9

under Bankruptcy § 550 and K.S.A. 33-207[8] because NCMIC benefitted from the transfers.  NCMIC seeks summary judgment on Count V, but not on Count IV.  The Trustee acknowledged at oral argument that Count V is an alternative to Count IV, since the total recovery from NCMIC under Counts IV and V is capped at $5,682,083.97.

**DISCUSSION.**

**A. The Positions of the Parties.**

In Count V, the Trustee contends, assuming the Operating Expense Transfers and the Other Lender Transfers are set aside as fraudulent, that they may be recovered from NCMIC as a "transfer beneficiary" under § 550(a)(1) since it was "the entity for whose benefit such transfer was made."  The Complaint alleges the payment of the franchisees' expenses benefitted NCMIC "because it enabled the agents to continue operating and thereby preserved the underlying collateral value which secured" NCMIC's loans and "because, in certain instances, it enabled underperforming agencies to become profitable and thereby continue making monthly loan payments to NCMIC without additional 'subsidization' by Brooke Capital."[9]  At oral argument, counsel for the Trustee unequivocally stated that the theory of recovery under Count V is that the transfers benefitted NCMIC in three respects:  (1) the collateral for the participated loans held by

---

[8] Despite the allegation that the transfers may be recovered under K.S.A. 33-207, the Trustee did not raise this state law remedy in response to NCMIC's motion for summary judgment.  The Court finds that reliance on K.S.A. 33-207 to support a right to relief against NCMIC under Count V has been waived.

[9] Dkt. 1, Complaint ¶103.

10

NCMIC remained viable and intact; (2) NCMIC continued to get loan payments because the franchisees continued in business; and (3) NCMIC was paid face value by Aleritas when it repurchased some participation interests while the loans were performing and not in default. NCMIC responds that as a matter of law the Trustee cannot recover from it as a transfer beneficiary because: (1) the Trustee has not avoided, and cannot now avoid (because of the statute of limitations), the transfers made to the initial transferees; and (2) NCMIC is not "the entity for whose benefit such transfer was made" under § 550(a)(1).

## B. NCMIC Is Not Entitled to Summary Judgment on the Theory that the Trustee Has Not Avoided the Transfers.

The Court finds that NCMIC's first argument is without merit. NCMIC argues, based upon the decision of the Tenth Circuit Court of Appeals in *Slack-Horner*,[10] that the Trustee may not recover the transfers from NCMIC because he has not avoided the transfers from Brooke to the third parties. NCMIC also argues that any such avoidance action would now be time barred.

In *Slack-Horner*, as a result of the debtor's failure to pay property taxes, the taxes became a lien on the debtor's real property. The lien was sold at a public sale to Simons. When the debtor failed to timely redeem, Simons received a treasurer's deed. The debtor filed for relief within one year, and the trustee brought an action alleging that the transfer of the property to Simons was voidable as a fraudulent conveyance. Both the bankruptcy

---

[10] *Weinman v. Simons (In re Slack-Horner Foundries Co.)*, 971 F.2d 577, 580 (10th Cir. 1992).

11

court and the district court found the trustee could not avoid the transfer. On appeal, the Tenth Circuit affirmed. Contrary to the trustee's characterization of the transfer to be avoided as being between the debtor and Simons, the Tenth Circuit held that the debtor's interest was transferred from the debtor to the state at the public sale and the state then transferred the state's interest to Simons. Therefore the state was the initial transferee under the § 550, and Simons was considered an immediate transferee of the initial transferee. The Tenth Circuit then held that although § 550 authorized the trustee in certain circumstances to recover the value of the property transferred from either the initial transferee or a subsequent transferee, "in order to recover from a subsequent transferee the trustee must first have the transfer of the debtor's interest to the initial transferee avoided under §548."[11] Since the trustee had made no attempt to have the transfer from the debtor to the state avoided, the trustee could not demonstrate any basis for recovering the property from Simons. *Slack-Horner* therefore stands for the rule that avoidance of the initial transfer is necessary before the transfer can be recovered from a subsequent transferee.

