**SO ORDERED.**

**SIGNED this 4th day of January, 2016.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge

_____

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **In Re:** | |
| **BROOKE CORPORATION, et al.,** | **CASE NO. 08-22786** |
| DEBTORS. | **CHAPTER 7** |
| **CHRISTOPHER J. REDMOND,** Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation (f/k/a Brooke Franchise Corporation), and Brooke Investments, Inc., | |
| PLAINTIFF, | |
| v. | **ADV. NO. 12-6043** |
| **NCMIC FINANCE CORPORATION,** | |
| DEFENDANT. | |

**MEMORANDUM OPINION AND ORDER DENYING
NCMIC FINANCE CORPORATION'S MOTION FOR SUMMARY JUDGMENT
ON THE TRUSTEE'S FRAUDULENT TRANSFER CLAIMS**

Defendant NCMIC Finance Corporation (NCMIC)[1] has moved for summary judgment on Count IV, the remaining claim in this adversary proceeding brought by Christopher J. Redmond, Chapter 7 Trustee (Trustee) of Brooke Corporation (Brooke Corp), Brooke Capital Corporation f/k/a/ Brooke Franchise Corporation (Brooke Franchise), and Brooke Investments, Inc. (BII).[2]

Prepetition, Brooke Franchise was a franchisor of insurance agencies. Non-debtor Aleritas Capital Corporation f/k/a/ Brooke Credit Corporation (Aleritas) made loans to Brooke franchisees. Aleritas then sold participation interests in these loans to various entities, including NCMIC. Brooke Franchise would receive commissions from the sale of insurance by the various Brooke agencies and transmit a portion of those funds for loan payments to Aleritas, who in turn, transferred the monies to the various entities who had purchased loan participations, including NCMIC. A large number of agencies did not generate sufficient commissions to cover the loan payments and other expenses. Brooke Franchise frequently used its own funds to pay or subsidize the agencies' loan payments. The Trustee alleges that during the four-year period preceding Brooke Franchise's bankruptcy filing, Brooke Franchise made a total of $4,448,511.23 in subsidized loan payments to NCMIC. The Trustee seeks to recover these payments as constructively fraudulent transfers under 11 U.S.C. §§ 544, 548(a)(1)(B), and 550, and under the Kansas

---

[1] NCMIC appears by Paul D. Sinclair, Jason L. Bush, and Brendan L. McPherson of Polsinelli PC.

[2] The Trustee appears by John J. Cruciani and Michael D. Fielding of Husch Blackwell LLP.

2

Uniform Fraudulent Transfer Act (KUFTA), K.S.A. 33-201 to -212.[3]

**NCMIC'S Motion for Summary Judgment.**

NCMIC moves for summary judgment on three grounds: (1) The Trustee may not avoid the transfers because NCMIC has satisfied the § 548(c) good-faith affirmative defense; (2) the Trustee may not avoid the transfers because Brooke Franchise received reasonably equivalent value in exchange for the transfers; and (3) if the transfers may be avoided, the Trustee may not recover the transfers from NCMIC due to the § 550 good-faith-transferee defense. The Trustee responds that there are material facts in controversy regarding each of these defenses. As examined below, after careful review of NCMIC's supporting memorandum, the Trustee's response, and NCMIC's reply, the Court finds that NCMIC is not entitled to judgment on any of the three grounds submitted.

**Summary Judgment Standard.**

Grounds one and three are affirmative defenses. When moving for summary judgment under Rule 56[4] on these issues, NCMIC "must demonstrate that no disputed material fact exists regarding" the defense.[5] If NCMIC "meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact."[6] The second ground tests whether the Trustee has evidence to prove an element of his

---

[3] Future references to Title 11 in the text are cited by section number only.

[4] Fed. R. Civ. P. 56. This rule is made applicable to this proceeding by Fed. R. Bankr. P. 7056.

[5] *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997).