But *Slack-Horner* does not apply to this case. There are three categories of persons from whom recovery can be made under § 550(a): (1) the initial transferee; (2) the party for whose benefit the transfer was made; and (3) any immediate or mediate transferee of the initial transferee (subsequent transferees). *Slack-Horner* applies to

---

[11] *Id*. at 580.

subsequent transferees.  In this case, the Trustee seeks to recover the transfers from

NCMIC as a transfer beneficiary, not as a subsequent transferee.  The Court declines to

extend *Slack-Horner* to transfer beneficiaries.  As this Court has previously observed,

*Slack-Horner* is a minority position, and the argument that it was wrongly decided is

attribute.[12]  Further, the Trustee is not seeking to recover from NCMIC without an

adjudication that the transfers are avoidable; in Count V, the Trustee seeks both to avoid

the transfers as fraudulent transfers and to recover from NCMIC.

## C.  NCMIC Is Entitled to Summary Judgment Because as a Matter of Law NCMIC Is Not a Transfer Beneficiary.

NCMIC's next argument, that as a matter of law, it is not a transfer beneficiary of

the third-party payments, has merit.

The phrase "the entity for whose benefit the transfer was  made" is ambiguous.

Must the transferor intend to confer a benefit on the transferee?  What type of benefit

must be received?  How directly must it be related to the avoided transfer?  The Code

does not define the conditions for transfer-beneficiary liability, there is no relevant

legislative history, and the liability of a person for whose benefit the transfer was made

had not been codified in prior bankruptcy law.  Nevertheless, prior to enactment of the

Code, "[c]ourts . . . permitted trustees to recover from nontransferees who had received

---

[12] *Reiderer v. Logan Wildlife Corp. (In re Brooke Corp.)*, 443 B.R. 847, 853-55 (Bankr. D. Kan. 2010).

the actual benefit of the transfers."[13]  Preference recovery was permitted "from

guarantors, sureties, or indorsers of notes even though such parties were not transferees

and had not taken any action to procure payment to the holder of the debt."[14]  As to

fraudulent transfers, courts allowed recovery from benefitted parties, but courts "applying

pre-Code law steadfastly rejected attempts by bankruptcy trustees to impose liability on

parties merely because they had conspired with, or aided and abetted, the debtor."[15]

*Mack v. Newton*,[16] a 1984 Fifth Circuit Court of Appeals decision, is an example.

The case concerned the financing of a dairy cattle operation, Dairyland Inc.  The trustee

alleged that two principals of Dairyland and Equico, a lender to Dairyland and Dairy

Cows, another business controlled by the Dairyland principals, were liable for the

fraudulent transfer of Dairyland cows mortgaged to Equico where the proceeds were not

applied to the Dairyland secured debt.  A jury found in favor of the trustee.  On appeal,

the Fifth Circuit considered the right of the trustee to recover the value of the fraudulent

transfers from the principals and Equico.  The court started its analysis by stating the

general rule under the Act that "one who did not actually receive any part of the property

fraudulently transferred . . . will not be liable for its value, even though he may have

---

[13] Larry Chek and Vernon O. Teofan, *The Identity and Liability of the Entity for Whose Benefit a Transfer Is Made Under Section 550(a): An Alternative to the Rorschach Test*, 4 J. Bankr. L. & Prac. 145, 150 (1995).

[14] *Id*.

[15] *Id*. at 151.

[16] *Mack v. Newton*, 737 F.2d 1343 (5th Cir. 1984).