[6] *Id.*

constructive fraudulent conveyance claim under § 548(a)(1)(B). On this issue too, NCMIC, as the movant, has the burden to show the absence of material disputed facts. If the motion for summary judgment is properly supported, the Trustee must make a showing sufficient to establish that a reasonable factfinder could find the existence of the element essential to his case which NCMIC has challenged.[7] When applying the standard of Rule 56(c), courts "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party."[8] Further, relief under Rule 56 "'is always discretionary, and in cases posing complex issues of fact and unsettled questions of law, sound judicial administration dictates that the court withhold judgment until the whole factual structure stands upon a solid foundation of a plenary trial where the proof can be fully developed, questions answered, issues clearly focused and facts definitively found.'"[9]

**Discussion.**

This is a factually complex case which generally requires the application of settled principles of bankruptcy law to unique circumstances. When moving for summary judgment, NCMIC provided 138 paragraphs of allegedly undisputed facts. When

---

[7] *SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[8] *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1146 (10th Cir. 2005) (*citing Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999)).

[9] 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d,* § 2725 at 415 (3d ed. 1998) (*quoting In re Bloomfield S.S. Co.*, 298 F. Supp. 1239, 1242 (S.D.N.Y. 1969)).

responding, the Trustee admitted only 54 of these statements, and set forth 434 paragraphs of additional allegedly undisputed facts. In reply, NCMIC denied or objected to approximately 200 of the Trustee's statements. The Court therefore does not attempt to set forth complete findings of uncontroverted and controverted facts, as it might do in a less complex case. Rather, the Court will examine the legal basis for each of the three matters asserted by NCMIC and determine if NCMIC is entitled to judgment as a matter of law.

### A. NCMIC is not entitled to summary judgment on the "for value and in good faith" defense.

The Trustee seeks to avoid transfers made to NCMIC as constructively fraudulent conveyances under § 548(a)(1)(B). Subsection (c) of § 548 provides the affirmative "for value and in good faith" defense. It states:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

The Bankruptcy Code does not define good faith. In *M & L Business Machine*, a Ponzi scheme case, the Tenth Circuit rejected a subjective test and ruled the lower courts "properly held that good faith under § 548(c) should be measured objectively."[10] As

---

[10] *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc )*, 84 F.3d 1330, 1338 (10th Cir. 1996).

5

Case 12-06043    Doc# 169    Filed 01/04/16    Page 5 of 20

adopted by the Tenth Circuit, the defense is not available "'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose.'"[11] Rather than relying on the test as expressly stated by the Tenth Circuit, NCMIC relies upon other portions of the *M&L Business Machine* opinion and states the two-part inquiry to be: "(1) Would the circumstances place a reasonable person on inquiry of a debtor's fraudulent purpose and impending insolvency; and if so, (2) Would a diligent inquiry have discovered the fraudulent purpose and insolvency."[12] This statement includes the issue of insolvency, which is not in the two-part test as announced by the Tenth Circuit. The Court therefore will not consider "impending insolvency" as part of the inquiry since it is mentioned in the analysis of the facts in *M &L Business Machine,* but not in its formulation of the objective test.

Under the objective test, a circumstance sufficient to put the transferee on inquiry notice is referred to as a "red flag."[13] Since the Trustee seeks to avoid the transfers to NCMIC as constructively fraudulent conveyances, rather than as transfers made with actual fraudulent intent as were at issue in *M & L Business Machine*, the "red flags" sufficient to trigger an obligation to make further inquiry focus on irregularities in the

---

[11] *Id*. (*quoting Jobin v. McKay (In re M&L Bus. Mach. Co., Inc.)*, 164 B.R. 657, 661 (D. Colo. 1994), *which was quoting Hayes v. Palm Seedling Partners-A (In re Agric. Research & Tech. Group, Inc.*, 916 F.2d at 536 (9th Cir. 1990)).

[12] Doc. 123 at 3.