14

participated or conspired in the making of the fraudulent transfer."[17]  It approvingly

quoted the following rationale for this rule from the Ninth Circuit's decision in *Elliott*:

> The purpose of those sections of the Bankruptcy Act which are here relevant is clearly to preserve the assets of the bankrupt; they are not intended to render civilly liable all persons who may have contributed in some way to the dissipation of those assets.  The Act carefully speaks of conveyances of property as being 'null and void,' and authorizes suit by the trustee to 'reclaim and recover such property or collect its value.' The actions legislated against are not 'prohibited'; those persons whose actions are rendered 'null and void' are not made 'liable'; and terms such as 'damages' are not used. The legislative theory is cancellation, not the creation of liability for the consequences of a wrongful act.[18]

It then noted that there is "an exception to the general *Elliott* rule for those cases in which

a person does not actually directly receive the transferred property, but nevertheless

indirectly receives it or receives its proceeds or value."[19]  Applying these considerations

to the Dairyland transfers, the court affirmed a judgment against the principals and

Equico with respect to 188 cows mortgaged to Equico which were transferred from

Dairyland to Dairy Cows and thereafter sold by Dairy Cows to third parties, with the

proceeds going to Equico and being applied to Dairy Cows', rather than Dairyland's,

debt.  However, it reversed the judgment as to 275 Dairyland cows mortgaged to Equico

---

[17] *Id*. at 1357.

[18] *Elliott v. Glushon*, 390 F.3d 514, 516 (9th Cir. 1967); quoted in *Mack v. Newton*, 737 F.2d at 1358.

[19] 737 F.2d at 1358.

which were sold at auction to third parties by Dairyland for cash which was deposited in the Dairyland bank account and used in its operations, rather than to pay its debt to Equico.  The Fifth Circuit rejected the trustee's argument that although the defendants did not receive the proceeds, they "received a benefit from the fact that these funds helped Dairyland continue to operate."[20]  It stated:

> [S]uch a benefit does not suffice to take the situation out of the *Elliott* rule. . . . The exceptions are essentially consistent with this "disgorging" approach:  one must return what one has wrongfully received.  The Trustees's theory is inconsistent with this:  it is based on an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received.  Hence it essentially is no more than "the creation of liability for the consequences of a wrongful act."[21]

The enactment of § 550(a)(1) of the  Bankruptcy Code codified the concept that one who benefitted from an avoided transfer may be liable to the estate, even though the person or entity was not the recipient of the transferred property.  The archetypical example of an "entity for whose benefit such transfer was made" occurs where the debtor pays its creditor and thereby reduces the personal liability of a guarantor of the debt.[22]  Even though the guarantor does not receive the payment, the guarantor gets the benefit of the transfer because the guarantor's liability has been extinguished by the payment.

---

[20] *Id*. at 1359.

[21] *Id*. at 1359-1360.

[22] *E.g., Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988); *Terry v. Meredith (In re Meredith)*, 527 F.3d 372, 375 (4th Cir. 2008); *Reily v. Kapila (In re International Mgmt. Assocs.)*, 399 F.3d 1288, 1292 (11th Cir. 2005).

16

"[N]othing in the text of § 550(a)(1) limits 'the entity for whose benefit' the transfer was made only to a debtor or guarantor."[23]

The issue here is to determine and apply the criteria for liability of a transfer beneficiary under § 550(a)(1). There are no Tenth Circuit Court of Appeals or Bankruptcy Appellate Panel decisions construing "the entity for whose benefit such transfer was made" as used in § 550(a)(1). Both the Trustee and NCMIC direct the Court to the *McCook* decision, which rejects intent to benefit as sufficient for transfer beneficiary liability, and holds that "transfer beneficiary status depends on three aspects of the 'benefit': (1) it must actually have been received by the beneficiary; (2) it must be quantifiable; and (3) it must be accessible to the beneficiary."[24] The disgorgement-based understanding of recovery, as discussed in *Mack*, is the basis for each of these three elements. When requiring an actual benefit and not merely intent to benefit, the *McCook* decision cited *Mack* and agreed with the observation of commentators that "fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but did not benefit from it."[25] The requirement

---

[23] *Meredith* at 375; *see also Citicorp N. Am., Inc. v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1313 (11th Cir. 2012) (reduced liability of guarantor when debt is paid is "not the only circumstance that can give rise to 'for whose benefit' liability").

[24] *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 590 (Bankr. N.D. Ill. 2005). When presenting its written arguments, NCMIC contended that debtor intent to benefit the transfer beneficiary was also a necessary element. Dkt. 17 at 16-27. But at oral argument, NCMIC's counsel did not pursue that position and stated that upon further examination of the case law, he no longer understood intent to benefit to be a necessary element. The Court therefore does not address the relevance of intent.