[13] *See* Paul Sinclair and Brendan McPherson, *Red Flags of Fraud: Background for Due Diligence*, 30 Am. Bankr. Inst. J. 34, 34 (May 2011).

transfers rather than a fraudulent purpose or intent. The second part of the objective good-faith test asks whether a "diligent inquiry would have discovered" facts indicating that the loan payments were constructively fraudulent. The "reasonable person" for purposes of the objective test is not a "generic, reasonable person," but requires "specific focus on the class or category of the transferee."[14] The question is whether a reasonably prudent purchaser of the Brooke participation interests would have made inquiries, and after a diligent investigation, have learned that the borrowers, the Brooke franchisees, were not providing the funds for some of the payments made to NCMIC.

It is uncontroverted that although NCMIC began purchasing participation interests in Brooke franchisee loans in the late 1990s,[15] it made no independent investigation of the quality and status of the loans, and had no concerns about its investments until it didn't receive its loan payments in May of 2008.[16] When moving for summary judgment, NCMIC asserts facts purporting to establish that there were no "red flags" before the summer of 2008. Such absence is said to be evidenced by the following: NCMIC was owed money on the Brooke franchisee loans and expected Aleritas to make payments to it; there were no irregularities in the loan payments it received from Aleritas; the loans were at market rates; the franchisee loans were legitimate, arms-length transactions in

---

[14] *In re Bayou Group, LLC*, 439 B.R. 284, 313 (S.D.N.Y. 2010).

[15] Doc. 127 at 103, T'ee SOF 244.

[16] *Id*. at 119, T'ee SOF 319. (NCMIC objected to the SOF as immaterial and objectionable, but the objection is directed at portions of the statement other than when Greg Cole of NCMIC became concerned about the loans).

7

which hundreds of sophisticated investors and banks purchased interests; and NCMIC was not aware of any concerns expressed by any other purchaser of such interests. NCMIC also asserts that if it had conducted a diligent inquiry before the summer of 2008, it would not have discovered a "fraudulent purpose" because Brooke Franchise fully disclosed in its SEC filings its practice of making loans to Brooke franchisees. NCMIC also argues that a diligent inquiry would not have disclosed that Brooke Franchise was insolvent because: Brooke Franchise's SEC filings reported significant year-end shareholder equity for 2004 through 2007; each year, an independent accounting firm issued unqualified audits of Brooke Franchise's financial statements; on August 31, 2007, Duff & Phelps determined that the equity value of Brooke Franchise was significant; and on November 15, 2007, CBIZ issued a favorable solvency opinion in conjunction with a proposed transaction by Brooke Capital.[17]

The Trustee responds with additional facts which he contends demonstrate "that the circumstances regarding the Brooke loan participations would have placed a reasonable person on inquiry notice."[18] First, the Trustee points to evidence suggesting that NCMIC's failure to identify red flags was the result of its total reliance on Brooke for information regarding the loans when purchasing the interests, rather than conducting an independent evaluation, as a prudent investor would have done. Even though NCMIC

---

[17] The Trustee has moved to exclude the admission of the Duff & Phelps and CBIZ reports. Doc. 129. Although the Court denied the motion, it also ruled that the use of these reports at trial would be very limited. Doc. 159.

[18] Doc. 127 at 155.

8

personnel responsible for the participations had substantial banking experience, the facts provided by the Trustee show that NCMIC did not apply basic lending practices to the Brooke loan participations. NCMIC and Brooke had a long-standing relationship, and NCMIC did not purchase loans from anyone other than Brooke. The decisions to purchase the participation interests were made by one individual without the input of a loan committee. Prior to 2001, Pat McNerney of NCMIC independently evaluated the loans by getting the documentation that Brooke sent and reviewing it.[19] After 2001, when direct responsibilities for the Brooke participations were transferred to Greg Cole, Mr. McNerney (who supervised Mr. Cole) did not know if there had been any deterioration in the credit approval policies for purchasing Brooke participations.