[25] *Id.* at 591 (citing Chek and Teofan, *The Identity and Liability of the Entity for Whose Benefit a Transfer Is Made*, 4 J. Bankr. L. & Prac. at 169).

that the benefit be quantifiable was described as a "corollary to the disgorgement-based requirement . . . . A merely theoretical benefit is not sufficient since it would not be subject to disgorgement."[26] Likewise the accessible benefit requirement follows from the disgorgement-based requirement, since "[e]ven if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had access to it."[27] Turning to the facts before it, the bankruptcy court held that debtor McCook's transfer to another entity of the debtor's contractual right to acquire a smelter, in an attempt to protect this asset from the reach of McCook's creditors, was a fraudulent transfer. As to recovery, it applied the foregoing three criteria and held that Lynch, a man who controlled both McCook and the transferee, was liable as the entity for whose benefit the transfer was made. The court reasoned that Lynch received an actual benefit (his share of the value of the assets on the date of transfer); that the benefit was quantifiable (since testimony established a value of $11.1 million for the smelter); and that the value was accessible (through Lynch's control of the transferee).

As stated above, the Trustee's theory of recovery is that NCMIC benefitted from Brooke Capital's transfers in three respects: (1) the collateral for the participated loans held by NCMIC remained viable and intact; (2) NCMIC continued to get loan payments because the franchisees continued in business; and (3) NCMIC was paid face value when Aleritas repurchased some participation interests while the loans were performing and not

---

[26] *Id.* at 591.

[27] *Id.* at 592.

Case 12-06043   Doc# 37   Filed 03/13/13   Page 18 of 23

in default.  In support of its summary judgment motion, NCMIC argues that the benefit

allegations do not satisfy the *McCook* criteria.  It contends that the Trustee's "'continuing

operations' theory is based upon an alleged benefit to [NCMIC] that was, at best,

theoretical and amorphous" and that to the extent NCMIC benefitted at all, the benefit is

"neither quantifiable nor accessible" by NCMIC.[28]  The Trustee responds that the

transfers benefitted NCMIC because they "enabled NCMIC to continue receiving its

monthly loan payments because the other creditors did not take actions that would cause

the agency to cease operating."[29]  According to the Trustee, the actual benefit is therefore

the monthly loan payments, which are both quantifiable and directly accessible because

they were received by NCMIC.

The Court will therefore examine each of the *McCook* aspects of benefit.  The first

question is whether NCMIC actually received a benefit.  This must be answered in light

of the disgorgement-based understanding of recovery of fraudulent transfers from those

benefitting from the transfer.  The words "such transfer" in the phrase "the entity for

whose benefit such transfer was made" refers to the transfer avoided as a fraudulent

conveyance.  Therefore, the benefit actually received must flow from the initial transfer

which is avoided.[30]  Here the transfers which the Trustee seeks to avoid are thousands of

---

[28] Dkt. 17 at 24.

[29] Dkt. 18 at 33-34.  When making this argument in his written submission, the Trustee focuses exclusively upon examination of a situation where an agency has sufficient funds to pay NCMIC's loan payments, but has insufficient revenues to make its other monthly payments.  This is considered later in this memorandum.

[30] *Bonded Fin. Servs.*, 838 F.2d at 896.

transfers to creditors of hundreds of franchisees, whose loans from Aleritas were held by NCMIC. The Trustee does not argue that NCMIC received a benefit from any single transfer; he argues that the benefit derives from the cumulative effect of many transfers to creditors of a franchisee. Under § 550(a)(1), it is the franchisees who benefitted from "such transfers," since as to each transfer, their liability to their creditors was diminished. But under the Trustee's continuation of business theory, NCMIC did not receive an actual benefit from "such transfers" — the alleged benefit is a secondary result of the benefit to the franchisees/agents. Also, under the Trustee's continuation of business theory, the second *McCook* requirement, that the benefit be quantifiable, is not satisfied. Continuation of the franchisees/agents' businesses is a theoretical and amorphous benefit to which a monetary value related to the avoided transfers cannot be assigned. Likewise, the benefit of continued operation of the franchises was not accessible to NCMIC. It would not be fair to disgorge the transfers from NCMIC which benefitted, if at all, only indirectly from the cumulative effect of the transfers.