      The Trustee's additional facts also evidence that NCMIC's reliance on Brooke continued after the purchase of the participation interests. NCMIC did not do any loan reviews from 2004 through 2007. Aleritas sent "alert reports" (also known as "pass/watch/fail reports") to NCMIC on a monthly basis. The reports were used to complete a borrowing-base report for NCMIC's lender, Wells Fargo, for which loans marked "fail" were ineligible, but the reports were not used as a reason for NCMIC to evaluate the credit, even though many loans were reported to be on a watch status. Mr. Cole was generally aware that Brooke made periodic advances to franchise agencies but did not recall inquiring about the amount of any resulting balances that were owed to

---

[19] Doc. 127 at 103, T'ee SOF 246.

Brooke by agencies in whose loans NCMIC held participation interests.[20] NCMIC began to experience loan delinquencies with its Brooke loans in 2006. When a loan would go past due, NCMIC would pressure Aleritas, which would then repurchase the loan (even though the participation agreements provided they were non-recourse) or extend the due date. Loan delinquencies began to create problems for NCMIC in staying in compliance with its debt covenants with Wells Fargo.

The Court finds that the additional facts provided by the Trustee regarding the purchase and servicing of the loans, when construed in his favor as required in ruling on NCMIC's motion for summary judgment, create issues of fact regarding the existence of red flags which should have triggered a further inquiry by NCMIC. A reasonably prudent purchaser of participation interests in the Brooke agency loans may have been alarmed about Brooke's extensions of credit to the agencies, the number of Brooke's failed loans, the substantial number of loans that were on watch status, and the recurring loan delinquencies. The Trustee also asserts that NCMIC ignored red flags in Brooke's SEC filings. For example, he says, these filings "reported agency 'statement balances' for short-term cash flow assistance," which he contends meant Brooke had advanced money to the agencies or extended their payment due dates to make them appear to be current on the participated loans.[21]

The good-faith-transferee inquiry focuses not only on what the transferee knew but

---

[20] *Id*. at 108, T'ee SOF 278.

[21] *Id*. at 111, T'ee SOF 289.

10

also on what the transferee should have known. "[A] transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to ignore" warning signs.[22] Summary judgment therefore cannot be granted on NCMIC's contention that there were no "red flags" which should have triggered a diligent inquiry.

Material disputed issues of fact also preclude a finding that if NCMIC had conducted a diligent inquiry, it would not have discovered the constructive fraud. The simple fact refuting NCMIC's position is that when NCMIC did make a diligent inquiry, starting on approximately June 30, 2008, it discovered that it had been receiving loans payments on participated loans where the agency had not made any payments to Brooke Franchise for several months. Following Brooke's bankruptcy filing, Mr. Cole learned that there had been nefarious activities occurring as early as 2006, and these activities included loan participations being carried on Brooke's and NCMIC's books after the debts had been extinguished, forgiveness of debt which NCMIC was not aware of, and double sales and double pledges of collateral. NCMIC does not even suggest that an earlier inquiry would not have revealed these nefarious activities.

**B. NCMIC is not entitled to summary judgment on the issue whether Brooke Franchise received a reasonably equivalent value in exchange for the transfers alleged to have been constructively fraudulent.**

To recover on his constructively-fraudulent-transfer claim, the Trustee must show that Debtor Brooke Franchise transferred an interest of the Debtor in property to NCMIC

---

[22] *Moglia v. Universal Auto., Inc. (In re First Nat'l Parts Exchange, Inc.)*, 2000 WL 988177 at *6 (N.D. Ill. July 12, 2000).

and received less than a reasonably equivalent value in exchange.²³ This Court thoroughly examined reasonably equivalent value in *Redmond v. SpiritBank*,²⁴ a recent opinion filed after completion of the briefing on NCMIC's motion for summary judgment. That opinion states in part:

> "In determining 'reasonably equivalent value,' courts typically compare the value of the property transferred with the value of what the debtor received." Section 548(d)(2)(A) defines "value" to mean "property, or satisfaction or securing of a present or antecedent debt of the debtor."
> . . .
> "As a general rule, obligations incurred by a debtor solely for the benefit of a third party are treated as not supported by a reasonably equivalent value." In other words, a "payment made solely for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor." An exception to this rule "has been recognized where a debtor receives an indirect benefit from paying or guaranteeing the obligation of a third party." . . . If the Trustee proves the absence of a direct benefit to the Debtor, the burden then shifts to SpiritBank to show the Debtor received an indirect benefit.²⁵