In the Trustee's brief opposing summary judgment, rather than relying upon the general allegation that the benefit to NCMIC was the continuation of the franchisees/agents' businesses, as alleged in the Complaint and repeated at oral argument, the Trustee focuses upon a more specific situation which he contends would satisfy each of the *McCook* requirements. He states:

> To illustrate the "indirect benefit" that NCMIC
> received it is necessary to consider a situation where an agent
> generates sufficient revenues to make its monthly loan

20

payments to NCMIC but has insufficient monies to pays its remaining monthly obligations (including operating expenses and monies owed to other lenders). In that scenario, Brooke's payments to the third-parties created a direct benefit to NCMIC because [they] enabled NCMIC to continue receiving its monthly loan payments because the other creditors did not take actions that would cause the agency to cease operating. Thus, the first element of the *McCook* decision is met — NCMIC received an actual benefit (i.e., its monthly loan payments) from the revenues generated by the agent/franchisee. Moreover, the monthly loan payment was quantifiable and it was directly accessible because it was received by NCMIC (thereby satisfying the second and third elements of the *McCook* decision).[31]

In a footnote to this explanation, the Trustee makes the argument that summary judgment should not be granted because discovery is required. He states:

Quantifying the exact dollar amount of that benefit necessarily requires a fact intensive, in-depth loan-by-loan review which will depend upon the monthly loan payments to NCMIC as well other monies that Brooke paid to third-parties on behalf of each agent/franchisee. Additionally, this will require a review of all monies received by NCMIC with respect to each loan (including monthly loan payments as well as monies from the sale of any participated interests). This in-depth, loan-by-loan review cannot be completed without discovery which the Trustee has already commenced.[32]

The Court finds that this scenario does not change the foregoing analysis that the Trustee's claim alleged in Count V does not satisfy the *McCook* requirements or provide a basis to deny summary judgment because there are material facts in dispute. Recovery from NCMIC under the scenario presented relies upon the aggregate effect of the

---

[31]Dkt. 18 at 33-34.

[32] *Id*. at 34, n. 10.

Case 12-06043   Doc# 37   Filed 03/13/13   Page 21 of 23

allegedly fraudulent transfers to third-party creditors of the franchisees/agents. The Trustee does not suggest that he would conduct discovery on a transfer-by-transfer basis. And even if such an analysis were made, the making of a loan payment to NCMIC by an agent/franchisee whose other creditors were paid would be the result of that agent/franchisee's independent decision to pay NCMIC; the third-party payments would have made such payment possible but there would be no direct relationship between the transfers and the payment to NCMIC. The alleged benefit to NCMIC would not "derive directly from the transfer"[33] and would bear "no necessary correspondence to the value of the property transferred or received."[34] As stated by the Trustee, the transfers would have simply "enabled" the payments to NCMIC. To adopt the Trustee's theory would dramatically expand the scope of § 550(a)(1) liable parties beyond those against whom the disgorgement-based theory of recovery is applicable.

**CONCLUSION.**

For the foregoing reasons, the Court finds that, assuming the Operating Expense Transfers and the Other Lender Transfers from Brooke Capital to third-party creditors of the franchisees/agents who were liable on the notes in which NCMIC held participation interests are avoidable as fraudulent transfers, NCMIC is not liable to the Trustee under § 550(a)(1) as an entity for whose benefit such transfers were made. There are no

---

[33] *Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*, 299 B.R. 709, 718 (Bankr. D. Me. 2003) (citing *Bonded Fin. Servs.*, 838 F.2d at 896).

[34] *Mack v. Newton*, 737 F.2d at 1360.

material facts in controversy, and NCMIC is entitled to judgment as a matter of law on Count V of the Complaint.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding.

**IT IS SO ORDERED.**

# # #