When moving for summary judgment, NCMIC does not argue that Brooke Franchise received a direct economic benefit in exchange for the transfers it made to Aleritas which were then transferred to NCMIC. Rather, it asserts that Brooke Franchise received an indirect benefit with a value reasonably equivalent to or greater than the value it transferred to NCMIC. According to NCMIC, "[b]y making the transfers (loan

---

²³ 11 U.S.C. § 548(a)(1)(B); K.S.A. 33-204(a)(2) and 33-205(a).

²⁴ *Redmond v. SpiritBank (In re Brooke Corp.)*, 541 B.R. 492, 2015 WL 7568202 (Bankr. D. Kan. Nov. 20, 2015).

²⁵ *Id*. at 510-11 (footnoted citations omitted).

12

payments), the franchise agencies' loans were kept current and lenders such as [NCMIC] did not declare loan defaults or initiate collection activities against the agencies, thereby allowing the Brooke franchise agencies to continue to operate."[26] The benefits NCMIC claims Brooke Franchise received from those continued operations include: the continued collection of franchise fees which exceeded the subsidized loan payments; the receipt of profit-sharing monies from policies sold by the Brooke agencies; the Brooke agencies' continued payment of lease obligations which would have been the responsibility of Brooke Franchise if the agencies had closed; and Brooke Franchise's continued receipt of the spread between the interest owed by the Brooke franchisees and the interest paid to the loan participants. In addition, NCMIC characterizes the loans to the Brooke agencies, the proceeds of which were used in part to make payments to NCMIC, as investments made with a legitimate expectation of the success of the agencies, thereby providing value to Brooke Franchise. Finally, NCMIC argues that Brooke Franchise received reasonably equivalent value because it had an implied contractual obligation to make the loan payments on behalf of the franchise agencies.

The Trustee responds that whether reasonably equivalent value was received is a question of fact, and that factual disputes preclude summary judgment in favor of NCMIC on the theories advanced. When disputing that Brooke Franchise received the value alleged from continued operation of the Brooke agencies, the Trustee cites evidence

---

[26] Doc. 123 at 65.

Case 12-06043    Doc# 169    Filed 01/04/16    Page 13 of 20

indicating that the cost to Brooke Franchise to maintain the Brooke agencies exceeded the revenue it received; that more than 90% of the agency leases were in the name of Brooke Investments, Inc., not Brooke Franchise; and that there is no evidence that Brooke Franchise received any of the interest spread that Aleritas obtained.[27]  As to the argument that the loans to Brooke agencies were "investments" providing an expectation of value to Brooke Franchise, the Trustee provides facts allegedly showing that Brooke's business model was unsustainable, so there was no reasonable expectation of any benefit.  Finally, to refute NCMIC's assertion that Brooke Franchise was obligated to make loans to cover the Brooke agencies' loan payments, the Trustee provides the testimony of Brooke personnel asserting that Brooke Franchise had no such obligation.

The Court finds that NCMIC's motion for summary judgment on the contention that Brooke Franchise received reasonably equivalent value for the loan payments it made to NCMIC must be denied.  First, the Court emphasizes that NCMIC does not contend that Brooke Franchise received a direct benefit of equivalent value.  Second, the Court makes no finding that the various forms of indirect benefit urged by NCMIC suffice under § 548 (a)(1)(B).  But assuming that NCMIC's approach is acceptable under § 548(a)(1)(B), there are material facts in controversy about the existence of such indirect benefits and whether their value was reasonably equivalent to value of the allegedly fraudulent transfers made to NCMIC.  NCMIC has not shown the absence of material

---

[27] Dec. 127 at 176-77.

14

disputed facts supporting the position that Brooke Capital received reasonably equivalent value.

### C.  NCMIC is not entitled to summary judgment on the § 550(b)(1) "good faith transferee" defense.

Section 550(a) allows the Trustee to recover transfers avoided under § 544 (incorporating the KUFTA) and § 548 from (1) the initial transferee of the avoided transfer or the entity for whose benefit the transfer was made, or (2) any immediate or mediate transferee of such initial transferee.  However, for an immediate or mediate transferee of the original transferee, § 550(b)(1) bars recovery if the transferee "takes for value . . . , in good faith, and without knowledge of the voidability of the transfer avoided."  NCMIC moves for summary judgment, asserting that (1) it was an immediate transferee of the initial transferee, Aleritas, and (2) the good faith standard is satisfied.

The Bankruptcy Code does not define initial transferee.  "Generally, the party who receives a transfer of property directly from the debtor is the initial transferee."[28]  However, many courts, including the Tenth Circuit, have found that a party acting merely as a conduit is not an initial transferee.  In *Stockton*, this Court found that a bank collecting loan payments from Brooke Corporation for transfer to loan participants was a conduit.[29]  The conduit exception was described as follows:

---

[28] 5 *Collier on Bankruptcy*, ¶ 550.02[4][a] at 550-20 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2015).

[29] *Northern Capital, Inc., v. Stockton Nat'l Bank (In re Brooke Corp.)*, 458 B.R. 579 (Bankr. D. Kan. 2011) (hereafter "*Stockton*").

15

> Under this theory, as authoritatively formulated by the Seventh Circuit in *Bonded* which formulation has been adopted in the Tenth Circuit, "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." This approach recognizes that the term "transferee" must mean something different from anyone who simply touches the money, such as a "'possessor' or 'holder' or 'agent,'" and provides a basis to hold that "those who act as mere 'financial intermediaries,' 'conduits' or 'couriers' are not initial transferees under § 550." "A person or entity is not the initial transferee under *Bonded* if it received no benefit from the transferred funds, had to follow instructions on how to use the funds, and would have been liable to the transferor if it had used the funds for its own purposes." The Seventh Circuit has recently characterized the *Bonded* definition as an "approach that tracks the function of the bankruptcy trustee's avoiding powers: to recoup money from the real recipient of preferential transfers." Whether a transferee is an initial transferee or conduit is a fact intensive inquiry.[30]

NCMIC anticipates the Trustee's position that because Aleritas was a conduit when it received the funds from Brooke Franchise that it then paid to NCMIC and other participating lenders, NCMIC has strict liability as an initial transferee and an entity for whose benefit the transfer was made. NCMIC therefore moves for summary judgment on the Trustee's use of the conduit theory to strip NCMIC of the § 550 good-faith-transferee defense. NCMIC argues: a trustee may not use conduit status offensively; Aleritas should not be considered a mere conduit because Aleritas did not act as an innocent participant but had first-hand knowledge of and actively participated in the making of loans to franchisees, placing it in the best position to monitor Brooke Franchise's

---

[30] *Id*. at 584-85 (footnoted citations omitted).

16

operations; and the conduit doctrine does not apply under the KUFTA.

In response, the Trustee relies upon this Court's decision in *Stockton* holding that Stockton Bank was a mere conduit for the monies it received from Brooke Corporation which were paid to other banks who had purchased loan participations in Brooke Corporation notes. He also argues that there is no prohibition or restriction on the offensive use of the conduit doctrine, pointing out that such use was permitted by this Court in *Stockton* and by other courts in other cases. Further, the Trustee provides authorities holding the conduit doctrine applicable to transfers avoided under other states' versions of the Uniform Fraudulent Transfer Act.

The Court rejects NCMIC's position that the conduit doctrine cannot be used offensively by the Trustee. NCMIC's position is based upon dicta regarding the origin of the doctrine. NCMIC cites no case where such a limitation has been applied. A respected commentator states, "The conduit theory can be used either defensively by an alleged transferee or offensively by a trustee seeking to bypass one party in pursuit of another."[31]

However, NCMIC's position that the doctrine requires that the purported conduit must have acted in good faith and as an innocent participant is supported by case law, including a decision of the Eleventh Circuit.[32] The conduit doctrine requires "initial

---

[31] 5 *Collier on Bankruptcy*, ¶ 550.02[4][b], n. 81 (*citing In re Granada, Inc.*, 156 B.R. 303, 307 (D. Utah 1990); *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re Tousa, Inc.)*, 680 F.3d 1298, 1314 (11th Cir. 2012); and *In re Columbia Data Prods., Inc.*, 892 F.2d 26, 28 (4th Cir. 1989)).

[32] Doc. 123 at 57-58 (*citing Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1322-23 (11th Cir. 2010)).

recipients of the debtor's fraudulently transferred funds who seek to take advantage of equitable exceptions to § 550(a)(1)'s statutory language [to] establish (1) that they did not have control over the assets received, i.e. that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer."[33]

The extent to which this two-part inquiry should apply in this case is open to question. NCMIC cites no Tenth Circuit case law even recognizing the equitable roots of the conduit doctrine. *Bonded*, the Seventh Circuit opinion on which the Tenth Circuit relied when it adopted the conduit doctrine, focused on the details of the avoided transaction, not on equitable principles. In addition, the Eleventh Circuit's requirement of good faith states it is applicable where the recipient of an avoided transfer is seeking to take advantage of the conduit doctrine. That is not the situation here.

The Court declines to rule on the relevance and importance of Aleritas's conduct when ruling on NCMIC's motion for summary judgment. The motion, including the § 550(b)(1) defense, is being denied for other reasons. The law is uncertain and the question is not fully developed in the briefs. Further, "[w]hether a transferee is an initial transferee or conduit is a fact intensive inquiry."[34] Although the uncontroverted facts establish a relationship between Brooke Franchise and Aleritas with respect to the transfers, full development of that relationship and whether it is sufficient to distinguish

---

[33] *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1323 (11th Cir. 2010).

[34] *Stockton*, 458 B.R. at 585.

this case from *Stockton* cannot be satisfactorily determined without the benefit of a trial.

With respect to the good faith element of the § 550(b)(1) defense, NCMIC incorporates by reference the arguments it presented under § 548(c).[35] This reliance appears to be appropriate, as a respected commentator has remarked on the similarity of the two good faith standards.[36] But as examined above, the Court finds that disputed issues of material fact preclude summary judgment on the good faith defense of § 548(c). For the same reasons, the Court finds that disputed issues of material fact preclude summary judgment on the good faith element of the § 550(b)(1) defense.

NCMIC also moves for summary judgment on the Trustee's KUFTA claim based upon the good-faith-transferee-for-value defense of K.S.A. 33-208(b). That subsection provides that to the extent a transfer is voidable, it may be recovered from the "first transferee," "the person for whose benefit the transfer was made," or "any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." Since there are no Kansas cases adopting the conduit doctrine, NCMIC contends that Aleritas should be considered the "first transferee," that NCMIC was a subsequent transferee, and that NCMIC is protected by the good-faith-for-value defense.

The Trustee responds that the Florida UFTA, which is identical to the Kansas version, has been construed to include the conduit doctrine.[37] He also notes that NCMIC

---

[35] Doc. 123 at 54-55.

[36] 5 *Collier on Bankruptcy*, ¶ 550.03[2] at 550-27.

[37] *Perlman v. Delisfort-Theodule*, 2010 WL 4514249 at *2 (S.D. Fla. Nov. 2, 2010); *Steinberg v. Barclay's Nominees (Branches) Limited*, 2008 WL 4601042 at *7-8 (S.D. Fla. Sept. 30, 2008).

19

has not cited and his own research has not revealed any cases holding that the conduit doctrine does not apply to UFTA claims.

The Court therefore declines to hold that the conduit doctrine does not apply under the KUFTA. Further, even if NCMIC were considered a subsequent transferee under the KUFTA, genuine issues of material fact preclude a finding that NCMIC took the payments in good faith for value.

**CONCLUSION.**

For the foregoing reasons, NCMIC's motion for summary judgment is denied.

**IT IS SO ORDERED.**

# # #