SO ORDERED.

SIGNED this 15th day of May, 2017.



_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

---

**Designated for print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et al.,** | **CASE NO. 08-22786** |
| **DEBTORS.** | **CHAPTER 7** |
| **CHRISTOPHER J. REDMOND,** **Chapter 7 Trustee of Brooke** **Corporation, Brooke Capital** **Corporation (f/k/a Brooke Franchise** **Corporation), and Brooke Investments,** **Inc.,** | |
| **PLAINTIFF,** | |
| v. | **ADV. NO. 12-6043** |
| **NCMIC FINANCE CORPORATION,** | |
| **DEFENDANT.** | |

**MEMORANDUM OPINION FOLLOWING TRIAL FINDING THE**
**TRUSTEE MAY AVOID CONSTRUCTIVELY FRAUDULENT TRANSFERS**
**AND RECOVER THEIR VALUE FROM THE DEFENDANT**

Plaintiff Christopher J. Redmond, as Trustee (Trustee) of Brooke Corporation

(Brooke Corp), Brooke Capital Corporation (f/k/a Brooke Franchise Corporation) and Brooke Investments, Inc., seeks to avoid as constructively fraudulent conveyances numerous cash transfers totaling $4,448,511.23 that Brooke Capital made to defendant NCMIC Finance Corporation (NCMIC) during the four years before Brooke Capital filed for relief under Chapter 11 of the Bankruptcy Code. The Trustee asserts these claims under 11 U.S.C. §§ 544 and 548[1] and the Kansas Uniform Fraudulent Transfer Act (KUFTA), K.S.A. 33-201 to -212, and seeks to recover the same from NCMIC under § 550 and K.S.A. 33-208.[2] Evidentiary hearings were held on eight days during April[3] and five days during June of 2016.[4] Closing arguments were heard on July 12, 2016. The Trustee appeared in person and by counsel Michael J. Fielding and John J. Cruciani of Husch Blackwell LLP. NCMIC appeared by its president, Gregory M. Cole, and by counsel Paul B. Sinclair, Jason L. Bush, and Brendan L. McPherson of Polsinelli PC. The parties stipulated that this Court has jurisdiction of the parties and the subject matter, that the Court may try the proceeding to a conclusion and enter a final judgment, and that the proceeding is governed by the law of the State of Kansas and the United States

---

[1] Future references to Title 11 in the text shall be to the section number only.

[2] The counterclaims asserted by NCMIC (doc. 5) that were not previously dismissed on the Trustee's motion (doc. 24) were included in the pretrial order (doc. 180). However, NCMIC failed to offer evidence in support of those counterclaims, and the Trustee moved for judgment on them at the close of NCMIC's case in chief. The motion was granted. *See* doc. 278 (Courtroom Minute Sheet June 21, 2016).

[3] April 20, 21, 22, 25, 26, 27, 28, and 29, 2016.

[4] June 14, 15, 20, 21, and 22, 2016.

2

Bankruptcy Code.[5]  For the following reasons, the Court holds that NCMIC is liable to the Trustee for $3,373,515.61.

The following outline is provided for the reader's convenience.

BACKGROUND FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 4

    A.  THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 5

    B.  BROOKE'S INSURANCE AGENCY FRANCHISE BUSINESS. . . . . . . . . . . . . . . . . .  p. 6

    C.  MANY BROOKE FRANCHISEES WERE NOT SUCCESSFUL. . . . . . . . . . . . . . . . . .  p. 9

    D.  LOANS TO BROOKE AGENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 10

    E.  NCMIC'S RELATIONSHIP WITH BROOKE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 12

    F.  BROOKE'S ACCOUNTING AND FINANCIAL EXPERTS. . . . . . . . . . . . . . . . . . . .  p. 16

    G.  THE 2008 COLLAPSE OF BROOKE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 17

ANALYSIS AND CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 18

    A.  THE TRUSTEE'S CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 18

    B.  THE PRIMARY CONTESTED ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 20

    C.  EXCEPT FOR THE TRUSTEE'S MOTION ON NCMIC'S COUNTERCLAIMS, THE RULE 52(c) MOTIONS ARE DENIED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 20

    D.  THE TRUSTEE HAS ESTABLISHED THE ELEMENTS OF HIS CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 23

        1.  Brooke Franchise Had a Property Interest in the Subsidized Loan Payments Transferred to NCMIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 23

        2.  Brooke Franchise Was Continuously Insolvent During the Four Years Preceding the Filing of its Bankruptcy Petition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p. 32

---

[5] Doc. 218.  The parties also agreed to a set of joint exhibits, designated as Jxxxx.xxxx, with the last five digits identifying the page of the exhibit.  Each party also presented separate exhibits.  The Trustee's exhibits are identified as Txxxx and pages numbered as Txxxx.xxxx, with the first four digits identifying the exhibit number and the last four digits identifying the page of the exhibit.  NCMIC's separate exhibits are identified as NFC-xxx, with the three digits identifying the exhibit number, and individual pages were marked TR_NFC_xxxxx, with the five digits identifying the page of the exhibit.

3.  Brooke Franchise Did Not Receive Reasonably Equivalent Value (REV) in Exchange for the Transfers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 52

4.  NCMIC Is Not Entitled to the For-Value-and-in-Good-Faith Defenses of § 548(c) and K.S.A. 33-208. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 62

5.  The Trustee May Avoid Brooke Franchise's Transfer of Subsidized Loan Payments to NCMIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 64

E.  SECTION 550 ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 64

1.  Liability under § 550. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 64

2.  Brooke Credit Was a Conduit and Not an Initial Transferee of the Subsidized Loan Payments Transferred to NCMIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 65

3.  Alternatively, If Brooke Credit Was an Initial Transferee, the Trustee May Recover from NCMIC Because It Has Not Satisfied the For-Value-In-Good-Faith Defense of § 550(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 75

4.  The Amount of Recovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 86

a.  The Trustee's Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 86

b.  The Court Adopts Revised Exhibit C (as Corrected) Prepared by the Trustee's Expert as Establishing the Loan Subsidizations Brooke Franchise Paid to NCMIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 87

c.  The Avoided Transfers Are Limited to Those for which Brooke Franchise Had Not Been Reimbursed as of the Date Brooke Franchise Filed for Relief under the Bankruptcy Code. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 106

d.  Because of the Trustee's Settlements of Adversary Proceedings Against Agents, the Single Satisfaction Rule of § 550(d) Bars the Trustee's Recovery of $8,175 of the Transfers Included on Revised Exhibit F. . . . . . . . . . . . . . . p. 109

e.  The Trustee May Recover $3,373,515.61 from NCMIC. . . . . . . . . . . . p. 115

F.  THE TRUSTEE'S REQUEST FOR PREJUDGMENT INTEREST IS DENIED. . . . . . p. 116

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 118

## BACKGROUND FACTS.

The following findings of fact primarily address the background of this

4

contentious adversary proceeding. Additional findings of fact supporting the Court's decisions of contested issues are included in the Analysis portion of this memorandum opinion.

## A. THE PARTIES.

Brooke Corp, a holding company that supported the Brooke insurance franchise operation, was a publicly-traded Kansas corporation. When most of the events giving rise to this case occurred during the four years prior to the filing of Brooke Corp's bankruptcy petition on October 28, 2008, virtually all of Brooke's business was carried out by Brooke Franchise Corporation and Aleritas, which until July 2007 were wholly-owned subsidiaries of Brooke Corp. In November 2007, Brooke Capital, a publicly-traded Kansas corporation headquartered in Kansas and 81% owned by Brooke Corp, became the successor to Brooke Franchise. The parties have stipulated to refer to Brooke Capital as Brooke Franchise without regard to the name change. Aleritas Capital Corporation (formerly Brooke Credit Corporation), 62% owned by Brooke Corp after July 2007, is a Delaware corporation headquartered in Kansas. The parties have agreed to refer to Aleritas as Brooke Credit without regard to its name change.

Defendant NCMIC is the finance subsidiary of NCMIC Group Inc., a subsidiary of a mutual holding company owned by the policy holders of NCMIC Insurance Company, who are all chiropractors. NCMIC Group Inc. owns two malpractice insurance carriers, a risk retention group, and two insurance agencies. NCMIC engages in equipment financing for health care and other small businesses, credit card issuing, insurance

5

premium financing, and commercial lending. At the end of 2007, NCMIC's entire portfolio had a value of approximately $187 million, which included $36.7 million in participation interests in loans made to Brooke insurance franchisees that had been originated by Brooke Credit.

## B. BROOKE'S INSURANCE AGENCY FRANCHISE BUSINESS.

From 1986 to 1996, Brooke Corp and its subsidiaries primarily provided administrative services to bank-owned insurance agencies. In 1996, Brooke expanded its processing center and established a franchise model, which included a lending program to facilitate the acquisition of existing insurance agencies by Brooke franchisees. The Brooke franchise network grew to nearly 900 agencies at its height at the end of 2007. The sales and operations of Brooke franchises were carried out by Brooke Franchise, while the lending was done by Brooke Credit. Brooke Agency Services Company (BASC) was the agent of record with over 200 insurance carriers, and Brooke agents sold policies as subagents of BASC. Brooke Investments was a facility management company for the Brooke corporate offices located in Overland Park, Kansas, the Phillipsburg, Kansas processing center, and several service centers. It was also the lessee at some locations occupied by Brooke franchisees.

The Brooke processing center in Phillipsburg, Kansas, did the accounting for Brooke Franchise and for the franchise agents,[6] using the Brooke Management System.

---

[6] The parties and the witnesses used the nouns "agent," "agency," and "franchisee" interchangeably. The Court continues that practice without implying or intending any legal significance to the choice.

6

Commissions received by BASC for the sale of insurance by franchisees were transferred to the BASC Consolidated Receipts Trust Account, and then to a Master Receipts Trust Account at Bank of New York (BONY). BONY then reserved funds needed for payments on securitized loans and transferred the remainder to Brooke Franchise accounts. The processing center would identify how much was owed to each agent and post it to that agent's statement balance report. On a monthly basis, certain expenses, including the Brooke Franchise monthly franchise fee (generally 15% of each agent's sales commissions), loan payments owed by the agent on loans from Brooke Credit, and operating expenses, were paid and posted to the agent's statement balance. The accounting for the agents would be closed on the 15th of each month. By the 19th of each month, Brooke Franchise created a monthly agent statement balance report. If an agent's revenue exceeded the expenses Brooke Franchise had paid, the balance would be paid to the agent. At times, the commissions earned were not sufficient to cover the charges and expenses, resulting in an amount that agent owed to Brooke Franchise. Theoretically, the agents were to pay the balance as part of a settlement process, but this frequently did not occur, and statement balances that many agents owed to Brooke Franchise were carried from month to month. The Brooke Management System also provided a means for franchise agents to access their documents and accounting information.

In 2001, in addition to a monthly franchise fee (generally 15% of each agent's sales commissions), Brooke Franchise began charging an initial franchise fee to new

7

franchisees. By 2003, the initial franchise fee was $95,000. The fee later increased to $125,000 and then $165,000. The initial franchise fees that Brooke Franchise received annually totaled approximately $8.7 million in 2004, $19.4 million in 2005, $31.8 million in 2006, and $32.5 million in 2007.[7]

Initially, all Brooke franchise agencies were "conversion agencies," meaning that the franchisee had owned or acquired an existing agency when he or she signed up to become a Brooke franchisee. In late 2003, Brooke Franchise expanded its program to include start-up agencies, which allowed the recruiting of individuals as Brooke agents who did not have the benefit of an existing book of business or prior experience. Between the end of 2003 and 2007, the number of Brooke agencies grew from 234 to 882.[8] By the end of 2007, 43% of all the Brooke agencies were start-up agencies.[9]

Brooke Franchise provided services to the franchisees. According to the Brooke Corp 2003 year-end Securities and Exchange Commission (SEC) Form 10-K filing, in exchange for the initial franchise fee, the "franchisees [were provided] with a business model, use of a registered trade name, access to the products of our insurance company suppliers and use of our Internet-based management system."[10] Ongoing services

---

[7] Trial Ex. J0587.0007 (Brooke Corp Form 10-K for year ended Dec. 31, 2006, at 5); Trial Ex. J0596.0016 (Brooke Corp Form 10-K for year ended Dec. 31, 2007, at 16).

[8] Trial Ex. J0596.0013 (Brooke Corp Form10-K for year ended Dec. 31, 2007, p. 13); Trial Ex. J0574.0005 (Brooke Corp Form 10-K for year ended Dec. 31, 2003, at 3).

[9] Trial Ex. T1028.0011 (Expert Report of R. Larry Johnson regarding Insolvency of Brooke Capital Corporation).

[10] Trial Ex. J0574.0006.

8

included the maintenance and operation of the accounting system at the Phillipsburg processing center, cash management, document imaging, marketing assistance, and business advisory services. Also, Brooke maintained the relationships with the insurance carriers whose products the franchisees sold. Brooke had three major sources of revenue: the initial franchise fees, the continuing monthly commission fees (usually 15%), and profit-sharing monies paid by some carriers based on the volume of business placed with them.

### C.  MANY BROOKE FRANCHISEES WERE NOT SUCCESSFUL.

Not all Brooke franchisees were successful; less than half of the start-up agencies succeeded, but the success rate was higher for the conversion agencies. Brooke Credit knew there were agents who were struggling to generate sufficient revenue each month to pay their bills. Monthly meetings, called "statement-readiness meetings" and "collateral preservation meetings" were held by Brooke Franchise. Troubled agencies, those that had statement balances or were not following proper procedures, were identified at the statement-readiness meetings. Brooke Credit personnel were always invited to the meetings, and attended from "time to time."[11] At the "collateral preservation meetings," discussions focused on assistance that could be given to troubled agencies, and whether Brooke Franchise should take over an agency, since the value of the agency was often the primary collateral for the agency loans. Pass-fail-watch reports were generated. The

---

[11] Doc. 234, Devlin Tr. 50:3-6, Apr. 20, 2016.

9

included the maintenance and operation of the accounting system at the Phillipsburg processing center, cash management, document imaging, marketing assistance, and business advisory services. Also, Brooke maintained the relationships with the insurance carriers whose products the franchisees sold. Brooke had three major sources of revenue: the initial franchise fees, the continuing monthly commission fees (usually 15%), and profit-sharing monies paid by some carriers based on the volume of business placed with them.

### C.  MANY BROOKE FRANCHISEES WERE NOT SUCCESSFUL.

Not all Brooke franchisees were successful; less than half of the start-up agencies succeeded, but the success rate was higher for the conversion agencies. Brooke Credit knew there were agents who were struggling to generate sufficient revenue each month to pay their bills. Monthly meetings, called "statement-readiness meetings" and "collateral preservation meetings" were held by Brooke Franchise. Troubled agencies, those that had statement balances or were not following proper procedures, were identified at the statement-readiness meetings. Brooke Credit personnel were always invited to the meetings, and attended from "time to time."[11] At the "collateral preservation meetings," discussions focused on assistance that could be given to troubled agencies, and whether Brooke Franchise should take over an agency, since the value of the agency was often the primary collateral for the agency loans. Pass-fail-watch reports were generated. The

---

[11] Doc. 234, Devlin Tr. 50:3-6, Apr. 20, 2016.

9

principal reason to list an agency as failed was if its sales had decreased by 15% or more from the prior quarter.

Many agencies owed statement balances to Brooke Franchise from month to month. Periodically, Brooke Franchise moved balances owed by agencies off the monthly statements to avoid discouraging and overwhelming the franchisees. As of December 31, 2007, Brooke Corp disclosed on its Form 10-K filed with the SEC that the outstanding statement and non-statement balances totaled $9.7 million and $9.8 million respectively, for a total of $19.5 million owed by agents, after allowances and write-offs.[12]

### D. LOANS TO BROOKE AGENTS.

Brooke Credit made loans to new Brooke franchisees to pay the Initial Franchise Fee, and often provided them with additional working capital loans. Brooke Franchise estimated that the initial investment required for an average conversion agency was between $190,700 and $385,800, and for an average start-up agency between $170,000 and $190,800.[13] A dedicated staff at Brooke Credit did underwriting for the loans and produced a credit report for each franchisee. Although Brooke Credit had a credit policy for such loans, the policy was not always followed. Each loan was documented by a note and security agreement, pledging substantially all of the agent-franchisee's assets, which generally included very little tangible property.

---

[12] Trial Ex. J0595.0015.

[13] Trial Ex. T1028.001, n.26 (citing Brooke Franchise Offering Circular, April 1, 2008).

10

After Brooke Credit made loans to franchisees, it sold many of the loans in whole or in part in one of two ways: (1) by selling participation interests in individual loans to community banks or investors;[14] and (2) by bundling loans into groups and selling them either as part of six securitizations, which totaled $174 million, or as additional off-balance-sheet "credit facilities," which totaled $150 million.[15]  Participation interests were sold to NCMIC and approximately 170 community banks.  Brooke Credit used a form participation agreement for each transaction, and this document controlled the relationship between Brooke Credit (as the originating lender or seller) and NCMIC (as a participating lender or purchaser).  The agreement included information about the borrower on the underlying loan, specified the percentage of the loan that was being acquired (which was sometimes 100% and at other times a lesser interest), and provided that the interest in the loan was being purchased without recourse to Brooke Credit.  A true-sale addendum reiterated that the transaction was a true sale.  Following the sale, Brooke Credit acted as a loan servicer and was required to forward loan payments to the participant within 10 days of receipt.  Prior to the sale of a participation interest, the purchaser was given a copy of the credit memorandum for the loan which had been prepared by Brooke Credit personnel.  When it sold participation interests, Brooke Credit

---

[14] A participation interest in a loan is an undivided interest in the principal and interest due on a loan originated by another party.  In this case, Brooke Credit originated loans to Brooke franchisees, sold participation interests in the loans (usually 100% of each loan) to NCMIC and others, but retained obligations to service the loans and remit monthly loan payments to the participants.  See T0810.0003.

[15] Doc. 260, Cole Tr. 204:23, June 15, 2016.

promised the buyer a lower interest rate than the borrowers on the loans were obliged to pay, giving Brooke Credit an "interest spread."

With respect to payments on the franchisee loans, Brooke Credit generated a list of payments that were due each month and emailed that list to Brooke Franchise. Brooke Franchise would issue a single check, drawn on Brooke Franchise's account, to Brooke Credit for the total amount due. Brooke Franchise would then charge the individual loan payments to the agents' monthly statements. When Brooke Credit received the check from Brooke Franchise, it would allocate the money to the various loans and make payments to the loan holders, including the participants, based on their pro rata share as provided by the participation agreements.

Although Brooke Franchise had no obligation to do so, it advanced money to agents for the purpose of making payments on loans that Brooke Credit had originated. Brooke Credit was fully aware that Brooke Franchise would make loan payments on behalf of agents even when the agents did not have adequate commission revenue in a given month to fund the loan payments. The Trustee's constructive fraudulent transfer claims seek to recover such payments that were made to NCMIC.

### E. NCMIC'S RELATIONSHIP WITH BROOKE.

NCMIC had a long-term relationship with Brooke. NCMIC had begun buying Brooke loan participations in the very late 1990's. It did not buy loan participations other than from Brooke. In the early 2000's, Greg Cole, currently president of NCMIC, and Pat McNerney, currently CEO of NCMIC, helped Brooke Credit as it was developing its

12

franchise platforms and structures by giving information about how community banks might look at the loan documents Brooke Credit was generating.  NCMIC also made loans to Brooke entities and officers, including a $2.3 million loan to Brooke Capital on January 23, 2008, a $3 million loan to Brooke Corp on March 25, 2008, and a $2.5 million loan to Brooke Corp on May 21, 2008.[16]  NCMIC provided insurance premium financing that Brooke agencies could offer to their customers.

Generally, NCMIC was a short-term lender to Brooke Credit, serving a warehouse-type function under which it would hold the participated loans until Brooke repurchased them for securitizations or sales to community banks.  On average, NCMIC held loans for about three months, with Brooke Credit, not NCMIC, deciding which loans it would repurchase from NCMIC.  Starting in mid- to late 2006, NCMIC decided not to purchase start-up agency loans.  Over the life of the relationship, NCMIC purchased interests in approximately 1,050 loans.  Of these, 950 loans, totaling $206 million, were repaid.[17]  NCMIC's holdings at any one time varied from a low of $20 million to a high of $45 million.[18]  At the end of 2007, NCMIC's entire loan portfolio was $188 million, of which Brooke participations were approximately $37 million.[19]  When the relationship

---

[16] Doc. 260, Cole Tr. 108:5-21, June 15, 2016.

[17] Doc. 259, Cole Tr. 33:8-16, June 14, 2016.

[18] *Id*. at 26:10 to 27:4.

[19] *Id*. at 27:5-16.

terminated in 2008, NCMIC held participation interests in about 100 loans.[20]

Greg Cole made the decisions regarding NCMIC's purchase of Brooke franchisee loans without the assistance of a loan committee. With respect to the purchase of participation interests, NCMIC's credit policy required it to "make its own independent credit decision when evaluating a purchase offering and . . . base its decision on appropriate financial and other information as it would with direct credit."[21] Brooke Credit would give NCMIC a credit memorandum about the loan being offered. Generally, the memorandum contained a summary of the borrower's loan request, some financial information about the agency if it was going to be a conversion agency, some personal financial information about the agent, and the expected source of repayment.[22] NCMIC occasionally had follow-up questions which it posed to Brooke Credit, which always provided the information it requested. NCMIC conducted no other review before purchasing the participation interests. When making the purchases, NCMIC looked at the individual borrower, but ultimately, considered its risk to be with Brooke Franchise, the franchisor. Mr. Cole testified that "in the event the franchisee is not successful, the franchisor is going to step in because it's in his best interest to do so."[23] After purchasing the loans, the only monitoring NCMIC performed was to record the loan payments and

---

[20] Doc. 260, Cole Tr. 202:19-22, June 15, 2016.

[21] Trial Ex. J081.008; Trial Ex. J082.011; Doc. 260, Cole Tr., 126:6 to 127:1, June 15, 2016.

[22] *E.g*, Trial Ex. NFC-50.

[23] Doc. 260, Cole Tr. 133:10-15, June 15, 2016.

14

review the monthly pass-fail-watch reports.

When Brooke Credit designated an agency as failed, NCMIC took no action other than to remove the value of the loan from the borrowing base calculation NCMIC had with its lender. NCMIC did not discuss an agency with Brooke Franchise when the agency's loan was designated as watch or fail.

NCMIC always timely received the currently due loan payments from Brooke Credit. NMCIC experienced its first payment delinquency in May of 2008. Greg Cole was not surprised that all payments were received in a timely manner. He "expected those payments to come in monthly. That was the appeal of the mechanism, the enterprise, . . . that it had the ability to facilitate a weaker performer and/or replace that franchise."[24] NCMIC experienced maturity delinquencies, primarily with respect to start-up agencies. Cole expected Brooke Credit to repurchase the delinquent matured loans, which it did, even though it had no obligation to do so.

The parties do not dispute that NCMIC received payments from Brooke Franchise on the agent loans in which NCMIC held a participation interest when the agents did not have adequate commission revenue in a given month to make the loan payments. Their dispute is over the amount. The Trustee's expert, Mr. Barrett, determined that the total of the subsidized payments from November 1, 2004, through October 28, 2008, was

---

[24] *Id*. at 59:1-5.

15

$4,448,511.23,[25] and the Trustee seeks to recover this amount from NCMIC. Through its expert, Mr. Tittle, and through cross-examination and argument, NCMIC challenges the reliability of Mr. Barrett's opinion and contends that the total of the subsidized payments to NCMIC was $2,000,092.33.[26]

### F. BROOKE'S ACCOUNTING AND FINANCIAL EXPERTS.

Summers, Spencer, and Callison (SSC), an independent accounting firm, issued unqualified audit reports for Brooke Franchise, and other Brooke-related entities, each relevant year. The Brooke entities were SSC's first and only clients who filed reports with the SEC. Brooke Franchise's stockholder equity as reported on the Form 10-K's filed with the SEC based on the SSC-audited statements was $9.8 million, $17.6 million, $30.2 million , and $12.7 million, for the years 2004 through 2007, respectively.[27]

In 2005, Brooke Corp engaged a second accounting firm, Mayer Hoffman McCann, as a "second set of eyes" to provide assistance in the evaluation of accounting and reporting issues. Brooke Corp also retained CBIZ Accounting, Tax, & Advisory Services (CBIZ) to provide consulting services. In 2007, Brooke Capital hired Duff & Phelps to issue a buy-side fairness opinion regarding contemplated acquisitions. On or about November 15, 2007, CBIZ issued a solvency report for Brooke Corp's board of

---

[25] Trial Ex. T1019.0002 (August 17, 2015, Supplement to Expert Report of Kent E. Barrett dated February 19, 2015, at 2). Mr. Barrett testified about minor corrections which resulted in modification of this amount to $4,443,802.09. Doc. 226, Barrett Tr. 139:19-146:12, Apr. 25, 2016; Trial Ex. 2878.

[26] Trial Ex. NFC-216 at Tr-NFC-005176 (Expert Report of John Tittle, Jr., Revised Report on Damages dated April 1, 2016, p. 12).

[27] Trial Ex. J0542.0034 (Brooke Capital Corp. Form 10-K for fiscal year ended 12/31/07).

directors. Neither the Duff & Phelps nor the CBIZ reports are in evidence. When performing services, these accountants accepted the SSC-audited financial statements and did not question the solvency of Brooke Franchise. They relied on the accuracy of the financial statements of the Brooke entities, which had been audited by SSC, and did not perform independent audits.

### G. THE 2008 COLLAPSE OF BROOKE.

Brooke began experiencing severe financial distress in the first quarter of 2008.[28] In late June or early July 2008, after NCMIC first experienced a payment delinquency in May 2008, Greg Cole and Pat McNerney went to the offices of Brooke Franchise to examine the credit files that corresponded to NCMIC's participation interests. They found that the files were fairly complete for the inception of the loans, but lacked subsequent information, including the current status of the borrowers. Through conversations with Brooke Credit personnel, Cole and McNerney learned that even though some franchisees had not made their scheduled loan payments for some time, Brooke Franchise continued to transfer money to Brooke Credit for payment to the participating lenders.

On September 11, 2008, Bank of New York filed suit against Brooke Credit, Brooke Corp, Brooke Franchise, and several other parties on behalf of investors who had

---

[28] There is a dispute about the cause of that distress and ultimate failure. The Trustee contends that the Brooke business model was fatally flawed and doomed to fail because it was dependent upon initial franchise fees which required an ever-expanding number of new Brooke franchisees. NCMIC contends that the failure of Brooke, like many other enterprises, was caused by the 2008 financial collapse. For the reasons examined below, the Court agrees with the Trustee, not NCMIC.

17

purchased interests in securitizations of agent loans made by Brooke Credit, alleging misappropriation of pledged funds. On September 17, 2008, the parties to that suit agreed to an order appointing Albert Riederer as a Special Master to take control of Brooke Corp. On October 28, 2008, Brooke Corp and Brooke Franchise filed for Chapter 11 bankruptcy protection. An emergency motion appointing Mr. Riederer as Chapter 11 Trustee was granted. Brooke Investments filed for relief on November 3, 2008. The three Brooke cases have been administratively consolidated. Brooke Credit is not a bankrupt. On June 29, 2009, the three Brooke cases were converted to Chapter 7. After the resignation of Mr. Riederer as trustee, Christopher J. Redmond was appointed as the successor Chapter 7 Trustee.

**ANALYSIS AND CONCLUSIONS OF LAW**.

    **A. THE TRUSTEE'S CLAIMS**.

The Trustee alleges that during the four-year period preceding Brooke Franchise's bankruptcy filing, Brooke Franchise made a total of $4,448,511.23 in avoidable subsidized loan payments to NCMIC through the mechanism of transferring its own funds to Brooke Credit, who then transferred the funds to NCMIC in satisfaction of agents' liabilities on participated loans in which NCMIC held an interest.[29] The Trustee seeks to avoid these payments as constructively fraudulent transfers under § 544[30] (based on the

---

[29] Doc. 180 at 2-3 (Pretrial Order).

[30] Section 544(b)(1) gives a trustee the power to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable [state] law by a creditor holding an [allowed] unsecured claim." "The burden is on the trustee seeking to take advantage of this provision to demonstrate the

incorporation of the KUFTA) and § 548, and to recover the avoided transfers from NCMIC under § 550 and K.S.A. 33-208.

Section 548(a)(1)(B) allows the trustee to "avoid any transfer . . . of an interest of the debtor in property . . . if the debtor . . . received less than a reasonably equivalent value in exchange for such transfer . . . and was insolvent on the date that such transfer was made." Subsections 33-204(a)(2) and 33-205(a) of the KUFTA are substantively similar to § 548(a)(1)(B). K.S.A. 33-207 provides for remedies similar to those allowed under § 550. Neither the Trustee nor NCMIC have suggested that the KUFTA requires a different legal analysis than the Bankruptcy Code. The Court therefore holds that the following rulings applying §§ 548 and 550 are applicable to recovery under the KUFTA as incorporated by § 544 as well.

The distinction between the bankruptcy and state law bases for recovery is the look-back period; the Bankruptcy Code look-back period is two years from the date of filing, whereas the look-back period is four years under state law.[31] The Trustee is utilizing KUFTA to avoid transfers made within four years before October 28, 2008, the date Brooke Franchise filed its petition under Chapter 11.

---

existence of an actual creditor with an allowable claim against the debtor." 5 *Collier on Bankruptcy* ¶ 544.06 at 544-21 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief 16th ed.). Mr. Redmond's testimony that such claims against Brooke Franchise exist is unchallenged, (Doc. 231, Redmond Tr. 33, 35, 46, 47, Apr. 27, 2016), and proofs of claim related to this testimony are in evidence. Trial Ex. T02884 - T02891.

[31] K.S.A. 33-209(b).

## B.  THE PRIMARY CONTESTED ISSUES.

It is uncontroverted that Brooke Franchise transferred its property to NCMIC —
that Brooke Franchise transferred money through Brooke Credit to NCMIC as payments
owed by agents on loans purchased by NCMIC.  But NCMIC contends that the Trustee
must identify (i.e., trace) each specific transfer for purposes of establishing his
constructive fraudulent transfer claims.  NCMIC also contends that the Trustee may not
avoid the subsidized loan payments because he has not proven (1) that Brooke Franchise
was insolvent at the time of the transfers and (2) that Brooke Franchise did not receive
reasonably equivalent value (REV) in exchange for the transfers.  Even if these elements
are proven, NCMIC contends the Trustee may not avoid the transfers because NCMIC is
protected by the for-value-and-in-good-faith defense of § 548(c).

If the Trustee prevails on his constructive fraudulent transfer claims, NCMIC
nevertheless argues the Trustee may not recover from it under § 550.  NCMIC contends
that Brooke Credit, not NCMIC, is the initial transferee having strict liability under
§ 550(a)(1) and that NCMIC, as the transferee receiving the loan payments from Brooke
Credit, is entitled to the "for value . . . in good faith" defense of § 550(b)(1).  Further, if
the Trustee may recover from NCMIC under § 550, the amount of the allowable recovery
is hotly contested.

## C.  EXCEPT FOR THE TRUSTEE'S MOTION ON NCMIC'S
COUNTERCLAIMS, THE RULE 52(c) MOTIONS ARE DENIED.

At the close of the Trustee's case, NCMIC moved for a judgment on partial

20

findings under Federal Rule of Civil Procedure 52(c) on the issues of REV and damages. The Court waited to rule on the motion until after briefs were filed. The trial proceeded with NCMIC presenting its case, followed by the Trustee's rebuttal.

Federal Rule of Civil Procedure 52(c) "authorizes the . . . court to enter judgment at any time a party has been fully heard on an issue and the court can make an appropriate disposition based upon the evidence."[32] "Most commonly a Rule 52(c) motion is advanced by the defendant at the close of the plaintiff's case (and may be renewed at the close of all evidence)."[33] "In deciding a Rule [52(c)] motion which calls for an adjudication upon the merits of the plaintiff's claim, the . . . court undertakes the fact finding process which involves a weighing of the evidence and an assessment of the credibility of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal 'right to relief.'"[34]

The Court has carefully considered NCMIC's written arguments in support of its motion, which, in addition to the issues of REV and damages that were raised orally, includes the issue of solvency. In other words, NCMIC moves for judgment on all the elements of the Trustee's avoidance claims. These are extremely complex issues, each of which was the subject of expert opinion testimony presented by both parties.

---

[32] 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure:* Civil 3d, § 2573.1 at 250 (3d ed. 2008).

[33] *Id*. at 252-253.

[34] *Feldman v. Pioneer Petroleum, Inc*., 813 F.2d 296, 299 n.4 (10th Cir. 1987).

21

The Court declines to decide these issues based on only a portion of the record, and therefore denies NCMIC's motion. This exercise of discretion is authorized by Rule 52(c), which provides that "[t]he court may . . . decline to render any judgment until the close of the evidence."[35] "Whether a trial court rules on a party's Rule 52(c) motion at the close of the non-moving party's evidence or reserves ruling on the motion until after it has heard all of the evidence in the case is immaterial."[36] As stated by this Court, "when the Court defers ruling on a defendant's Rule 52(c) motion made orally at the close of the plaintiff's case until all of the evidence has been presented, the ruling on the motion and the ruling on the merits of the case fuse and become the same. . . . If the motion is granted at this stage, the Court need not consider the defendant's affirmative defenses."[37]

The Trustee also made a Rule 52(c) motion. At the end of NCMIC's case, he moved for judgment on NCMIC's counterclaims[38] and the § 548(c) for-value-and-in-good-faith defense.[39] NCMIC agreed that no evidence was presented in support of its counterclaims,[40] so the Trustee's motion regarding NCMIC's counterclaims was

---

[35] Fed. R. Civ. P. 52(c).

[36] *Cantwell & Cantwell v. Vicario*, 464 B.R. 776, 780 (N.D. Ill. 2011); *see MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 48 (Bankr. D. Colo. 2014) ("The Court now concludes that the best course of action is to render a judgment based on all the evidence, testimony, and applicable law.").

[37] *Redmond v. SpiritBank (In re Brooke Corp.)*, 541 B.R. 492, 498 (Bankr. D. Kan. 2015).

[38] *See* Doc. 180 at 17 (Pretrial Order) (identifying NCMIC's counterclaims).

[39] Doc. 269, Tr. 82:8-14, June 21, 2016.

[40] *Id*. at 84:16-85:13.

granted.[41]  The Court deferred ruling on the second portion of the Trustee's motion, and now, based on the authorities stated above, denies the Trustee's Rule 52(c) motion on the § 548(c) defense.  The Court will rule on the validity of NCMIC's defense as part of its analysis below.

### D.  THE TRUSTEE HAS ESTABLISHED THE ELEMENTS OF HIS CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS.

#### 1.  Brooke Franchise Had a Property Interest in the Subsidized Loan Payments Transferred to NCMIC.

The witnesses unanimously agreed that Brooke Franchise used its funds to subsidize payments for agents on loans in which NCMIC held participation interests. NCMIC does not challenge that it received transfers of Brooke Franchise's property within the meaning of §§ 548 and 550.  Rather, when asserting that the Trustee has not sustained his burden of proof, "NCMIC challenges how those alleged transfers are quantified,"[42] claiming that the Trustee has used an improper estimation approach.[43]

The Trustee relied on the expert opinion of Kent E. Barrett to identify and quantify the allegedly fraudulent transfers.  Mr. Barrett has been a public accountant and a member of the American Institute of Certified Public Accountants for over 30 years.[44]  In addition,

---

[41] *Id.* at 86:14-19.

[42] Doc. 229 at 8.  Quantification of the transfers is also an issue under § 550.  The methodology used by the Trustee's expert, Kent E. Barrett, to calculate that amount is discussed generally in the following paragraphs and in detail in section (E)(4).

[43] *Id.* at 12.

[44] Trial Ex. T1016.0005.

he is a CFE (certified fraud examiner), a holder of a CFF (certified in financial forensics) credential, a CLU (charter life underwriter), and a ChFC (chartered financial consultant).[45] In 1981, he graduated with high honors from Brigham Young University, earning both his bachelor and masters degrees.[46]  He started his career at the Ernst & Whinney accounting firm, and then spent about twelve years in various positions with subsidiaries of American General Corporation.[47]  In 2003, he joined Veris, a consulting firm formed in 2000 that provides forensic accounting services.[48]  Since early 2009, he has been a Senior Managing Director at Veris.[49]  While at Veris, he has spent approximately 4,000 hours on Brooke matters, starting with the malpractice suit against Brooke's accounting firm and continuing with litigation against insurance carriers, participating banks, insurance agents, securities underwriters, and outside counsel.[50]  As a result, he is very familiar with Brooke's books and records, so much so that in his opinion, he has developed a "better understanding of the breadth, the overall general topic of Brooke's accounting records than even anyone who was at Brooke" before its failure because he understands both the general and the particular aspects of Brooke's financial systems.[51]

---

[45] Doc. 224, Barrett Tr. 4:21-5:2, Apr. 21, 2016.

[46] Trial Ex. T1016.0005.

[47] Doc. 224, Barrett Tr. 5:24-6:18, Apr. 21, 2016.

[48] *Id*. at 7:17-8:18.

[49] Trial Ex. T1016.0005.

[50] Doc. 224, Barrett Tr. 10:2-12:25, Apr. 21, 2016.

[51] *Id.* at 16:23-17:3.

In this case, he was retained by the Trustee "to calculate the amount of the participating loan payments made to NCMIC that were subsidized by Brooke [Franchise]."[52] He prepared five reports which were admitted into evidence.[53] He testified on three days, explaining his methodology and conclusions in a clear, precise, and understandable manner. Before trial, he repeatedly refined his calculations, as more data became available and questions were raised. This practice of refinement continued as the trial progressed. The Court found Mr. Barrett to be an exceptionally helpful and credible expert witness. His credentials are outstanding. His thorough knowledge of Brooke's financial practices and records, and his dedication to preparing accurate and understandable reports was readily apparent.

Mr. Barrett's reports and testimony addressed the amount of subsidizations NCMIC received (as a loan participant) from Brooke Franchise as payments on loans Brooke Credit had made to various Brooke agents. The Trustee offered this evidence to establish both that Brooke Franchise subsidized loan payments and the aggregate amount of such subsidizations. NCMIC therefore challenges the Trustee's reliance on Mr. Barrett's expert opinion in two respects, asserting: first, Mr. Barrett's methodology was so flawed that it should be rejected as a basis for the Court to find that Brooke Franchise had an interest in the funds NCMIC received; and second, his method of quantifying the amount of the transfers is unreliable. The first of these contentions is addressed in this section of the

---

[52] Trial Ex. T1016.004.

[53] Trial Exs. T1016, T1017, T1019, T1020, and T1025.

25

Court's opinion; the second will be addressed later when discussing the amount of recovery under § 550.

To understand whether the Trustee has established that Brooke Franchise transferred an interest in its property to NCMIC for purposes of § 548, the Court must examine the details of the loan payment process. The simple statement that Brooke Franchise used its funds to make some loan payments on behalf of Brooke agents whose loans were held by NCMIC belies the complexity of the matter. Mr. Barrett thoroughly described the process in his reports and his testimony.[54]

Each month, Brooke Credit produced a loan payment report listing all of the monthly payments that were due on each outstanding agency loan. Using this report, a spreadsheet was produced showing all of the monthly payments due from Brooke franchisees. The spreadsheet was sent to Brooke Franchise. Brooke Franchise then sent a check drawn on its primary operating account for the total of the monthly payments due from the franchisees to Brooke Credit. The check was drawn without regard to whether the agents whose loans were being paid had sufficient funds available to make the loan payments.

Charging the payments to the agents each month was accomplished by Brooke Franchise's preparation of an agent statement for each insurance agency that included all of the charges (such as the monthly franchise fees, payments on agency loans, and other

---

[54] Trial Ex. T1016.0010 - .0013, T1019; Doc. 224, Barrett Tr., Apr. 21, 2016; Doc. 225, Barrett Tr., Apr. 22, 2016; and Doc. 226, Barrett Tr., Apr. 25, 2016.

26

agency expenses) and credits (such as commissions earned).  For some agents for some months, the balance on the agent statement was not sufficient to cover the loan payment; hence, a subsidization occurred — that is, the payment was made with Brooke Franchise's money, not the agent's.

When Brooke Credit received the monthly loan payment check from Brooke Franchise, it deposited the check into Brooke Credit's primary operating account.  In addition to the monthly statement of loan payments due, Brooke Credit also prepared a report showing the amount due to each participating lender on each participated loan.  From its primary operating account, Brooke Credit paid the total due to each participating lender, such as NCMIC, usually by an automated transfer.

Mr. Barrett prepared a detailed report identifying the amount of the participation loan payments made to NCMIC that were subsidized by Brooke Franchise.  In his initial report, dated February 19, 2015,[55] he concluded that Brooke Franchise subsidized $4.4 million in loan payments to NCMIC for the period from November 2004 through October 2008.[56]  The details of his findings are reported in his Exhibit C to that report, an Excel spreadsheet, which because of its size is included in the record only in electronic form.[57]  It includes data with respect to the 353 individual agencies that Mr. Barrett selected because

---

[55] Trial Ex. T1016.

[56] Trial Ex. T1016.0015.  After additional data was made available to him, Mr. Barrett created a Revised Exhibit C (T1023) from which he concluded that the amount of subsidized loan payments was $4,448,511.23, which was not substantially different from the $4,382,850.18 value based on Exhibit C. Trial Exh. T1019.0002.  Additional refinements to his calculations are discussed in section E(4).

[57] Trial Ex. T1014.

27

they exhibited "substantial negative cash flows during the periods that one or more of their loans were wholly or partially participated to NCMIC."[58] "Exhibit C contains over 10,000 rows of data, including cash flow data for 6,912 agency/months involving 163 groups of related agencies, 353 individual agencies and 223 franchisee loans in which NCMIC held a participating interest."[59] Generally, Exhibit C was prepared based on the assumptions that agency income was available to the agent at the start of the fiscal month and that loan payments were made at the end of the fiscal month, after other expenses were paid.[60]

In addition, Mr. Barrett's February 19, 2015 report documents the flow of cash related to NCMIC's loan participations.[61] He prepared an Exhibit D which demonstrates that the individual loan payments on Exhibit C were included in the total cash Brooke Franchise transferred to Brooke Credit each month. His Exhibit E (also in electronic form) shows all of the payments included on Exhibit C that Brooke Credit made to NCMIC, and identifies the related payment from Brooke Franchise to Brooke Credit. Exhibit F demonstrates that the money for the individual NCMIC loan payments was indeed sent

---

[58] Trial Ex. T1016.0015.

[59] *Id.*

[60] Revised Exhibit C, Trial Ex. T1023, reflects a refinement of this methodology where the subsidization was attributed first to non-loan-payment expenses where the payment check cleared the bank after the loan payments were made, and thereafter attributed to the loan payments, if the entire subsidization had not already been attributed to the paid after expenses.

[61] Trial Ex.T1016.0033 to T1016.0037.

from Brooke Credit to NCMIC.[62]  Put simply, for all of the transfers Mr. Barrett identified

as including subsidizations, he traced the funds on an individual-agency, monthly-payment

level from Brooke Franchise to Brooke Credit, and then to NCMIC.

NCMIC asserts that the Bankruptcy Code does not permit an estimation of the

transfers like that presented by the Trustee,[63] and that the Trustee's method of identifying

the allegedly fraudulent transfers is flawed because it makes

> no attempt to match cash flow on a daily basis to determine
> actual subsidies.  The data was available to match daily
> commission revenue receipts with daily payments of expenses
> and loan payment for each CONO [company number] so that
> actual, not estimated subsidies, could be identified.  But Mr.
> Barrett and the trustee chose not to use this data.  It
> presumably would have required analysis of daily transactions
> to identify the true subsidy.[64]

In other words, NCMIC contends that Mr. Barrett's analysis should be rejected because it

failed to break down the subsidized and non-subsidized portion of each loan payment

based on all of the actual transaction dates for each item of an agency's income and

expenses (such as the date when sales commissions were credited to the agency's

account).

In the unique circumstances of this case, the Court finds that it would be cost- and

---

[62] Trial Ex. T1016.0036; Doc. 225, Barrett Tr. 68-70, Apr. 22, 2016.  Note that this Exhibit F
addresses matters distinct from those addressed by Mr. Barrett's Revised Exhibit F submitted with his
August 17, 2015 Supplement to Rebuttal Expert Report of Kent E. Barrett dated May 14, 2015.  Trial Ex.
T1020.

[63] Doc. 229 at 8-12 (NCMIC Rule 52(c) Motion).

[64] *Id*. at 3-4 (internal emphasis and citations omitted).

29

time-prohibitive to follow the subsidization of agent loan payments on a day-to-day and dollar-for-dollar basis from Brooke Franchise to NCMIC. Under the Brooke Franchise agency accounting system, loan payments were made without regard to the agent balances, and the extent of subsidization was not determined or recorded by Brooke Franchise when it occurred. Brooke Franchise prepared the monthly agent statement balances only in paper form, so they were not available postpetition in a form that could be electronically accessed for use in this litigation and, according to Mr. Barrett, a "lifetime" would have been required to calculate the required data manually.[65] Mr. Barrett therefore went to the source data for the monthly agent statements and calculated the extent of subsidization based on his reconstruction of the finances of each agency. When doing so, he assumed that all revenues to which an agency was entitled were available as of the start of the fiscal month, but generally used the actual dates for the payment of expenses, including the loan payments. If this assumption regarding revenues impacted the result, it was a *de minimis* effect, which most likely worked to NCMIC's advantage. Further, Mr. Barrett testified that in many cases, he looked at agent statements and was able to verify that his numbers were correct.[66] Additional aspects of his methodology are examined below in the discussion of recovery under § 550.

The question posed by NCMIC is whether the fact that the Trustee has not traced the subsidy amount by matching income and expenses on a daily basis precludes the

---

[65] Doc. 224, Barrett Tr. 64:22-65:1, Apr. 21, 2016.

[66] *Id*. at 65:3-7.

Trustee's avoidance of the subsidies. The Court rules that it does not. "Fraudulent transfer law has always exalted substance over form."[67] Although generally, the trustee "has the burden of tracing funds it claims to be property of the estate[,] . . . proper tracing does not require dollar-for-dollar accounting."[68] Even commonly accepted methods of tracing, such as first-in-first-out, rely on assumptions and do not result in a precise identification of the property involved. In this case, Mr. Barrett identified the loan payments in issue by relying on reasonable assumptions compelled by the circumstances; what he did not compute was the portion of each payment that was subsidized based on a running day-to-day calculation of agent balances, as one would most likely do if there were only a few transfers in issue. The Court finds that under the circumstances of this case, Mr. Barrett's methodology is unquestionably acceptable. If the Court were to adopt NCMIC's view that the Trustee's identification of the subsidized transfers was legally insufficient, it would be exalting form over substance. NCMIC agrees that loan subsidization payments were made. The complexities and numerosity of Brooke's financial transactions should not serve as a shield to protect the transferees of constructively fraudulent transfers.

---

[67] 5 *Collier on Bankruptcy* ¶ 548.03[6] at 548-54.

[68] *IBT Int'l Inc. v. Northern (In re Int'l Admin. Serv., Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005) (no dollar-for-dollar tracing required where money was cycled through nearly two dozen entities on a regular basis); *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 334 (6th Cir. BAP 2007) (exact tracing not required where parties engaged in multiple, complicated transactions to make it extremely difficult, if not impossible, to trace the funds in a scheme to defraud creditors).

31

## 2. Brooke Franchise Was Continuously Insolvent During the Four Years Preceding the Filing of its Bankruptcy Petition.

As an element of his constructive fraudulent transfer claims, the Trustee has the burden to establish that Brooke Franchise was insolvent at the time of the transfers sought to be avoided, which in this case occurred during the four years before Brooke Franchise filed its Chapter 11 petition on October 28, 2008. The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."[69] The KUFTA is nearly identical: "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."[70] Insolvency under both the Code and the KUFTA is therefore determined using what is commonly called a "balance sheet test."[71] "However, this may be a misnomer because the Balance Sheet Test is based upon a fair valuation and not on Generally Accepted Accounting Principles ('GAAP'), which are used to prepare a typical balance sheet."[72] Because the liquidation of Brooke Franchise in bankruptcy was not clearly imminent on the transfer dates (the valuation dates), it must be valued as a going concern.[73]

---

[69] 11 U.S.C. § 101(32).

[70] K.S.A. 33-202(a).

[71] *Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 299 B.R. 626, 638 (10th Cir. BAP 2003).

[72] *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002) (citing *In re Trans World Airlines, Inc.*, 180 B.R. 389, 405 n.22 (Bankr. D. Del. 1994)).

[73] *Id*. at 541.

32

There are three approaches recognized in business valuations: (1) the income approach, which values the business "on the basis of some form of economic income stream;" (2) the market approach, which is based on transactions of similar companies; and (3) the asset-based approach, which is based on asset and liability values.[74] But, "'[n]o single valuation method is universally applicable to all appraisal purposes.'"[75] "'The approaches/methods used within a given assignment are a matter that must be determined by the business appraiser's professional judgment. The task is generally decided through consideration of the approaches/methods that are conceptually most appropriate and those for which the most reliable data is available.'"[76] "If sufficient data are available, the valuation analyst applies more than one approach in order to conclude mutually supported evidence of value."[77] The Tenth Circuit has stated, "[T]he matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in

---

[74] Shannon Pratt, *The Lawyer's Business Valuation Handbook* 82 (American Bar Association 2000) (hereafter *"Lawyer's Valuation Handbook"*).

[75] *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Serv., Inc.)*, 350 B.R. 520, 532 (Bankr. N.D. Okla. 2005) (quoting S. Pratt, R. Reilly & R. Schweihs, *Valuing A Business — The Analysis and Appraisal of Closely Held Companies* ¶ 396, at 27 (4th ed. 2000)).

[76] *Id*. (quoting Business Appraisal Standards promulgated by The Institute of Business Appraisers, Inc.).

[77] Israel Shaked & Robert F. Reilly, *A Practical Guide to Bankruptcy Valuation* 189 (American Bankruptcy Institute 2013) (hereafter *"Practical Guide"*).

33

§ 101(26) by the most appropriate means."[78]

In this case, the first generally-accepted method of valuation, the income approach, is not relied on by either party. Two important components of the income approach are projected cash flow and the cost of capital. A debtor's management is generally the source of the financial projections. In this case, neither management nor any professionals had prepared any financial projections, so the income approach cannot be used.

The Court must therefore decide whether the market approach or the asset-based approach is appropriate in this case for valuing Brooke Franchise to determine whether it was solvent when it subsidized loan payments to NCMIC. "The concept of the market approach is that valuation guidance can be found in transactions involving similar companies."[79] The "guideline publicly traded company method" of the market approach relies on a determination of the ratio of invested capital to operating income for a group of publicly-traded companies similar to the debtor's business.[80] The debtor's operating income is then multiplied by that ratio to estimate the debtor company's enterprise value.[81]

On the other hand, "the basic concept of the asset-based approach is that if all the company's assets and liabilities are revalued to current values, then the difference between

---

[78] *Jarboe v. Yukon Nat'l Bank (In re Porter)*, 866 F.2d 355, 357 (10th Cir. 1989).

[79] *Lawyers Valuation Handbook* 139.

[80] *Practical Guide* 120-21.

[81] *Id.*

34

the assets and liabilities should equal the value of the equity."[82]  There are five basic steps

in the asset value method:  (1) obtain a balance sheet conforming to GAAP;

(2) "[d]etermine which assets and liabilities on the GAAP-basis balance sheet require

revaluation;" (3) "[i]dentify any off-balance-sheet actual or contingent assets or

liabilities;" (4) "[v]alue the items identified in steps 2 and 3;" and (5) "[c]onstruct a market

value-based balance sheet using the adjusted values."[83]

　　　　As in many fraudulent conveyance actions, the trial of the solvency issue in this

case involves the testimony and reports of two experts, R. Larry Johnson of Veris

Consulting, Inc., for the Trustee[84] and John Tittle, Jr., of Tittle Advisory Group for

NCMIC.[85]  Mr. Johnson focused on Brooke Franchise's balance sheet, aligning his

analysis with the asset-based approach, while Mr. Tittle analyzed Brooke Franchise's

solvency using a market approach.  The two experts' reports present diametrically

opposing conclusions.  Mr. Johnson opined that Brooke Franchise was continuously

insolvent from November 1, 2004, through October 28, 2008, with a *negative* net worth of

($5.2) million at the year's end in 2003, ($11.6) million in 2004, ($27.5) million in 2005,

---

[82] *Lawyer's Valuation Handbook* 168.

[83] *Id*. at 169-170.

[84] Trial Ex. T1028 (Expert Report of R. Larry Johnson Regarding Insolvency of Brooke Capital Corporation, Feb. 19, 2015).

[85] Trial Ex. NFC-219 (Expert Report of John Tittle, Jr., Report on Solvency, as revised Aug. 14, 2015).

35

($43.3) million in 2006, and ($85.1) million in 2007.[86]  Mr. Tittle opined that Brooke

Franchise was solvent until approximately March of 2008, and had a fair market value of

$71.248 million at the end of 2004, $80.398 million at the end of 2005, $80.266 million at

the end of 2006, and $175 million at the end of 2007.[87]  Although the Court finds that both

witnesses are qualified experts and each used recognized methodologies, the Court

determines, for the reasons examined below, that the opinions of Mr. Johnson are more

reliable, and concludes that Brooke Franchise was continuously insolvent during the four

years preceding the filing of its bankruptcy petition.

Mr. Johnson's initial retention in Brooke-related matters was for the purpose of

evaluating the conduct of SSC, Brooke Corp's audit firm, which had issued unqualified

opinions of Brooke's consolidated financial statements for the years 2001 through 2007.

Mr. Johnson was initially retained by counsel for NCMIC for purposes of a lawsuit

NCMIC filed against SSC in the District Court of Johnson County, Kansas, on November

25, 2008 (the SSC Litigation).  The Trustee also asserted claims in the SSC Litigation on

behalf of the bankruptcy estates.  At some point, NCMIC's retention of Mr. Johnson

became joint with the Trustee, so that by the time Mr. Johnson undertook his work and

issued his report concerning SSC's accounting, he had been jointly retained by NCMIC

and the Trustee.  Mr. Johnson's preliminary report, dated July 19, 2010, describes his

retention as follows:

---

[86] Trial Ex. T1028.0030 - .0033.

[87] Trial Ex. NFC-219 at TR_NFC_005416.

36

> I have been engaged by Shaffer Lombardo Shurin in the matter
> of NCMIC Finance Corporation vs. Summers, Spencer &
> Callison, CPAs, Chartered ("SS&C") to analyze and evaluate
> whether the consolidated financial statements of Brooke
> Corporation ("Brooke") for the years ended December 31,
> 2007, 2006 and 2005 were prepared in conformity with
> generally accepted accounting principles (GAAP) and, further,
> to evaluate whether the audits of those financial statements,
> which were conducted by SS&C, complied with the applicable
> professional standards that governed those audits.[88]

In connection with that lawsuit, Mr. Johnson reached three conclusions: (1) the financial statements of Brooke Corp consolidated contained material misstatements; (2) for the period from 2003 through 2007, Brooke Corp's consolidated operations reflected an insolvency; and (3) the audit procedures SSC conducted were deficient.[89] In Mr. Johnson's opinion, the financial statements of the Brooke companies "provided no basis for reliance by any third party."[90] During the very early stages of the SSC Litigation, the claims against SSC were settled for the remaining proceeds of SSC's $10 million malpractice policy. From that settlement, NCMIC received in excess of $3 million, and the Trustee and another creditor of Brooke shared the remainder.[91]

---

[88] Trial Ex. T0017.0005.

[89] Doc. 262, Johnson Tr. 37:10-39:11, Apr. 26, 2016.

[90] Doc. 263, Johnson Tr. 160:1-3, Apr. 26, 2016.

[91] *See* Doc. 128 at 2 (Trustee's Motion in Limine to Exclude any Evidence Regarding Brooke's Alleged Solvency). Based on NCMIC's reliance on Mr. Johnson's report in the SSC Litigation, in which Mr Johnson concluded that Brooke was insolvent for the period from 2003 through 2008, the Trustee filed a motion in limine arguing that estoppel principles precluded NCMIC from offering any evidence alleging that Brooke was solvent through December 31, 2007. Doc. 128. The issue was fully briefed, and an evidentiary hearing was held. The Court denied the motion. It found that although most of the elements of judicial estoppel were present, the doctrine did not bar NCMIC's change of position because the settlement had occurred so early in the litigation process that NCMIC had not designated Mr. Johnson

37

Of particular importance in this litigation is Mr. Johnson's opinion, stated in his 2010 preliminary report prepared when retained by NCMIC and the Trustee for purposes of the SSC Litigation, that Brooke's recognition of its initial franchise fee income in the year when it was received was "a clear violation of GAAP,"[92] particularly Statement of Accounting Standards No. 45 *Accounting for Franchise Fee Revenue* (SFAS 45),[93] and Staff Accounting Bulletin No. 104 (SAB 104).[94] The latter provides that "[u]nless the up-front fee is in exchange for products delivered or services performed that represent the culmination of a separate earnings process, the deferral of revenue is appropriate."[95] Mr. Johnson concluded that "the services and rights provided by Brooke at the outset in exchange for the initial franchise fee were not 'discrete earnings events,' and that exchange was not the 'culmination of a separate earnings process,' but, rather, the initiation of a long-term relationship involving substantial services to be provided by

---

as an expert and had not made any court filings in which it asserted the insolvency of Brooke or relied on Mr. Johnson's opinion. Doc. 158 (Order Denying Trustee's Motion in Limine).

[92] Trial Ex. T0017.0020.

[93] Mr. Johnson's preliminary report quoted SFAS 45 in pertinent part, and it provides:

> Sometimes, large initial franchise fees are required but continuing franchise fees are small in relation to future services. If it is probable that the continuing fee will not cover the cost of the continuing services to be provided by the franchisor and a reasonable profit on those continuing services, then a portion of the initial franchise fee shall be deferred and amortized over the life of the franchise.

Trial Ex. T0017.0018.

[94] Mr. Johnson's preliminary report also quotes portions of SAB 104, at Trial Ex. T0017.0019. SEC Staff Accounting Bulletin 104 (SAB 104).

[95] Trial Ex. T0017.0019.

Brooke on an ongoing basis."[96]  Based on Brooke's circumstances, Mr. Johnson concluded

that the expected life of a Brooke agency was 15 to 18 years, and the recognition of the

initial franchise fees should have been deferred on a straight-line basis over this period.[97]

The impact of this adjustment was a cumulative loss of $56.4 million for the period from

2001 to 2007.[98]  Mr. Johnson concluded that SSC violated multiple applicable auditing

standards, including "failing to take exception to Brooke's recognition of initial franchise

fees as revenue at the outset of the franchise relationship in direct violation of the

provisions of SAB 104."[99]

Mr. Johnson was retained by the Trustee in this matter against NCMIC "to analyze

the financial condition of [Brooke Franchise] and to evaluate whether it had been

continuously insolvent since November 1, 2004."[100]  To provide a framework for the

application of appropriate accounting policies, Mr. Johnson began by examining the

totality of the Brooke operation to understand the operation, funding, financing, and

accounting of the franchise business.  He concluded that Brooke had a materially-flawed

business model, "one that will not reasonably be predicted to produce financial results that

---

[96] Trial Ex. T0017.0020.

[97] Trial Ex. T0017.0022.

[98] *Id.*

[99] Trial Ex. T0017.0047.

[100] Trial Ex. T1028.0003.

39

reflect profitability and solvency."[101]

Two aspects of Brooke's failure were: (1) franchise fees were recorded one hundred per cent as revenue by Brooke Franchise in the year they were received; and (2) after the inception of a franchise arrangement, the expenses of the ongoing operation of the franchise were greater than the revenues being produced, so the initial franchise fees for new agencies were being used to pay for the ongoing support of the existing agencies. Brooke's ability to stay in business was therefore predicated on the ability to sell new franchises.

Further, the defects in Brooke's operations were masked by the relationships among the Brooke entities and agents. The front-end profit recognized by Brooke Franchise was coming from Brooke Credit in the form of loans to new Brooke agents. In order for Brooke Credit to obtain financing so it could advance funds to new franchisees, it needed the loans made to the existing agents to perform. This was assured because Brooke Franchise controlled the money that was due to the agents and made the loan payments to Brooke Credit whether or not the agent had sufficient revenue to fund the payment. Agent statement balances grew to $20 million in 2007 as these advances grew. The result was "an illusion of profit."[102]

Brooke supported its immediate recognition of the initial franchise fee by asserting that its obligations were substantially completed as of the inception of the franchise

---

[101] Doc. 262, Johnson Tr. 55:18-56:5, Apr. 26, 2016.

[102] *Id.* at 62:19-20.

40

arrangement without an ongoing obligation, and that the initial transaction was a separate unit of accounting. Mr. Johnson convincingly opined that this position was erroneous, and that applicable accounting standards, particularly SFAS 45, required the recognition of the initial fee over the expected life of the franchise relationship.[103] SFAS 45 states two conditions for the immediate recognition of an initial franchise fee: (1) "when all material services or conditions related to the sale [have] been substantially performed or satisfied by the franchisor;" and (2) "it is probable that the continuing fee will . . . cover the cost of the continuing services to be provided by the franchisor and a reasonable profit on those continuing services."[104] If these conditions are not met, SFAS 45 requires that a portion of the initial franchise fee be deferred and amortized over the life of the franchise.[105]

Mr. Johnson testified that in his opinion the first requirement of SFAS 45 was not satisfied because Brooke had a continuing obligation to provides the services said to be purchased with the initial fee,[106] which were identified by Brooke in its annual report to the SEC for 2004 as the delivery of a business model for the franchisee's operations, use of the Brooke trade name, access to over 100 insurance carriers, and use of the Brooke cash management system.[107] In addition, the absence of a discrete economic event was

---

[103] *Id*. at 65:14-73:1.

[104] T0017.0018.

[105] *Id*.

[106] Doc. 262, Johnson Tr. 67:3-69:5, Apr. 26, 2016.

[107] Trial Ex. J0574.006 (Brooke Corp 2004 Form 10-K).

41

evidenced by the practice whereby Brooke Credit financed the initial fee, that fee was transferred to Brooke Franchise, and then Brooke Franchise made loan payments to Brooke Credit on behalf of the agent, carrying the agent's obligation as either a statement or a non-statement balance.[108] For all Brooke's agents, the statement and non-statement balances had grown to $20 million by the end of 2007.[109]

Mr. Johnson also testified that the second condition for immediate revenue recognition — that continuing fees would cover the cost of continuing services to franchisees — was not satisfied.[110] He analyzed the recurring revenues, defined by Brooke Corp in its SEC filings to be "those revenues that are reasonably likely to be recorded in the next year if no new franchise locations [were] added,"[111] which generally consisted of the franchise charge of 15% of commissions earned by agents, interest income, brokerage commissions, and underwriting profits. He also analyzed the recurring expenses, those expenses that were "reasonably likely to be incurred in the next year if no new franchise locations [were] added," including payroll, other operating expenses, depreciation, and amortization.[112] Using Brooke Corp's financial statements, Mr. Johnson determined that the recurring revenues minus the recurring expenses was negative in the years from 2004

---

[108] Doc. 262, Johnson Tr. 95:24-96:17, Apr. 26, 2016.

[109] Trial Ex. T0017.0017.

[110] Doc. 262, Johnson Tr. 78:4-82:20, Apr. 26, 2016.

[111] Trial Ex. J0574.0033 (Brooke Corp 2004 Form 10-K).

[112] *Id.*

42

through 2007, and increasingly so, from ($17,632) million in 2004 to ($26,263) million in 2005, ($29,190) million in 2006, and ($45,584) million in 2007.[113]  A separate analysis showed that the largest portion of the shortfall was in Brooke Franchise.[114]

Having concluded that the initial franchise fees should not have been recognized as revenue in the year they were received, Mr. Johnson then determined the proper accounting procedure.  He considered SFAS 45, Emerging Issues Task Force item 00-21, and SAB 104, and concluded that the fees should have been recognized over the economic term of the franchise relationship, at which time the earnings process would have been complete.[115]  Mr. Johnson opined that the period of recognition of the income should have been tied to the terms of the loans to the franchisees.[116]  Because the loan terms for viable agencies were 15 to 18 years, he used an amortization period of 15 years.[117]  The resulting annual net adjustment to Brooke's income was ($15.773) million in 2004, ($26.748) million in 2005, ($29.825) million in 2006, and ($25.498) million in 2007.[118]  After making related tax adjustments, Mr. Johnson calculated the impact on the stockholder's

---

[113] Trial Ex. T1028.0020.

[114] Doc. 262, Johnson Tr. 85:13-21, Apr. 26, 2016.

[115] *Id*. at 106:19-107:4.

[116] *Id*. at 107:9-24.

[117] *Id*. at 107:14-109:14. If the circumstances showed a disproportionate effort when the franchise was established, more of the revenue could have been attributed to the first year. Doc. 263, Johnson Tr. 243:16-244:15, Apr. 26, 2016.

[118] Trial Ex. T1028.0045.

43

equity of Brooke Franchise. Whereas Brooke Franchise had reported positive stockholder equity for the years from 2003 through 2007, after Mr. Johnson amortized the recognition of the initial franchise fee income over 15 years, the result was negative stockholder equity of ($11.6) million in 2004, ($27.5) million in 2005, ($43.3) million in 2006), and ($85.1) million in 2007.[119]

Finally, Mr. Johnson examined the Brooke Franchise balance sheet to determine if there were additional items unrelated to income recognition that also needed adjustment. He concluded that the amounts due from agents should be removed from the balance sheet because they were probably not collectible, that the affiliated receivables (the majority of which were due from Brooke Corp) should be reflected as fully impaired because they could not be collected due to the insolvency of Brooke Corp and Brooke Credit (as documented in separate expert reports), and that intangible assets should be removed since they had no utility or economic value due to the insolvency of Brooke Franchise.[120] These values reflect all of the adjustments Mr. Johnson believed to be appropriate to measure the economic value of Brooke Franchise's assets and liabilities. He concluded that there was an economically-based insolvency and no enterprise value — i.e., no value of the company that was greater than the sum of its parts.[121]

The result is Mr. Johnson's opinion that Brooke Franchise was insolvent at the end

[119] Trial Ex. T1028.0030.

[120] Doc. 262, Johnson Tr. 117:17-124:25, Apr. 26, 2016.

[121] *Id.* at 138:7-10.

44

of the year by ($47.5) million in 2004, ($70.1) million in 2005, ($92.1) million in 2006, and ($127.8) million in 2007, and that the insolvency continued to grow until October 28, 2008, when Brooke Franchise filed for bankruptcy relief.[122] "Brooke [Franchise's] insolvency resulted primarily because of Brooke's flawed economic business model."[123] The economic conditions in 2007 and 2008 might have accelerated the time of the collapse, but the collapse was "inevitable."[124]

NCMIC's solvency expert is Mr. Tittle. He utilized the market approach[125] and concluded that Brooke Franchise and Brooke Credit were solvent at the end of 2004, 2005, 2006, and 2007.[126] His calculations were based "upon the numbers as reflected on the public filings and internal financial records used to prepare such public filings of the Brooke Entities without adjustment of any kind, unless otherwise noted"[127] — in other words, the financial statements audited by SSC. To value the Brooke entities, Mr. Tittle used two guideline company methods.[128] He first identified a large number of publicly-traded companies engaged in businesses similar to that of the Brooke entity being valued

---

[122] *Id*. at 129:3-130:21; Trial Ex. T1028.0034.

[123] Trial Ex. T1028.0034.

[124] Doc. 263, Johnson Tr. 208:12-17, Apr. 26, 2016.

[125] Trial Ex. NFC-219 at TR_NFC_005378. Mr. Tittle did not use the income approach to value the companies since management did not regularly perform projections. *Id*. at Tr_NFC_00399.

[126] *Id*. at TR_NFC_005379.

[127] *Id*. at TR_NFC_ 005397.

[128] *Id*. at TR_NFC_005399.

and then examined the microeconomic activity of those businesses for similarities to the Brooke entity.[129]  For Brooke Franchise, this process yielded five comparable guideline companies.[130]  For each guideline company, he determined its market capitalization (the number of shares outstanding times the share price as of December 31 of the year in issue) and subtracted the company's net debt (long-term debt minus cash) to determine the enterprise value of the company.[131]  Next, he calculated two value ratios:  (1) the enterprise value divided by gross revenue over the last 12 months; and (2) the enterprise value divided by earnings before interest, taxes, depreciation, and amortization (EBITDA). These ratios were calculated for each comparable company and a mean determined.[132]

Mr. Tittle then applied the amount of Brooke Franchise's gross revenue and EBITDA for the year in question as determined from Brooke Franchise's audited financial statements to the ratios, yielding estimates of Brooke Franchise's market value.[133]  Mr. Tittle determined the average of the two values to be the Implied Enterprise Value of Brooke Franchise.[134]  For Brooke Credit, he identified eight comparable guideline companies and completed similar calculations.[135]  He then took similar steps under the

---

[129] *Id*. at TR_NFC_00510 to TR_NFC_005411.

[130] *Id*. at TR_NFC_00512.

[131] *Id*. at TR_NFC_00411.

[132] *Id*. at TR_NFC_00412.

[133] *Id*.

[134] *Id*.

[135] *Id*. at TRC_NFC_005413.

46

guideline-transaction method, based on comparable companies involved in merger and

acquisition transactions.  Mr. Tittle then compared the results from the two methods

(guideline companies and guideline transactions), calculated a weighted average, and

concluded the result was the Brooke entity's fair market value.

Mr. Tittle opined that Brooke Franchise's fair market value exceeded its total

liabilities as of the end of the year by $71.2 million in 2004, $80.4 million in 2005, $80.3

million in 2006, and $175.0 million in 2007.[136]  He also opined in his report that Brooke

Credit's fair market value was in excess of its total liabilities as of the end of the year by

$33.1 million in 2004, $62.8 million in 2005, $19.6 million in 2006, and $78.7 million in

2007.[137]  Mr. Tittle valued Brooke Corp by adding its share of the value he had determined

for its two primary operating subsidiaries, Brooke Franchise and Brooke Credit, estimating

the book value of its other assets, and subtracting its liabilities.  This resulted in an

enterprise value for Brooke Corp of $112.2 million in 2004, $164.1 million in 2005,

$142.5 million in 2006, and $157.8 million in 2007.[138]  Although Mr. Tittle did not

perform any formal valuations for 2008, he is of the opinion that the Brooke entities

became insolvent in March 2008.[139]

Mr. Tittle testified that in his opinion, the demise of the Brooke entities was caused

---

[136] *Id*. at TR_NFC_005416.

[137] *Id*. at TR_NFC_005417.

[138] *Id*.

[139] Doc. 235, Tittle Tr. 49:14-21, Apr. 29, 2016.

47

by external economic factors, such as the freezing of the credit market and the drop in the stock market that began in late 2007 and continued in 2008.[140] The resulting inability of Brooke to refinance its debt began the downward spiral, and the lack of liquidity caused its demise.[141]

The Court finds the insolvency opinion of Mr. Johnson to be better reasoned and more reliable than the valuation opinion of Mr. Tittle. First, Mr. Johnson's credentials and experience show that he is better qualified than Mr. Tittle for the specific task of determining solvency in this case. Mr. Johnson is a CPA who has practiced in the accounting field since 1968 and has been engaged in several hundred accounting, auditing, and consulting engagements.[142] Mr. Johnson has served on several committees which set standards for the American Institute of Certified Public Accountants, with particular emphasis on the insurance industry.[143] Mr. Tittle, also licensed as a CPA, is a Certified Insolvency and Restructuring Advisor and a Certified Turnaround Professional.[144] His experience and specialization focus on restructuring distressed businesses, not the accounting issues that predominate the solvency analysis in this case.

Second, Mr. Tittle's opinion that the market approach showed Brooke Franchise

---

[140] Id. at 45:22 - 46:22.

[141] Id.

[142] Trial Ex. T1028.0004.

[143] Id. at T1028.0004-.0005.

[144] Trial Ex. NFC-219 at TR_NFC_005375.

48

was solvent until March 2008 depends on the accuracy of the income and earnings reported in Brooke Franchise's audited financial statements, the statements that SSC audited. But Mr. Tittle did not convince the Court that his reliance on those statements was well founded. Mr. Tittle did not conduct an audit of the financial statements and did not review or analyze SSC's audit.[145] NCMIC did not retain any other expert to perform this function. Rather, when it was litigating against SSC in state court, NCMIC contended that SSC did not conduct a proper audit, and NCMIC received a substantial settlement from that lawsuit. Mr. Tittle testified that his analysis would change if there were errors in the income reported in Brooke's SEC filings, but he did not quantify the potential change.[146] He agreed that if Brooke's revenues were overstated to such an extent that Brooke Franchise had zero EBITDA or negative EBITDA, that would invalidate the EBITDA analysis on which he based his opinion that the company was solvent.[147]

Third, the pivotal issue on the insolvency question is whether Brooke Franchise's immediate recognition of all of the initial franchise fees it received, as reported in Brooke Franchise's financial statements, was in accord with GAAP. Mr. Johnson prepared a report and testified that it was not, and that SSC's unqualified audit of those statements was improper. His analysis was thorough and well-supported. Mr. Tittle testified that he did not agree with Mr. Johnson's conclusion that Brooke Franchise's audited financial

---

[145] Doc. 235, Tittle Tr. 97:15-98:6, Apr. 29, 2016.

[146] *Id*. at 131:17-132:1.

[147] *Id.*

49

statements did not conform with GAAP, particularly SFAS 45 regarding revenue recognition. The Court finds Mr. Tittle's testimony regarding income recognition to be totally untrustworthy. Mr. Tittle was not engaged to evaluate the SSC audits or the income recognition standards and methods. The matters were not addressed in Mr. Tittle's written report. Mr. Tittle has never been retained by any party as an expert to evaluate whether or not an audit has been performed in accord with GAAP or PCAOB[148] standards.[149]

To discredit Mr. Johnson's opinion, NCMIC relies on the fact that when Brooke Franchise was conducting its business, third party professionals did not question Brooke's income recognition practices, and, although the SEC raised the issue, it was satisfied even though Brooke Franchise did not change its practices after the SEC's inquiry. But this argument is not persuasive. It is based on conjecture, not the objective standards of GAAP. Further, NCMIC ignores the fact that it brought suit against SSC in state court for improper auditing practices, retained Mr. Johnson to evaluate SSC's conduct, and relied on Mr. Johnson's analysis (which included his opinion that Brooke's initial franchise fee income recognition was improper) when it participated in a settlement with SSC for its insurance policy limits. NCMIC provides no explanation for this change of position, and no credible expert opinion in support of it.

Fourth, the Court finds Mr. Johnson's methodology and adjustments to Brooke

---

[148] Public Company Accounting Oversight Board.

[149] Doc. 235, Tittle Tr. 98:13-17, Apr. 29, 2016.

Franchise's audited balance sheet to be trustworthy. Although Mr. Johnson was reluctant to attach a label to his methodology, the Court views his work as consistent with the asset-based method of valuation. It shows that Brooke Franchise was insolvent for purposes of the Trustee's effort to avoid Brooke Franchise's constructively fraudulent conveyances; the sum of its debts was greater than all of its assets at a fair valuation.

Finally, for four reasons, the Court rejects NCMIC's counsel's arguments[150] that the opinions of Mr. Johnson are unreliable and the Trustee therefore has failed to prove insolvency. First, contrary to NCMIC's position, Mr. Johnson's valuation approach is not an inferior method. It is one of the three recognized approaches and is a good method for estimating the value of a business which is continuing to generate losses.[151]

Second, Mr. Johnson's income-recognition analysis is based on authoritative standards, and NCMIC provided no reliable opinion evidence to the contrary. Its only expert regarding solvency and related questions was Mr. Tittle. His testimony, but not his report, touched on the solvency question, but he was not retained to address income recognition and acknowledged that he had not evaluated SSC's unqualified audits. NCMIC attempts to refute Mr. Johnson's opinion based on circumstantial evidence that numerous parties, including the SEC, accepted the audited financial statements. Such acceptance is common since parties generally do not distrust audited financial statements. There is no evidence any of those parties affirmatively approved of Brooke Franchise's

---

[150] *See* Doc. 212 (Trial Brief of NCMIC).

[151] *In re Commercial Fin. Serv., Inc.*, 350 B.R. at 534.

51

revenue recognition approach.

Third, NCMIC's argument that Mr. Johnson's theory is erroneous because he relied on the financial data of Brooke consolidated, rather than Brooke Franchise alone, when comparing the recurring expenses and recurring income is misdirected. Mr. Johnson relied on this consolidated data when discussing Brooke's flawed business model as a cause of its collapse, not as the basis for finding Brooke Franchise to be insolvent.

Fourth, Mr. Johnson's adjustments to the corrected GAAP financial statements of Brooke Franchise are fully supported by his detailed report and testimony.

For the foregoing reasons, the Court finds that the Trustee has sustained his burden to prove that Brooke Franchise was continuously insolvent during the four years preceding the filing of its bankruptcy petition on October 28, 2008.

### 3. Brooke Franchise Did Not Receive Reasonably Equivalent Value (REV) in Exchange for the Transfers.

When seeking to avoid constructively fraudulent transfers, the Trustee has the burden to show that Brooke Franchise "received less than a reasonably equivalent value in exchange for such transfer."[152] "In determining 'reasonably equivalent value,' courts typically compare the value of the property transferred with the value of what the debtor received."[153] Generally, obligations incurred solely for the benefit of a third party are not

---

[152] 11 U.S.C. § 548(a)(1)(B)(i).

[153] *White v. Coyne, Schultz, Becker & Bauer, S.C. (In re Pawlak)*, 483 B.R. 169, 183 (Bankr. W.D. Wis. 2012).

52

considered to be supported by reasonably equivalent value.[154]  An exception to this rule has been recognized "where a debtor receives an indirect benefit," such as from paying the obligation of a third party.[155]  The indirect benefit to the debtor must be "reasonably certain and quantifiable."[156]  The focus is to "ensure that the estate is not depleted by transfers for no or inadequate value."[157]

In this case, only Brooke's franchisees were obligated on the notes in which NCMIC held participation interests.  The evidence establishes that NCMIC did not transfer anything of value to Brooke Franchise in exchange for the loan payments[158] and that Brooke Franchise was not obligated to advance funds to pay its agents' loans that were originated by Brooke Credit.[159]  Therefore, if there was REV, it must be because of an indirect benefit to Brooke Franchise.  NCMIC has the burden to produce evidence of the indirect REV, but the Trustee bears the ultimate burden of proof to show the lack of REV as an element of his case.[160]

---

[154] *Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*, 457 B.R. 441, 444 (Bankr. M.D.N.C. 2011).

[155] *Id.*

[156] 5 *Collier on Bankruptcy* ¶ 548.05[2][b] at 548-74.

[157] *Montoya v. Campos (In re Tarin)*, 454 B.R. 179, 183 (Bankr. D.N.M. 2011).

[158] Doc. 260, Cole Tr. 116: 21-24, 120:4-9, June 15, 2016; Doc. 269, Tittle Tr. 28:13-31:13, June 21, 2016; Doc. 225, Barrett Tr. 62: 21-24, Apr. 22, 2016.

[159] Doc. 234, Devlin Tr. 19:2-4, Apr. 20, 1016; Doc. 238, Larson Tr. 17:11-14, Apr. 20, 2016; Doc. 281, Rob Orr Tr.171:9-172:15, Apr. 28, 2016; Doc. 231, Redmond Tr. 20:18-21, Apr. 27, 2016.

[160] *First Nat'l Bank in Anoka v. Minn. Util. Contracting, Inc. (In re Minn. Util. Contracting, Inc.)*, 110 B.R. 414, 417-18 (D. Minn. 1990).

53

NCMIC's expert, Mr. Tittle, prepared a report,[161] prepared a revised report,[162] and testified concerning REV. His opinions are premised on the understanding that REV means "that the debtor gave value, that the debtor gained something of value as a result of the transfer, and that the received value is substantially comparable to the worth of the transferred property."[163] In his opinion, Brooke Franchise "had a vested interest in keeping agency loans current because it received direct value from doing so" in three forms:[164] (1) commission-based franchise fees from the agents whose loans were subsidized, (2) profit-sharing revenues from "insurance companies related to the volume of policies sold by Brooke franchisees;"[165] and (3) rents received from some of these franchisees who rented office space from Brooke Franchise. For the years 2004 through 2007, he estimated that the agents whose loan payments were subsidized as shown on Mr. Barrett's revised Exhibit C generated commission-based franchise fees paid to Brooke Franchise of $19.219 million more than the subsidized loan payments,[166] produced $2.228 million in profit-sharing revenues in excess of the subsidized payments,[167] and paid $2.853

---

[161] Trial Ex. NFC-217 (Expert Report of John Tittle, Jr., Report on Reasonably Equivalent Value, May 14, 2015).

[162] Trial Ex. NFC-215 (Expert Report of John Tittle, Jr., Revised Report on Reasonably Equivalent Value, April 1, 2016).

[163] *Id*. at TR_NFC_005127.

[164] *Id.* at TR_NFC_005132.

[165] *Id*.

[166] *Id*.

[167] *Id*. at TR_NFC_005134.

million in rent to Brooke Franchise.[168]  In Mr. Tittle's opinion, Brooke Franchise's transfers to NCMIC also resulted in indirect value to Brooke Franchise in the form of its fulfilling contractual obligations to provide cash management services to franchisees, NCMIC's continued purchase of loan participations, the interest spread between the loan rates Brooke Credit charged the franchisees and the participation interest rates it paid, and the preservation of Brooke's business model by allowing it to continue making loans to finance initial franchise fees.[169]  Mr. Tittle estimated that the amount Brooke Credit earned in loan origination fees for the subsidized agencies was $1.168 million,[170] and that the interest-spread value to Brooke Credit was $2.678 million.[171]  He therefore concluded that "Brooke [Franchise] received more than reasonably equivalent value since direct and indirect value received by Brooke [Franchise] in exchange for making the transfers for loan payments for Revised Exhibit C agencies far exceeded the alleged Subsidized NCMIC loan payments [$4.4 million] that the Trustee seeks to avoid and recover from [NCMIC]."[172]

Kent E. Barrett of Veris Consulting, Inc., the Trustee's expert, prepared reports in

---

[168] Id. at TR_NFC_005135.

[169] Id. at TR_NFC_005136 to TR_NFC_005139.

[170] Id. at TR_NFC_005138.

[171] Id. at TR_NFC_005139.

[172] Id. at TR_NFC_005122.

55

response to Mr. Tittle's analysis.[173]  In his opinion, Mr. Tittle's value analysis was based on the erroneous position that value was generated by the continuing operation of Brooke's business.  According to Mr. Barrett, "[t]he longer Brooke [Franchise] was able to sustain its operations by using initial fees from new franchisees to support the continued operations of the existing franchisees, the more insolvent it became."[174]  Therefore, Mr. Tittle's attempts to quantify the "'direct' value alleged to have resulted from the loan subsidizations were "meaningless because none of the items actually constitute 'value' to Brooke [Franchise] and, [render] the amounts involved irrelevant."[175]  Nevertheless, Mr. Barrett reached the following conclusions regarding Mr. Tittle's quantification of value. The calculation of value from recurring franchise fees and profit-sharing revenue ignores the associated expenses; the figure calculated is 100% of the recurring commission revenues, which have a questionable relationship to the loan payments shown on Exhibit C; the calculation of value from the receipt of rent payments ignores the substance of the rent arrangements, which were not primarily with Brooke Franchise; the loan origination fees and interest spread were revenue to Brooke Credit, not Brooke Franchise; continuing to collect initial franchise fees provided Brooke Franchise with the ability to use the funds to pay its current obligations, thereby permitting it to continue its operation, and resulted

---

[173] Trial Ex. T1017 (Rebuttal Expert Report of Kent E. Barrett, May 14, 2015); Trial Ex. T1025 (Supplemental Rebuttal Report, Aug. 19. 2105).

[174] Trial Ex. T1017.0029.

[175] Trial Ex. T1025.0017.

56

in a substantial loss of value.[176]

The Court finds that Brooke Franchise "received less than a reasonably equivalent value in exchange for"[177] the loan subsidization transfers to NCMIC. There was no direct benefit to Brooke Franchise because the payments were made solely for the benefit of the agents, not Brooke Franchise. There were no reasonably equivalent indirect benefits; NCMIC's arguments of indirect benefits are factually and legally flawed.

The rationale for recognizing an indirect benefit as a basis for finding REV is that if in such cases "the consideration given to the third person has ultimately landed in the debtor's hands, or . . . the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and . . . the value of the benefit received by the debtor approximates the value of the property or obligation he has given up."[178] A leading treatise, *Collier on Bankruptcy*, identifies three circumstances when such an indirect benefit has been recognized: "(i) the debtor and the third party are closely related or share an identity of interests, so that what benefits one will benefit the other on something close to a dollar-for-dollar basis; or (ii) the debtor had the actual use and benefit of the goods or services for which the third party was obligated, again on something close to a dollar-for-dollar basis; or (iii) when the transfer also

---

[176] Trial Ex. T1025.0017-0018.

[177] 11 U.S.C. § 548(a)(1)(B).

[178] *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991-92 (2d Cir. 1981).

57

satisfied an obligation for which the debtor was liable."[179]  None of these circumstances are present here.  Brooke Franchise and the agents whose loans were paid were not so closely related that Brooke Franchise benefitted in amounts close to the benefits conferred on the agents.  The transfers were not to purchase goods or services used by Brooke Franchise.  Also, Brooke Franchise had no obligation to make the payments.  Rather, NCMIC argues that the payments allowed the agents whose loan payments were made by Brooke Franchise to stay in business, thereby generating franchise fees, profit-sharing revenue, and rent payments from these agents, and also providing other alleged benefits to Brooke entities.[180]

NCMIC also argues that the loan subsidies were "investments" in Brooke Franchise's franchisees, and that it is well established that a debtor receives REV in a third party when it makes an investment in that party with a legitimate expectation of success that will financially enhance the debtor.  The factual record does not support such a position.  Brooke Franchise had formal programs to help struggling agencies; there is no evidence that making the loan payments the Trustee seeks to recover was part of those programs.  Further, the success of Brooke Franchise was not tied to the success of individual troubled agencies.  NCMIC's theory of indirect value through "investment" in

---

[179] 5 *Collier on Bankruptcy* ¶ 548.05[2][b] at 548.74.

[180] Even if NCMIC's theories of indirect benefit fit into one of the foregoing categories, the Court could not find REV because the quantification of that benefit is not reliable.  The only significant amount is the estimated amount of ongoing commission fees payable to Brooke Franchise, but, as pointed out by Mr. Barrett, this estimation ignores the related expenses.

58

individual agencies appears to the Court to be a veiled argument that by providing the subsidies, Brooke Franchise prevented loan defaults and thereby maintained the confidence of NCMIC and other purchasers of loan participations, which allowed Brooke Credit to obtain funding, to make loans to new franchisees, and to sell those loans to the participants. In other words, the subsidizations allowed the continuation of the Brooke franchise system. But that theory is factually wrong. The continuation increased the insolvency of Brooke; it did not add value. The theory is also legally unsupported. "'A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.'"[181] Those cases which have found REV in the debtor's ability to keep his business in operation as a result of the challenged transaction identified "direct and measurable benefits to the debtor — either by tracing the benefits from the third party to the debtor or by finding that the opportunity to continue in business was, at the time of the transfer, something a reasonable person would attempt to obtain through the transfer made."[182]

*Fairchild Aircraft*,[183] relied on by NCMIC, is such a case. It involved an attempt to

---

[181] *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re Tousa, Inc.)*, 680 F.3d 1298, 1311 (11th Cir. 2012) (quoting *Bloor v. Dansker (In re Investors Funding Corp. of New York Sec. Litig.)*, 523 F. Supp. 553, 541 (S.D.N.Y. 1980)).

[182] 5 *Collier on Bankruptcy* ¶ 548.05[2][b] at 548-75. *Collier* cites *In re Fairchild Aircraft*, discussed in the text, and *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 845 F. 2d 635, 647 (3rd Cir. 1991), a leveraged buyout case which is factually dissimilar to the present case.

[183] *Butler Aviation Int'l Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119 (5th Cir. 1993) *abrogated on other grounds by Texas Truck Ins. Agency, Inc. v. Cure (In re Dunham)*, 110 F.3d 286 (5th Cir. 1997).

59

recover funds paid over time by the debtor Fairchild, an aircraft manufacturer, to Butler Aviation for fuel that Butler provided to Air Kentucky, a customer of Fairchild. Fairchild thought that its relationship with Air Kentucky had great long-term potential which could be realized only if Air Kentucky were financially sound. Fairchild therefore embarked on a plan to assist Air Kentucky, including spending between $16,000 and $20,000 a week on fuel to keep Air Kentucky flying until a buyer could be found. The court found REV to Fairchild based on the immediate benefit from not having to repossess aircraft it had previously sold to Air Kentucky, avoiding damage to another potential major customer, and keeping Air Kentucky marketable, which was likely to be very profitable to Fairchild.[184] In other words, Fairchild made a reasoned business decision to assist Air Kentucky by paying for fuel after having identified specific benefits that would provide to Fairchild.

This case is not similar to *Fairchild Aircraft*. There is no evidence that the subsidized loan payments were made pursuant to a reasoned business decision that the payments would result in a specific benefit to Brooke Franchise. The loan payments prevented default on the agent loans; this allowed the agents, Brooke Franchise, and other Brooke entities to continue business as usual. Brooke's management did not identify any direct, specific, and out-of-the-ordinary potential benefit the payments would provide to Brooke Franchise. Furthermore, in *Fairchild Aircraft*, the debtor planned to make

---

[184] *Id*. at 1125-27.

payments only until a buyer for Air Kentucky could be found.  Brooke had no similar plan

to end Brooke Franchise's payments when a specified event occurred.

Likewise, *LandAmerica*[185] and *PSN USA*,[186] two other cases relied on by NCMIC,

are clearly distinguishable.  *LandAmerica* concerned a bankrupt holding company's

attempt to recover utility payments it had made on behalf of subsidiaries from centralized

accounts funded by income earned by the subsidiaries.  When analyzing REV, the court

focused on whether the net effect of the transactions depleted the bankruptcy estate.

Because the revenue flowing into the holding company from the subsidiaries during the

relevant time period exceeded the amounts paid for utilities, there was no depletion of the

estate and REV was received.[187]  In addition, under the unique facts, the court found an

implied contract that created a duty for the holding company to pay the subsidiaries' utility

expenses.[188]  In this case, the subsidized loan payments depleted the Brooke Franchise

estate.  NCMIC nevertheless argues that because Brooke Franchise controlled the agents'

money, it had a duty to make their loan payments, and in this way, the payments provided

value to Brooke Franchise.  But the record is to the contrary.  Brooke Franchise had no

---

[185] *LandAmerica Fin. Group, Inc. v. S. California Edison Co.*, 525 B.R. 308 (E.D. Va. 2015).

[186] *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 F. App'x 925 (11th Cir. 2015).

[187] *LandAmerica Fin. Group, Inc.,* 525 B.R. at 314-15.

[188] *Id.* at 317.

duty to advance the funds to make the franchisees' payments.[189]

Likewise, *PSN USA* does not support NCMIC. In *PSN USA*, the debtor was the operator of a cable sports channel. The debtor's payments on a contract between its corporate parent and a satellite services provider were challenged as constructively fraudulent conveyances by the liquidating trust. Even though the debtor was not a party to the contract, REV was found because the debtor received and used the satellite services.[190] In this case, Brooke Franchise did not receive or use services provided by NCMIC.

For the foregoing reasons, the Court finds that the Trustee has proven that Brooke Franchise did not receive REV in return for the subsidized loan payments. Brooke Franchise did not receive any direct value from NCMIC, and Brooke Franchise did not receive any specific indirect value from third parties. The estate of Brooke Franchise was depleted by the subsidized loan payments.

### 4. NCMIC Is Not Entitled to the For-Value-and-in-Good-Faith Defenses of § 548(c) and K.S.A. 33-208.

The issues the parties identified in the pretrial order include NCMIC's contention that it "has met the 'good faith and value' defense of § 548(c) and K.S.A. 33-208 because it gave value, took for value and in good faith, and therefore may retain any interest transferred to it."[191] The factual basis for the defense as stated in the pretrial order relates

---

[189] Doc. 234, Devlin Tr.19:2-4, Apr. 20, 2016; Doc. 238, Larson Tr.17:11-14, Apr. 20, 2016; Doc. 281, Rob Orr Tr. 171:9-172:15, Apr. 28, 2016; Doc. 231, Redmond Tr. 20:11-21, Apr. 28, 2016.

[190] *In re PSN USA, Inc.*, 615. F. App'x at 931-32.

[191] Doc. 180 at 11.

62

to good faith, not value.  At the close of NCMIC's case, the Trustee moved for judgment on the defense, arguing that NCMIC had presented no evidence that any direct value moved from NCMIC to Brooke Franchise.[192]  As stated above, the Court declined to rule at that time.  The Court now finds that NCMIC has failed to prove the defense.

Section 548(c) of the Bankruptcy Code provides in part: "a transferee . . . of . . . a transfer [avoidable under § 548] . . . that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer."  K.S.A. 33–208(a) provides that a "transfer or obligation is not voidable under subsection (a)(1) of K.S.A. 33–204 against a person who took in good faith and for a reasonably equivalent value."  In the context of a constructive fraudulent transfer case, the defense allows the transferee to reduce its liability to the extent of any value it gave the transferor, even though the value given was not reasonably equivalent to the value of what the transferee received.[193]  The burden is on the defendant to prove the defense.[194]

Section 548(c) expressly requires the recipient of the transfer to have given value to the debtor.  Greg Cole, the president of NCMIC, admitted that NCMIC did not transfer any value directly to Brooke Franchise in connection with the franchise loan payments.[195]

---

[192] Doc. 269, Trial Tr. 86:23-89:1, June 21, 2016.

[193] 4 William L. Norton, Jr., and William L. Norton III, N*orton Bankruptcy Law & Practice 3d*, § 67:10 at 67-28 (Thomson Reuters 2016).

[194] *Jobin v. McKay (In re M&L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996).

[195] Doc. 260, Cole Tr. 116:21-24-120:9, June 15, 2016.

63

Both NCMIC's and the Trustee's experts agreed that NCMIC did not transfer anything of value to Brooke Franchise in exchange for the payments.[196] The defense therefore fails.

In addition, the § 548(c) defense is not available to NCMIC because, as examined below in the discussion of § 550(b), the Court finds that NCMIC did not act in good faith. These findings based on all of the evidence deny NCMIC the protection of the § 548(c) and K.S.A. 33-208(a) defenses.

### 5. The Trustee May Avoid Brooke Franchise's Transfer of Subsidized Loan Payments to NCMIC.

For the foregoing reasons, the Court holds that the Trustee has sustained his burden of proof under § 548(a)(1)(B) and the KUFTA, and may avoid the subsidized loan payments Brooke Franchise made to NCMIC within the four years preceding Brooke Franchise's filing for protection under title 11 on October 28, 2008. Under the circumstances of this case, the for-value-and-in-good-faith defense is not available to NCMIC.

### E. SECTION 550 ISSUES.

### 1. Liability under § 550.

Section 550 addresses the liability of transferees of fraudulent transfers avoided under § 548. The Trustee may recover the property transferred, or, if the court so orders, its value, from the initial transferee, the entity that received the transfer directly from the

---

[196] Doc. 269, Tittle Tr. 28:13-31:13, June 21, 2016; Doc. 225, Barrett Tr. 62:21-24, Apr. 22, 2016.

64

debtor.[197]  The Trustee may also recover from any immediate transferee of such initial transferee, but only if that subsequent transferee did not take for value and in good faith.[198]

In the Tenth Circuit, "initial transferee" has been defined to exclude a recipient of a transfer that acts as a conduit — an entity that has no dominion over the property transferred, no right to use the money for its own purposes.[199]  If the first recipient is a conduit, then the transferee from the conduit is an initial transferee, subject to strict liability.  On the other hand, if the first recipient is an initial transferee, then the person receiving the property from the initial transferee is a subsequent transferee and may avail itself of the § 550(b)(1) for-value-in-good-faith defense.

In this case, the Trustee contends that Brooke Credit, which received the subsidized loan payments from Brooke Franchise, was a conduit and NCMIC is therefore strictly liable as the initial transferee.  NCMIC, on the other hand, contends that Brooke Credit was not a conduit, and NCMIC, as the transferee from Brooke Credit, is not liable for the fraudulent transfers because it took them for value and in good faith.

### 2. Brooke Credit Was a Conduit and Not an Initial Transferee of the Subsidized Loan Payments Transferred to NCMIC.

The Bankruptcy Code does not define "initial transferee."  The Tenth Circuit[200]

---

[197] 11 U.S.C. § 550(a)(1).

[198] 11 U.S.C. § 550(a)(2) and (b)(1).

[199] *Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortg. Co.)*, 33 F.3d 42, 43-44 (10th Cir. 1994).

[200] *Id.*

65

follows the dominion test, "which focuses on whether the recipient had dominion over the money or other asset transferred."[201]  The dominion test was first authoritatively enunciated by the Seventh Circuit in *Bonded*.[202]  Under this test, "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes."[203]  This test recognizes that the term "transferee" must mean something different from anyone who simply touches the money, such as a "'possessor' or 'holder' or 'agent,'"[204] and provides a basis to hold that "those who act as mere 'financial intermediaries,' 'conduits' or 'couriers' are not initial transferees under § 550."[205]  "A person or entity is not the initial transferee under *Bonded* if it received no benefit from the transferred funds, had to follow instructions on how to use the funds, and would have been liable to the transferor if it had used the funds for its own purposes."[206]

---

[201] Jessica D. Gabel and Paul R. Hage, *Who is a "Transferee" under Section 550(a) of the Bankruptcy Code? The Divide Over Dominion, Control, and Good Faith in Applying the Mere Conduit Defense*,  21 Norton J. Bankr. L. & Prac. 47, 47 (2012) (hereafter "*Who is a Transferee?*") (available on Westlaw).  As discussed in more detail below, the Court acknowledges that the *Bonded* test, and therefore the Tenth Circuit test, has been referred to as the "dominion and control test" and as the "dominion or control test."  However, for purposes of this opinion, the Court adopts the nomenclature of the cited article, which makes a distinction between the Seventh Circuit's *Bonded* "dominion test" and the Eleventh Circuit's "control test."

[202] *Bonded Fin. Serv. Inc. v. European Amer. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (hereafter "*Bonded*").

[203] *Id.*

[204] *Id.* at 894.

[205] *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1202 (10th Cir. 2002) (*quoting Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996)).

[206] *CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 742 (Bankr. N.D. Ill. 2008).

66

In this case, Brooke Franchise transferred the subsidized loan payments to Brooke Credit, which then transferred those payments to NCMIC pursuant to the loan participation agreements between Brooke Credit and NCMIC. Under the dominion test as stated in *Bonded*, Brooke Credit was a conduit and NCMIC was the initial transferee.[207] This result is compelled by this Court's prior decision in *Stockton Bank*,[208] another adversary proceeding in the Brooke bankruptcy cases, where this Court held that a lead bank holding a note of the debtor was a conduit under *Bonded* when it received allegedly preferential payments from the debtor and, in accord with its participation agreements, immediately forwarded the payments to the holders of the participation interests in the loan. The participation agreements governing NCMIC's interests are identical to those in *Stockton Bank,* and the record shows that with respect to the subsidized payments, Brooke Credit conformed its actions to those required by the participation agreements and received no benefit from the transferred funds.

When arguing that Brooke Credit was not a conduit, NCMIC urges that *Stockton Bank* should not control for two reasons: (1) the conduit doctrine is a defense available to the recipient of an avoided transfer, and the Trustee should not be allowed to use the doctrine offensively; and (2) Brooke Credit, the alleged conduit, lacked good faith, and

---

[207] Of course, this holding applies only to the subsidized payments due on loans in which Brooke Credit sold participation interests and then only to the extent of the interests sold. Brooke Credit retained some agency loans for its own portfolio. With respect to payments on those loans, Brooke Credit was an initial transferee.

[208] *N. Capital, Inc. v. Stockton Nat'l Bank (In re Brooke Corp.)*, 458 B.R. 579 (Bankr. D. Kan. 2011).

had dominion and control of the transfers.[209]  The Court rejected the first reason when denying NCMIC's motion for summary judgment, and that decision will not be revisited here.[210]

With respect to the second reason, the factual basis for NCMIC's argument that Brooke Credit lacked good faith is Brooke Credit's knowledge that some Brooke franchisees were struggling and Brooke Franchise was providing financial assistance to them.  Brooke Franchise analyzed the performance of the franchise agents.  It held monthly readiness meetings to discuss how the franchisees were doing.  Brooke Credit was always invited to the meetings and attended from time to time.  At the monthly meetings, the focus was on agencies that were not paying their statement balances, why there was a balance, what the franchise agency was doing to fix the problems, and whether the agency needed assistance or consultation.  Brooke Credit also received monthly reports on each agency's status.[211]  The evidence is uncontroverted that Brooke Franchise made the monthly payments to Brooke Credit based on the statements prepared by Brooke Credit, and that Brooke Credit thereafter transferred to NCMIC the amount of the payments applicable to those agent loans in which NCMIC held participation interests.

---

[209] *See* Doc. 123 at 56-62; Doc. 215.

[210] *Redmond v. NCMIC Fin. Corp. (In re Brooke Corp.)*, 2016 WL 74796 at *6 (Bankr. D. Kan. Jan. 4, 2016) (hereafter "*NCMIC*").

[211] In addition, the Court notes that Brooke Credit appears to have received the full amount it requested each month, even though it knew that some agencies were struggling.  Brooke Credit also held some agency loans itself, and, like NCMIC and other participants, it benefitted from the subsidization practice.

The principal legal basis for NCMIC's argument that Brooke Credit was not a conduit because it lacked good faith is *Harwell*,[212] an Eleventh Circuit decision. NCMIC's closely-related argument that Brooke Credit was not a conduit because it exercised dominion and control over the funds it received from Brooke Franchise likewise is supported by Eleventh Circuit cases, primarily *Chase & Sanborn*.[213] Whether NCMIC's position is correct requires comparing the Eleventh Circuit's cases with Tenth Circuit precedent this Court is bound to follow.

*Harwell* supports NCMIC's argument that Brooke Credit's involvement in the administration of the Brooke franchise agencies should be considered when determining whether it was a conduit or an initial transferee. However, the Court is bound by the Tenth Circuit's adoption of *Bonded,* under which such evidence is not relevant. In reaching this conclusion, the Court finds the analysis in a 2012 article on the definition of "initial transferee" very helpful. Based on a thorough analysis of cases, the authors conclude that "[t]wo distinct tests have emerged for determining whether the recipient of a transfer"[214] is an initial transferee or a conduit. The first is the dominion test, "which focuses on whether the recipient had dominion over the money or other asset transferred."[215] As examined above, the dominion test was enunciated by the Seventh

---

[212] *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1322-23 (11th Cir. 2010).

[213] *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir. 1987).

[214] *Who is a Transferee?* at 47.

[215] *Id*.

69

Circuit in *Bonded*[216] and has been adopted by the Tenth Circuit.[217]  The second is the "'control test' which requires courts to examine the entire circumstances of the transaction, including whether the recipient acted in good faith, in order to determine whether the recipient actually controlled the transferred funds."[218]  The control test was authoritatively stated by the Eleventh Circuit in *Chase & Sanborn*.[219]

The two tests focus on different considerations.  The dominion test examines the rights and duties of parties under commercial law, where possessing money may not equate with the right to benefit from the money and the right to determine its disposition. The good faith of the recipient is not a consideration under the dominion test.  The Seventh Circuit rejected an approach, accepted by some courts, holding that an agent who lacked dominion over funds could be an initial transferee, but the agent's liability for the fraudulent transfer could be excused using the court's equitable powers.  Under the dominion test, "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purpose."[220]  "In other words, in order to be a transferee of the debtor's funds, one must (1) actually receive the funds; and (2) have full dominion over them for one's own account, as opposed to

---

[216] *Bonded,* 838 F.2d at 893.

[217] *In re First Sec. Mortg, Co.*, 33 F.3d at 44.

[218] *Who is a Transferee?* at 47.

[219] *Nordberg v. Societe Generale (In re Chase & Sanborn)*, 848 F.2d 1196, 1199 (11th Cir. 1988).

[220] *Bonded*, 838 F.2d at 894.

receiving them in trust or as agent for someone else."[221]

The *Chase & Sanborn* control test for conduit status is based on equitable considerations, rather than principles of commercial law. The test originated to resolve the issue whether the debtor had possessed property that the trustee subsequently sought to recover.[222] In that case, the court ruled the trustee could not recover because the debtor did not have sufficient control over the property to warrant a finding that the funds were the debtor's property. A "very flexible, pragmatic"[223] approach was taken under which courts were directed to "look beyond the particular transfer in question to the entire circumstances of the transactions."[224] This control test was soon adopted for purposes of defining who is an initial transferee of a fraudulent transfer.[225] The Eleventh Circuit interpreted case law to reject a literal interpretation of "initial transferee" and to hold that it would be inequitable to allow recovery from a party who never actually controlled the funds. The control test "simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable."[226]

*Harwell,* the case relied on by NCMIC, denied summary judgment on the conduit

---

[221] *Who is a Transferee?* at 51-52.

[222] *In re Chase & Sanborn*, 813 F.2d at 1181-82.

[223] *In re Chase & Sanborn*, 848 F.2d at 1199.

[224] *In re Chase & Sanborn,* 813 F.2d at 1181-82.

[225] *In re Chase & Sanborn*, 848 F.2d at 1199.

[226] *Id.*

71

defense to an attorney who had represented the debtor prepetition and received settlement funds because there was evidence that the attorney had schemed with the debtor to place the funds in the attorney's trust account for later distribution to the debtor, his family members, and selected creditors. The Eleventh Circuit thoroughly reviewed its precedent concerning the control test and concluded it demonstrated that: (1) § 550 should not be interpreted literally; (2) there is "an equitable exception to the literal statutory language of 'initial transferee,' known as the mere conduit or control test;"[227] and (3) as a part of the mere conduit or control test, the court "considers whether the intermediary 'acts without bad faith, and is simply an innocent participant.'"[228]

*Harwell* is a refinement of the control test. But the Tenth Circuit has not adopted the Eleventh Circuit's approach to the conduit doctrine or its refinement. Although the Tenth Circuit has referred to the test for conduit status as the "dominion and control" test,[229] the word "control" has not been used in a manner indicating that the Tenth Circuit accepts the control test as stated by the Eleventh Circuit in *Chase & Sanborn* or its later cases. In *First Security Mortgage*, the Tenth Circuit applied the *Bonded* dominion test, even though it referred to it as the "dominion or control test."[230] It did the same in

---

[227] *In re Harwell*, 628 F.3d at 1322.

[228] *Id.* at 1323 (quoting *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 705 (11th Cir. 2005)).

[229] *E.g., In re Ogden*, 314 F.3d at 1196.

[230] *In re First Sec. Mortg. Co.*, 33 F.3d at 43.

72

*Odgen*.[231]  Neither *Harwell* nor *IBT*, the case *Harwell* relied on when describing the good faith element of the control test, has been cited by the Tenth Circuit.  The Tenth Circuit has cited the 1988 *Chase & Sanborn* decision twice, once in a footnote in a unpublished opinion where the conduit defense was found to be procedurally defective,[232] and once for the holding that a bank is a conduit, after stating that the "dominion and control" test from *Bonded* has been adopted in the Tenth Circuit.[233]  The Ninth Circuit, which like the Tenth Circuit has adopted the *Bonded* test, "take[s] care not to apply the more lenient 'control test' put forth in *Chase & Sanborn Corp*."[234]  The Court therefore concludes that NCMIC's reliance on *Harwell* is misplaced.

This Court's understanding of the *Bonded* test is confirmed by *Paloian*, an opinion authored by Chief Judge Easterbrook, who also authored the *Bonded* decision.  In *Paloian*, he explains *Bonded* as adopting "an approach that tracks the function of the bankruptcy trustee's avoiding powers:  to recoup money from the real recipient of . . . transfers."[235]  At issue in *Paloian* was whether under *Bonded*, a securitization trustee was an initial transferee when it received funds in repayment on notes which were owned by a securitized asset pool trust, where the trustee was contractually bound to distribute the

---

[231] *In re Ogden*, 314 F.3d at 1202.

[232] *Xeta Corp. v. Canton Indus. Corp.*, 1997 WL 770941 at *3 n. 6 (10th Cir. Dec. 16, 1997).

[233] *In re Ogden*, 314 F.3d at 1202.

[234] *Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Inconmet, Inc.)*, 463 F.3d 1064, 1071 (9th Cir. 2007).

[235] *Paloian v. LaSalle Bank,* 619 F.3d 688, 691 (7th Cir. 2010).

trust's property to the pool's investors. Judge Easterbrook held that although the trustee had duties concerning the application of the funds, the trust, which was the owner of the assets, remained the real recipient of the funds and the appropriate party from whom to recover the transfers. The court reasoned that if the trustee were compelled to hand over the transfers, it would draw the money from the corpus of the trust, not its own assets, so that the money would really come from the investors — the persons for whose benefit the transfers had been made. The court declined to hold that the bankruptcy trustee should sue the thousands of investors rather than the securitization trustee, since that trustee could charge the recovery to the trust and "thus create the appropriate economic incidence."[236] *Paloian* confirms that under the *Bonded* dominion test, conduit status is determined based on a thorough review of the commercial transaction — examining not general equitable concepts, but who benefitted from the transfer and the legal status of the alleged conduit, rather than its conduct with respect to the transfer.

The Court therefore holds that under the *Bonded* dominion test, Brooke Credit was a conduit, and that NCMIC was an initial transferee of the subsidized loan payments. Under § 550(a)(1), the Trustee may therefore recover those loan payments (or their value) from NCMIC.

---

[236] *Id.* at 692.

### 3.  Alternatively, If Brooke Credit Was an Initial Transferee, the Trustee May Recover from NCMIC Because It Has Not Satisfied the For-Value-In-Good-Faith Defense of § 550(b).

When denying NCMIC's motion for summary judgment, the Court examined the criteria for good faith under § 548(c) and found the same analysis to be applicable under § 550(b)(1).[237]  Neither party argues that the Court's prior analysis on this point was erroneous.  Therefore, the Court will apply that prior formulation to the trial evidence to determine whether NCMIC took "for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided" under § 550(b)(1).  NCMIC has the burden of proof on this defense.[238]

The Tenth Circuit applies an objective standard to determine good faith.[239]  In *In re M & L Business Machine Company*, the Circuit ruled that a good faith defense to intentional fraudulent transfer liability under § 548(a)(1)(A) is not available "'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose.'"[240]  As this Court has previously ruled in this case, where NCMIC asserts a good faith defense to the Trustee's claims to avoid constructively fraudulent transfers under § 548(a)(1)(B), "[t]he question is whether a reasonably prudent purchaser of the Brooke participation interests

---

[237] *NCMIC*, 2016 WL 74796 at *7.

[238] *Redmond v. Brooke Holdings, Inc. (In re Brooke Corp.)*, 515 B.R. 632, 639 (Bankr. D. Kan. 2014).

[239] *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996).

[240] *Id*. (quoting lower court's opinion in the case, 164 B.R. 657, 661 (D. Colo. 1994)).

would have made inquiries, and after a diligent investigation, have learned that the borrowers, the Brooke franchisees, were not providing the funds for some of the payments made to NCMIC."[241] "Under the objective test, a circumstance sufficient to put the transferee on inquiry notice is referred to as a 'red flag.'"[242]

NCMIC argues that it had no actual knowledge that the loan payments it received from Brooke Credit had originated with Brooke Franchise, and that the circumstances would not have placed a reasonable person on inquiry notice.[243] It argues that it did not receive exorbitant interest; that there was nothing unusual about the manner in which Brooke Credit marketed the participation interests; that the transfers occurred at arm's length; that other sophisticated investors and community banks purchased interests in the franchisee loans; and that there were no irregularities in Brooke Credit's making of the loan payments. Further, NCMIC contends that diligent inquiry would not have discovered any "fraudulent purpose and impending insolvency."[244] Rather, according to NCMIC, inquiry would have revealed Brooke's audited financial statements, Brooke Corp's

---

[241] *NCMIC*, 2016 WL 74796 at *2.

[242] *Id*.

[243] On this issue, NCMIC relies on the authorities and arguments it submitted in support of its motion for summary judgment, where it stated that "the circumstances would not have placed a reasonable person on inquiry notice of any fraudulent purpose and impending insolvency on the part of Brooke Franchise." (Doc. 123 at 38). The Court rejected this standard and held that notice of fraudulent purpose and insolvency were not the correct considerations for determining good faith. *NCMIC*, 2016 WL 74796 at *2. Although NCMIC filed a trial brief on its § 550 defense after the Court ruled on the summary judgment motion, NCMIC did not avail itself of the opportunity to revise its arguments regarding inquiry notice, but rather relied on its brief in support of its motion for summary judgment. Doc. 215.

[244] *See* Doc. 123 at 38, relied on without modification by Doc. 215 at 1-2.

registration statements filed with the SEC, the Duff & Phelps buy-side fairness opinion dated August 31, 2007, and the CBIZ report dated November 15, 2007, none of which indicated any financial weakness.[245]

NCMIC's position was supported by the testimony of a financial expert, Randall Nay.[246] He is presently employed by Prairie Capital Advisors, a small consulting and investment firm.[247] He has about 39 years of experience working for banks and lenders, from 1970 to 2009, and for the past eight years has worked as a consultant.[248] His responsibilities have included reviewing commercial real estate, commercial business, and residential real estate loan opportunities, and making decisions whether or not to extend credit.[249] Mr. Nay's opinions were based on his analysis of the question: "Could the facts and circumstance of this case have put a reasonable person on inquiry notice of any fraudulent purpose or insolvency on the part of Brooke [Franchise] and, if so, would the ability to inquire by [NCMIC] have discovered the fraudulent purpose or insolvency" on the part of Brooke Franchise?[250] He testified that in his opinion, NCMIC had an

---

[245] Doc. 123 at 43-46.

[246] Mr. Nay's report, marked as trial exhibit NFC-221, was not offered as evidence.

[247] Doc. 261, Nay Tr. 3:15-19, June 15, 2016.

[248] Id. at 8:19-25.

[249] Id. at 9:9-14.

[250] Id. at 39:21-40:1. Mr. Nay's testimony addressed the good faith standard which this Court rejected when denying NCMIC's motion for summary judgment, as explained in footnote 242 above. Id. at 39:21-40:14 and 43:14-44:5.

77

appropriate credit policy, followed that policy, and adequately monitored the Brooke agency loan portfolio.[251]  He also testified that prudent lending practices did not require NCMIC to perform an on-site review of the agency loan files, and that NCMIC followed generally accepted lending practices.[252]  He did not believe there were any red flags that would have caused a reasonable lender in NCMIC's position to have questioned or investigated the loan files prior to May of 2008.[253]

The Trustee responded to Mr. Nay with the expert report[254] and opinion testimony of Edward C. Lawrence.[255]  Since 1985, Mr. Lawrence has been the managing director of Advanced Financial Associates, LLC, a financial consulting firm.[256]  He has served as an expert witness on banking-related cases for more than 30 years, including many engagements that focused on the lending activities for commercial loans and securitizations.[257]  He has been a consultant to some of the largest banks in the United States.[258]  For 16 years, Mr. Lawrence chaired the Department of Finance and Legal

---

[251] *Id*. at 31:10-16.

[252] *Id*. at 33:24-34.

[253] *Id*. at 34:13-21.

[254] Trial Ex. T1048.

[255] Mr. Lawrence testified on June 21 and 22, 2016.  The testimony given on June 21 has been transcribed, but that given on June 22 has not.

[256] Trial Ex. T1048.0003.

[257] *Id*.

[258] *Id*.

Studies in the College of Business at the University of Missouri-St. Louis.[259]  His report addressed:  "[W]hether NCMIC acted prudently and within industry standards/practices in purchasing and receiving payments on loan participations during the critical period of 2004 to 2008."[260]  His focus was "on reviewing NCMIC's lending policies, underwriting decisions, loan administration, and the monitoring of the Brooke participating loan portfolio."[261]

Mr. Lawrence's very thorough and meticulous analysis fully supports his opinion that NCMIC did not act prudently.  Mr. Lawrence examined 22 loan files provided by NCMIC.  Assuming that NCMIC provided everything its files contained, they were extremely incomplete.[262]  Mr. Lawrence concluded that the Brooke franchisee loans were high risk loans to subprime borrowers,[263] that NCMIC did very little, if any, due diligence, and that as a result, NCMIC "may not have fully comprehended the quality of the loans they were actually purchasing."[264]  Most of the loans did not meet the loan policies of either Brooke or NCMIC.[265]  He evaluated NCMIC's compliance with prudent lending practices and found many such practices were not followed.  NCMIC did not have a loan

---

[259] *Id.*

[260] *Id.*

[261] Trial Ex. T1048.0008.

[262] Doc. 269, Lawrence Tr. 127:3-6, 170:3-14, June 21, 2016.

[263] *Id.* at 126:23-127:2.

[264] *Id.* at 125:11-20.

[265] *Id.* at 166:16-20.

committee for the purchase of Brooke Credit loans, although it had loan committees for its other lending portfolios.[266]  A desirable loan has the purpose of assisting the borrower in being successful, but many of the loan files Mr. Lawrence reviewed contained no indication that the agency could succeed financially.[267]  In commercial lending, lenders look for the borrower to repay out of its cash flow, but for many of the loans Mr. Lawrence reviewed, the borrowers did not have a demonstrated capacity to repay from operations or even from collateral.[268]  With a few exceptions, the credit investigations of the agencies that the files contained revealed very weak credit scores.[269]  Credit scores run between 350 and 850, with more creditworthy borrowers receiving higher scores.  A credit score of 660 is normally the demarcation between prime and subprime borrowers.[270]  Of the ten files Mr. Lawrence initially reviewed, two had credit scores above 660, seven were between 660 and 535, and one was 468.[271]  The additional twelve files he reviewed also had "[v]ery low credit scores, with few exceptions."[272]  The collateral for the loans was intangible, and a guaranty of the loans that had been provided by D-B Indemnity, a

---

[266] *Id*. at 215: 5-17.

[267] *Id*. at 158:2-14.

[268] *Id*. at 160:9-21.

[269] *Id*. at 164:5-166:7.

[270] *Id*. at 164:12-19.  *See* Trial Ex. T1048.0027 at n. 26.

[271] Trial Ex. T1048.0024-0030.

[272] Doc. 269, Lawrence Tr. 164:20-25, 165:11-15, June 21, 2016.

80

Brooke-related entity, was worthless.[273]  NCMIC did no monitoring of the loans other than

to record payments; this is an unusual practice for a commercial lender with a $45 million

portfolio.[274]

NCMIC's credit policy for participations it purchased required the person making

the purchase decision to act as if they were direct loans and do the same analysis as for a

direct loan.[275]  NCMIC did not follow this policy,[276] nor did it verify the information in the

Brooke credit reports.  Mr. Lawrence opined that in many material respects, Brooke Credit

did not follow its own credit policies when making loans, and NCMIC ignored those

violations, even when its own credit policy required it to independently evaluate the

credit.[277]  Mr. Lawrence examined the material deficiencies in ten loan files in detail, and

concluded Brooke Credit's focus when it was evaluating potential borrowers was on their

personality, not whether they were acceptable credit risks.

With respect to Brooke's SEC filings, Mr. Lawrence identified a number of red

flags, unusual items that should have prompted due diligence investigations by investors

and lenders.  He calculated the agency failure rate based on information in the SEC filings,

---

[273] *Id*. at 240:1-243:11.

[274] *Id*. at 172:15-174:1.

[275] *Id*. at 175:10-14.

[276] *Id*. at 175:15-176:2.

[277] Trial Ex. T1048.0026-.0032.

81

and concluded there were 20 failures in 2004, 28 in 2005, 42 in 2006, and 89 in 2007.[278]

NCMIC should have been concerned that some of the agencies whose loans it held would fail.[279]  The number of agencies that could not pay back the credit within four months, the standard set by Brooke Franchise, grew from 72.7% at the end of 2004 to 94.8% at the end of 2007.[280]  Mr. Lawrence also opined that a lender should have been concerned about the disclosures in the SEC filings that the agent statement balances rose from $2.2 million in 2004 to $9.6 million in 2007.[281]  Mr. Lawrence identified a number of additional red flags in the SEC reports.  These included:  Brooke's clear dependence on initial franchise fees created an incentive for it to extend credit to borrowers who did not meet stringent underwriting criteria;[282] the adverse effect on Brooke if it were required to repurchase loans of poor quality;[283] the adverse effect on some agencies of increased interest rates on their acquisition loans, and lower commissions they would receive as a result of lower premiums charged by some insurance companies;[284] the fact that collateral for the loans in most cases was intangible and could rapidly decrease in value;[285] and the fact that in 2004,

---

[278] Trial Ex. T1048.0051.

[279] Doc. 269, Lawrence Tr. 199:18-24, June 21, 2015.

[280] Trial Ex. T1048.0020, T1048.52.

[281] Doc. 269, Lawrence Tr. 210:6-13, June 21, 2015; Trial Ex. T1048.0020.

[282] Trial Ex. J0574.0018 (Brooke Corp Form 10-K, Dec. 31, 2004).

[283] Trial Ex. J0590.0007 (Brooke Corp Form 10-K/A, Dec. 31, 2006).

[284] Trial Ex. J0590.0028.

[285] Trial Ex. J0590.0003.

82

Brooke's profitability was largely determined by its ability to add new franchise locations and earn the associated initial franchise fees.[286]

The Court finds that NCMIC did not receive the subsidized loan payments in good faith and without knowledge of the voidability of the avoided transfers. The opinion testimony of NCMICs expert, Mr. Nay, is far less reliable than that of the Trustee's expert, Mr. Lawrence. Mr. Nay's testimony addressed the legal standard that the Court rejected when it denied NCMIC's summary judgment motion. Mr. Nay's professional credentials and the strength of his analysis were far inferior to those of Mr. Lawrence, whose opinions the Court found to be well-reasoned and firmly grounded on his expertise and the record in this case.

The Court is convinced that a reasonably prudent purchaser of the Brooke Credit participation interests would have made inquiries, and after a diligent investigation, have learned that the borrowers, the Brooke franchisees, were not providing the funds for some of the loan payments made to NCMIC. There were many red flags. NCMIC relied heavily on the Brooke Credit memoranda when it purchased the participation interests. As demonstrated by Mr. Lawrence's testimony, those credit memoranda revealed that many of the borrowers were not credit-worthy — they had low credit scores, histories of loan delinquencies, low and even negative net worth, and no demonstrated capacity to succeed as agents. The many problems with the ten credit reports which Mr. Lawrence reviewed in

---

[286] Trial Ex. J0577.0037 (Brooke Corp Form 10-K/A, amendment 1, Dec. 31, 2004).

83

detail are astounding, even though eight of the reports addressed loans to existing agencies, not loans to the more problematic startup agencies. There is no evidence in the record that NCMIC ever rejected a loan offered by Brooke Credit, or ever independently verified the information provided, as required by its own credit policy and the industry standards for the purchase of loan participations.

Although NCMIC received monthly pass-fail-watch reports from Brooke Credit, when a participated loan was labeled "fail," NCMIC took no action other than to remove the loan from its borrowing base with its lender, Wells Fargo. It never inquired about the financial conditions of the borrowers.

NCMIC did review the Brooke SEC filings. As examined above, these filings revealed information that would have caused a prudent lender to make further inquiry about its loan portfolio, particularly where, as here, that portfolio was a substantial portion of the lender's loan assets.

As this Court has previously stated, "'[A] transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to ignore' warning signs."[287] But that its exactly what NCMIC did. It appears that one reason it did so was because it *always* received timely loan payments on *all* of the participated loans until May 2008. These timely monthly payments were received on approximately 1,050 loans over a four-year period. The Court finds this payment history is extraordinary, particularly since many

---

[287] *NCMIC*, 2016 WL 74796 at *4 (quoting *Moglia v.Universal Auto., Inc. (In re First Nat'l Parts Exch., Inc.)*, 2000 WL 988177 *6 (N.D. Ill. July 12, 2000)).

84

of the participated loans were to subprime borrowers. The absence of any payment defaults should have been a reason to inquire, not a reason for complacency.

Greg Cole, the NCMIC officer who controlled all aspects of its participation portfolio, is a highly-experienced and competent banker. When purchasing the participation interests, he looked at the individual borrowers, but considered NCMIC's ultimate risk to be with the franchisor.[288] He testified that "in the event the franchisee is not successful, the franchisor is going to step in because it's in his best interest to do so;"[289] an agency's nonpayment of its loan was the ultimate risk to Brooke Credit, but not to NCMIC. Mr. Cole regarded Brooke's cash management system and agency assistance programs as credit enhancements. NCMIC expected Brooke Franchise to pay if the agencies faltered. There is no evidence that Mr. Cole was surprised there were no late or missed loan payments until the spring of 2008. The Court surmises that NCMIC was not concerned whether or not the franchisees could make the loan payments because it relied on Brooke Franchise for payment.

NCMIC's conduct was not "wrong" or "fraudulent." NCMIC received and benefitted from what were essentially "gifts" from Brooke Franchise. The fact that the money came from Brooke Franchise, not the agents, became important only because of the insolvency of Brooke Franchise and the law of constructive fraudulent transfers, which allows the transferor to recover such "gifts" for the benefit of its creditors. If a holder of

---

[288] Doc. 260, Cole Tr. 39:10-40:6, June 15, 2016.

[289] *Id.* at 133:10-15.

loans wishes to protect itself from such liability, it must be more diligent in monitoring credit eligibility and loan performance than NCMIC was, particularly where it had reasons to suspect that some agents were in distress.

Based on the record, there is no doubt that if NCMIC had made inquiry to Brooke Franchise or Brooke Credit about why there were no payment defaults or the source of the payments it received, it would have learned of the loan subsidizations. Brooke personnel uniformly testified that all questions would have been answered. In June 2008, when NCMIC did make inquiry after the May 2008 payment was not made, it quickly learned of the many problems with the loans and the existence of the subsidizations.[290]

For the foregoing reasons, the Court concludes that NCMIC did not meet its burden of proof to avail itself of the for-value-in-good-faith defense of § 550(b)(1). The record clearly demonstrates that a reasonably prudent purchaser of the Brooke participation interests would have made inquiries, and after investigation, would have learned that Brooke franchisees were not providing the funds for some of the loan payments made to NCMIC.

### 4. The Amount of Recovery.

#### a. The Trustee's Claim.

The Trustee seeks to recover $4,448,511.23 in subsidized loan payments that were transferred to NCMIC from Brooke Franchise during the period from November 2004

---

[290] Trial Ex. J115, Doc. 260, Cole Tr. 171:16-174:18.

86

through October 2008.  Since Brooke Credit was acting as a conduit, the Trustee may

recover the property transferred or its value from NCMIC as the initial transferee under

§ 550(a)(1).  Or, even if the Court is incorrect and Brooke Credit was not acting as a

conduit, because NCMIC was not acting in good faith, NCMIC would be liable to the

Trustee for the property transferred or its value as an "immediate or mediate transferee"

under § 550(a)(2).

### b.  The Court Adopts Revised Exhibit C (as Corrected) Prepared by the Trustee's Expert as Establishing the Loan Subsidizations Brooke Franchise Paid to NCMIC.

A trustee is entitled to relief under § 550 in the amount of the value of the property

that was fraudulently transferred.[291]  The bankruptcy court "has the authority under

§ 550(a) to use its discretion to restore the estate to the position it would have been in had

the assets never been fraudulently transferred out of the estate."[292]  That discretion includes

approximating the value lost by the estate.[293]  Courts have relied on expert opinion

testimony to prove fraudulent transfers when information is incomplete or complex.[294]  To

establish the value of the property transferred in this case, for the reasons discussed below,

---

[291] *Galaz v. Galaz (In re Galaz)*, 2015 WL 457850 *10 (Bankr. W.D. Tex. Jan. 23, 2015).

[292] *West v. Hsu (In re Advanced Modular Power Sys., Inc.)*, 413 B.R. 643, 678 (Bankr. S.D. Tex. 2009).

[293] *In re Galaz*, 2015 WL 457850 at *10.

[294] *E.g., Pajaro Dunes Rental Agency, Inc.*v. *Spitters* (*In re Pajaro Dunes Rental Agency, Inc.*), 174 B.R. 557, 584 (Bankr. N.D. Cal. 1994) (experts disagreed on manner in which to trace each transaction; court found it would be inequitable and inefficient to trace funds and viewed the transaction as a whole); *Watts v. MTC Dev. LLC* (*In re Pallisades at W. Paces Imaging Ctr., LLC*), 501 B.R. 896 (Bankr. N.D. Ga. 2013) (court relied on expert report when conducting tracing analysis).

the Court adopts Revised Exhibit C prepared by the Trustee's expert, Kent E. Barrett.[295]

He was retained to "calculate the amount of the participating loan payments made to

NCMIC that were subsidized by Brooke [Franchise]."[296]  Absent Mr. Barrett's analysis,

because of the volume and complexity of the transfers in issue, it would be impossible for

the Court to determine the amount that was lost by the Brooke Franchise estate to

constructively fraudulent transfers to NCMIC.

 The reliability of Mr. Barrett's analysis is a hotly contested issue, so his

methodology will be examined in detail.[297]  Revised Exhibit C is an Excel spreadsheet

showing the analysis that supports the conclusion that $4.4 million in loan payments to

NCMIC were subsidized by Brooke Franchise on behalf of Brooke's agents.  In broadest

terms, the exhibit is Mr. Barrett's reconstruction of the monthly agent balance statements

---

[295] Trial Ex. T1023 (Revised Exhibit C to Trial Ex. T1019 (August 17, 2015 Supplemental Report of Kent E. Barrett dated Feb.17, 2015)).  The exhibit is an Excel spreadsheet having approximately 10,000,000 rows of data and about 45 columns.  It is available in electronic form only.  Revised Exhibit C is a modification of Exhibit C originally presented with Mr. Barrett's February 19, 2015 report (Trial Ex. T1016), which showed the total loan subsidization was $4,382,850.18.  For certain subsidizations in Exhibit C, beginning and ending dates and a substantial number of the loan payment amounts had been estimated because Mr. Barrett was not able to locate necessary documentation.  After the initial report, counsel provided Mr. Barrett with copies of NCMIC's monthly loan payments reports.  Using this data, Mr. Barrett replaced the estimated information and calculated a revised total subsidization amount of $4,448,511.23, which is 1.5% higher than the previous number.

[296] Trial Ex. T1016.0004.  Mr. Barrett issued four expert reports regarding subsidies:  Trial Ex. T1016 (Expert Report of Kent E. Barrett dated Feb. 19, 2015; Exhibit C calculates subsidies to NCMIC of $4,382,850); Trial Ex. T1017 (Rebuttal Expert Report of Kent E. Barrett dated May 14, 2015; responds to Mr. Tittle's Feb. 19, 2015 report; Exhibit F calculates subsidies and capped subsidies); Trial Ex. T1019 (Aug. 17, 2015 Supplement to Expert Report of Kent E. Barrett dated Feb. 19, 2015; Revised Exhibit C updates subsidies to NCMIC of $4,448,511); and Trial Ex. T1020 (Aug. 17, 2015 Supplement to Rebuttal Expert Report of Kent E. Barrett dated May 14, 2015; updated capped subsidies in Revised Exhibit F).

[297] Mr. Barrett's credentials are discussed in section (D)(1) above.

that had been prepared only in paper form by Brooke Franchise, which, because of the number of transactions, were not a practical source of the information he needed. As stated above, in the aggregate, these statements showed the agents owed $2.8 million, $7.3 million, $15.3 million, and $19.4 million to Brooke Franchise at the end of 2004, 2005, 2006 and 2007, respectively.[298] The reconstruction analyzed the cash flow by date for individual agents to determine what payments to NCMIC were subsidized by Brooke Franchise. When constructing Revised Exhibit C with the assistance of a former Brooke programmer who was familiar with Brooke's computerized financial records,[299] Mr. Barrett drew information from Brooke databases that recorded roughly 20 million transactions.[300] These included the accounting portion of the Brooke Management System maintained by Brooke Franchise,[301] which contained all of the detailed transaction data for all the agent activity and was used by Brooke Franchise to produce all the agent statements.[302] The records Mr. Barrett used also included Brooke Credit payment reports, bank statements for Brooke Franchise and Brooke Credit, and monthly reports produced by NCMIC regarding its participated loans.[303]

---

[298] Trial Ex. T1048.0052 (Table 5 based on Brooke Corp's Form 10-Ks dated Dec. 31, 2005, and Dec. 31, 2007).

[299] Doc. 224, Barrett Tr. 58:11-59:7, Apr. 21, 2016.

[300] Id. at 14:5-7.

[301] Id. at 17:21-18:7 and 58:11-19.

[302] Id. at 22:11-19.

[303] Id. at 22:25-24:15.

89

Mr. Barrett included an agency in Revised Exhibit C only if it had substantial negative cash flows during the periods that NCMIC held a participation interest in one or more of its loans.[304] This resulted in including 353 agencies, or a little over a third of all of Brooke Franchise's agencies.[305] Calculations were made for each identified agency for each month. The initial calculation determined if the agency had a positive or a negative cash flow for the month.[306] Brooke Franchise constructed the monthly agent statement balances using a fiscal month which ran from the 16th of the current month through the 15th of the next month, and Mr. Barrett used the same definition.[307] To compute the overall cash flow, Mr. Barrett subtracted the agency's operating expenses and any payments that were made on its loans by Brooke Franchise from the net commission revenue the agency earned, which was comprised of its gross revenue minus the monthly franchise fee (usually 15%) that it owed to Brooke Franchise.[308] A negative cash flow showed the presence of a subsidy, the amount of which Mr. Barrett referred to as the subsidization amount.[309]

When a subsidy was present, Mr. Barrett's next task was to identify any subsidized

---

[304] Trial Ex. T1016.0015.

[305] *Id.*; Doc. 225, Barrett Tr. 30:3-7, Apr. 22, 2016.

[306] Trial Ex. T1016.0019.

[307] Doc. 225, Barrett Tr. 9:16-20, Apr. 22, 2016.

[308] Trial Ex. T1016.0021.

[309] Doc. 225, Barrett Tr. 34:2-20, Apr. 22, 2016.

90

expenses or loan payments.  He never considered payments on securitized loans to be subsidized[310] as they were paid from segregated funds by Bank of New York, not by Brooke Franchise.[311]  Based on the timing of the payments, Mr. Barrett attributed subsidization to either the operating expenses paid for the month or to non-securitized loan payments.  Non-securitized loan payments were made to Brooke Credit in a lump-sum bulk payment, either on the last day of the statement month or a day or two later.[312]  The agencies' operating expenses were paid throughout each month.[313]  For purposes of Revised Exhibit C, the expense payment date Mr. Barrett assigned was the date the check cleared Brooke Franchise's accounts.[314]  For some expenses, this check-clear date was after the date the non-securitized loans were paid.[315]  These are referred to as the "paid after expenses."

To determine which payments were subsidized, on Revised Exhibit C, Mr. Barrett attributed the negative cash flow, the subsidization amount described above, first to the "paid after expenses," and then to the non-securitized loan payments.[316]  Therefore, the order of the application of net revenues available after the payment of securitized loans

---

[310] *Id*. at 48:11-18.

[311] *Id*. at 23:20-24:12.

[312] *Id*. at 39:3-8.

[313] *Id*. at 39:1-3.

[314] *Id*. at 40:11-16.

[315] Trial Ex. T1016.0017; Doc. 225, Barrett Tr. 38:9-40:6, Apr. 22, 2016.

[316] Trial Ex. T1016.0016-.0017; T1016.0020; Doc. 225, Barrett Tr. 41:1-8, Apr. 22, 2016.

and the monthly commissions was: (1) on-going expenses where the check cleared before the non-securitized loan payments; (2) non-securitized loan payments to Brooke Credit; and (3) expenses for the month paid by checks that cleared after any non-securitized loan payments.[317] In other words, Mr. Barrett concluded that Brooke Franchise subsidized a loan payment on behalf of an agency only if the subsidization amount exceeded the "paid after expenses."[318]

If NCMIC was the only entity to whom the non-securitized loan payment was owed, Mr. Barrett, after deducting the amount owed to Brooke Credit,[319] attributed the subsidy wholly to NCMIC; if more than one lender received payment, the subsidization was allocated between the lenders on a pro rata basis.[320] For the period from November 2004 through October 2008, he determined that the aggregate of the loan payments remitted each month to NCMIC, as shown on Revised Exhibit C, was approximately $9.4 million, of which $4.4 million was subsidized by Brooke Franchise.[321]

NCMIC presented rebuttal evidence through the testimony and Revised Report on

---

[317] Trial Ex. T1016.0016-.0017.

[318] *Id.*; Doc. 225, Barrett Tr. 54:17-22, Apr. 22, 2015.

[319] For example, the interest spread between that owed on the loan and the amount payable to NCMIC. Trial Ex. T1016.0036.

[320] Trial Ex. T1016.0022; Doc. 225, Barrett Tr. 55:23-56:21, Apr. 22, 2016.

[321] Trial Ex. T1016.0015.

92

Damages prepared by its expert, John Tittle.[322]  He testified that in his opinion, Mr.

Barrett's Revised Exhibit C was flawed for two primary reasons.[323]  First, he opined that

the information used in the reconstruction was unreliable.[324]  The information was not

pulled from the actual agent balance statements, which were not in electronic form.

Rather, it was pulled from the Brooke financial data, and Mr. Tittle was unable to replicate

the process.[325]  Second, Mr. Tittle testified that in his opinion, Mr. Barrett's calculations

were unreliable because they mixed cash and accrual accounting methods, and did not

follow generally accepted accounting principles.[326]  Revised Exhibit C was constructed as

if all revenue had been received at the first day of the fiscal cycle, rather than when it was

actually received; in contrast, expenses were treated as having been paid when the expense

checks cleared, not when the checks were written.[327]  An expanded version of Mr. Tittle's

opinion is included in his Revised Report on Damages.[328]

Mr. Tittle therefore prepared an alternative analysis.  Using only the data in

Revised Exhibit C, he divided the agencies into three buckets, based on each agency's

---

[322] Trial Ex. NFC-216 (Expert Report of John Tittle, Jr. Revised Report on Damages, dated Apr.
1, 2016).

[323] Doc. 268, Tittle Tr. 66:2-10, June 20, 2016.

[324] *Id*. at 67:11-15.

[325] *Id*. at 72:8-73:23.

[326] *Id*. at 66:6-67:10.

[327] *Id*. at 99:13-20.

[328] Trial Ex. NFC-216 at TR_NFC_005171-005173.

adjusted cash flow on an annual basis for the four-year period.[329]  Group 1 agencies were

those that had sufficient cash flow during the four years to service their debt.[330]  Since they

did not need assistance, Mr. Tittle opined that Group 1 agencies should not be included in

Revised Exhibit C.[331]  Group 2 agencies were those that experienced "mixed cash flow

results."[332]  As with Group 1 agencies, Mr. Tittle concluded that payments Brooke

Franchise made on behalf of Group 2 agencies should not be considered subsidies because

while they experienced some negative cash flow months, they also achieved many positive

net cash flow months and experienced one positive cash flow year.[333]  Mr. Tittle concluded

that only Group 3 agencies, those with consistently poor cash flow performance, should be

included in Revised Exhibit C.[334]  The subsidized transfers Brooke Franchise made on

behalf of Mr. Tittle's Group 3 agencies totaled $2,691,074.42, which is 60.49% of the total

subsidized payments identified by Mr. Barrett.[335]

    The Trustee retained Mr. Barrett to review and respond to Mr. Tittle's expert

report.[336]  Mr. Barrett disagrees with Mr. Tittle's conclusion that the calculated subsidies

---

[329] Doc. 268, Tittle Tr. 118:5-23, June 20, 2016.

[330] Trial Ex. NFC-216 at TR_NFC_005174.

[331] *Id*.

[332] *Id*.

[333] *Id*.

[334] *Id*. at TR_NFC_005174 to 005175.

[335] Trial Ex. NFC-216 at TR_NFC_005174.

[336] Trial Ex. T1017 (Rebuttal Expert Report of Kent E. Barrett, dated May 14, 2015).

94

should be disregarded for Group 1 and Group 2 agencies, saying "[T]he Tittle Report provides no basis for its conclusion that positive cash flows should offset negative cash flows for purposes of calculating subsidized loan payments."[337] Mr. Tittle's calculation to identify positive cash flow agencies was based on an agency's annual performance, but Mr. Barrett's Revised Exhibit C did not include all months for an agency. "[T]he fact that the total adjusted cash flows reflected on [Mr. Barrett's Excel spreadsheet] for these agencies is a positive number has nothing to do with the calculated subsidies;"[338] the identification of subsidy payments was based on viewing each month on a stand-alone basis.[339] Mr. Barrett's calculation of the adjusted cash flows for Mr. Tittle's Group 1 agencies for the entire period from November 2004 through October 2008 showed that 22% of them actually had a negative cash flow.[340]

Mr. Barrett supplemented his analysis with a category he called "Capped Subsidized NCMIC Pmts." This category compared each agency's calculated subsidy with the amount the agency still owed Brooke Franchise when it filed bankruptcy, which equaled the sum of the amounts that Brooke forgave and the actual reported ending agent balances.[341] As applied to the subsidies reported on Revised Exhibit C, that calculation,

---

[337] Trial Ex. T1017.0007.

[338] Trial Ex. T1017.0016.

[339] *Id.*

[340] Trial Ex. 1017.0017.

[341] Trial Ex. T1017.0031-.0033.

reported on Revised Exhibit F, shows that $3,386,399.75 of the subsidies transferred to NCMIC were never recovered.[342] This is significantly greater than Mr. Tittle's conclusion, based on his identification of Group 1 and 2 agencies, that only $2,691,074.42 of the subsidized loans payments Mr. Barrett identified should be considered because of the potential for payments by cash flow positive agencies.[343]

The Court rejects Mr. Tittle's three-bucket analysis as an alternative to Mr. Barrett's identification of subsidized loan payments made to NCMIC. Using Mr. Barrett's calculations, Mr. Tittle attempted to identify which agencies needed subsidization, not which agencies actually received subsidizations, the task performed by Mr. Barrett. In addition, Mr. Tittle's analysis fails to accurately determine which agencies actually needed the financial assistance given by Brooke Franchise. As pointed out by Mr. Barrett's rebuttal report, Mr. Tittle's placement of agencies in Groups 1, 2, and 3 was based on a misunderstanding of the information in Revised Exhibit C and is therefore not reliable.

In addition to Mr. Tittle's three-bucket analysis, NCMIC makes other arguments why the Court should reject Mr. Barrett's calculation that Brooke Franchise subsidized $4.4 million of loan payments to NCMIC. The Court rejects Mr. Tittle's challenges to Mr. Barrett's methodology. The data Mr. Barrett used in constructing Revised Exhibit C was not unreliable. The fact that Mr. Tittle could not replicate the data extraction used by Mr.

---

[342] Trial Ex. T1020.0002 (August 17, 2015 Supplement to Rebuttal Expert Report of Kent E. Barrett dated May 14, 2015) and T1021 (Revised Exhibit F).

[343] Trial Ex. NFC-216 at TR_NFC_005174.

96

Barrett is irrelevant. The data was extracted from Brooke's computerized records by a former Brooke programmer who was able to assemble the data Mr. Barrett needed. The Court also rejects Mr. Tittle's argument that Mr. Barrett's calculations are unreliable because they mixed cash and accrual accounting methods. Mr. Barrett did not purport to perform an accounting. His stated purpose was to reconstruct the monthly agent balance statements using source data.

In a post-trial brief, NCMIC's counsel raised a number of other objections to Mr. Barrett's calculations,[344] which the Court also rejects. First, NCMIC argues that "Mr. Barrett's estimation presented at trial was not 'proven with sufficient certainty to justify the award' proposed by the Trustee."[345] This argument is premised on Mr. Barrett's candor in admitting it is "possible that somewhere embedded in here, there could be a formula error that causes some minor change . . . [and] there could be a potential inaccuracy [in] . . . the process of pulling the cash flows" because the "criteria that was used . . . isn't perfect because Brooke wasn't always completely 100 percent consistent in the way it populated the fields and database."[346] But Mr. Barrett also testified that the data gathering, whether from the cash flows recorded by Brooke Franchise or the loan payments recorded by NCMIC, "was very solid, [with] . . . no real room for error."[347]

---

[344] Doc. 229 (NCMIC Financial Corporation's Rule 52(c) Motion for Judgment on Partial Findings, and Suggestions in Support).

[345] *Id*. at 13.

[346] Doc. 225, Barrett Tr. 220:23-221:10, Apr. 22, 2016.

[347] Doc. 226, Barrett Tr. 112:8-9, Apr. 25, 2016.

97

With respect to the underlying cash flow data, Mr. Barrett testified that he was aware of the problem areas and "manually tried to eliminate and identify all [of] those."[348] He concluded, "So I have a very high degree of confidence that this is accurate in that sense and that if there are any problems with it, it's not going to have any meaningful difference in the end results."[349] Given the complexities of the task of identifying the loan subsidies paid to NCMIC, the Court cannot expect absolute certainty. If it did, the Trustee could not possibly recover the loan subsidizations that even NCMIC admits occurred.

A source-data accuracy issue examined at trial and addressed in NCMIC's post-trial brief arose because some agencies included on Revised Exhibit C were related to each other, so that several individual agencies ("subCONOs," or sub-company numbers) were related to one main agency number, called a CONO. At times, Brooke did not charge expenses to the proper subCONO, creating a possibility that Mr. Barrett's calculations would show a particular subCONO received a subsidy solely because of the erroneous expense charge. Mr. Barrett changed his methodology to reduce this error by consolidating the data at the main CONO level.[350] Counsel for NCMIC questioned this procedure, observing among other things that not all of the subCONOs had NCMIC loans. In response, Mr. Barrett calculated the amount of the subsidization if the subCONOs were not grouped as he had done in Revised Exhibit C, and determined that the result would

---

[348] Doc. 225, Barrett Tr. 221:18-19, Apr. 22, 2016.

[349] *Id.* at 221:19-23.

[350] Doc. 226, Barrett Tr. 165:17-166:21, Apr. 25, 2016.

have been to increase the amount of the subsidization to $5.265 million.[351]  The Court

finds that Mr. Barrett's use of data at the main CONO level was a reasonable

accommodation for the identified source-data error that does not make his calculation of

the subsidized loan amount unreliable; if anything, it resulted in a lower total subsidization

to the benefit of NCMIC.

During cross-examination of Mr. Barrett, NCMIC's counsel identified two formula

errors on Mr. Barrett's spreadsheet.[352]  Mr. Barrett responded by reviewing the spreadsheet

and identifying six examples of the errors identified on cross-examination.[353]  He prepared

an exhibit summarizing those errors, which resulted in a reduction of the subsidization by

$4,709.14 on both Revised Exhibits C and F.[354]

Contrary to NCMIC's assertion that this correction "casts serious doubt" on the

amount of the Trustee's claim, the Court finds that Mr. Barrett's response enhances the

reliability of his calculations.  It illustrates the fact that because of the enormous volume of

data involved in the subsidization calculation, an error in any single entry would have a

minor impact on the ultimate conclusion.

The Court therefore rejects NCMIC's argument that Mr. Barrett's calculations were

not proven with sufficient certainty to justify the award proposed by the Trustee.  As stated

---

[351] *Id*. at 181:7-20; *see* Trial Ex. T2880.

[352] *See* Doc. 226, Barrett Tr. 135:15-136:20, Apr. 25, 2016.

[353] *Id*. at 139:3-15.

[354] Trial Ex. T2878; Doc. 226, Barrett Tr. 151:9-15, Apr. 25, 2016.

99

above, absolute accuracy is not required.

Second, counsel for NCMIC argues that "what the Trustee proposes in damages, through its expert Barrett is precisely defined as remote, contingent, speculative and conjectural."[355]  Under this heading, NCMIC challenges several of Mr. Barrett's assumptions and procedures:  (1) that he assessed no subsidization to securitized loans payments, (2) that he charged expenses in the order that the payments cleared Brooke Franchise's accounts, (3) that he failed to take into account instances when Brooke Franchise took over a Brooke agency, and (4) that he failed to account for working capital loans.  The Court will examine each of these contentions separately.

For the months shown on Revised Exhibit C, many of the agencies had both securitized and non-securitized loans.  The calculations on Revised Exhibit C assumed that loan payments on securitized loans were never subsidized by Brooke Franchise, because securitized loan payments were made by an entirely different process than payments on other loans.  When BASC received commissions from insurance companies, it transferred them to its consolidated receipts trust account.[356]  From there, the commissions were transferred to the master receipts trust account at BONY, which was the trustee for the various securitizations.[357]  BONY reserved the funds for the securitized loan payments, after which most of the remaining commissions in that account were transferred to the

_____

[355] Doc. 229 at 15.

[356] Doc. 226, Barrett Tr. 118:20-24, Apr. 25, 2016.

[357] *Id.* at 118:25-119:9.

Brooke Franchise accounts.[358]  In other words, Brooke Franchise did not receive the

commission money until after the portion required to make the securitized loan payments

was reserved for that purpose.  The system was designed so there would always be

sufficient cash to make the securitized loan payments.[359]  Mr. Barrett therefore reasonably

assumed that the commissions earned by agencies went first to pay their securitized loans.

Further, if an agency did not generate sufficient commissions to pay even its securitized

loans, then all of the additional payments Brooke Franchise made on behalf of the agency,

including the payments to NCMIC, would have been subsidized, and the assumption that

the securitized loans were paid first would not have impacted the results on Revised

Exhibit C.[360]  The Court finds that Mr. Barrett's assumption that securitized loan payments

were not subsidized by Brooke Franchise in the monthly expenses payment process was

appropriate.[361]

 NCMIC labels Mr. Barrett's determination of the order in which expenses were

paid as arbitrary and based on "no guiding principle other than to tag NCMIC with

---

[358] *Id*. at 119:22-121:2.

[359] *Id*. at 120:9-13.

[360] Doc. 225, Barrett Tr. 251:23-252:24, Apr. 22, 2016.

[361] NCMIC points out (*see* Doc. 229 at 16) that in a separate adversary proceeding, the Trustee asserted constructive fraudulent transfer claims against the Bank of New York and others, alleging the claims arose from the subsidization of securitized loan payments.  *Riederer v. Bank of New York Mellon (In re Brooke Corp.)*, Adv. No. 10-6245, Doc. 45, ¶¶ 373-390.  The subsidization process alleged in that proceeding is very different from the one at issue here.

101

subsidies."[362]  This argument borders on the irresponsible.  Mr. Barrett was not arbitrary.

He used the check-clear date to avoid relying on non-verifiable and inconsistent dates in

Brookes' accounting records.

NCMIC also complains that Mr. Barrett's methodology did not take into account

situations where Brooke Franchise would take over an agency under a management

agreement.  In such an event, Brooke Franchise became entitled to all commissions and, in

NCMIC's view, legally obligated to pay all expenses, including loan payments.[363]  Mr.

Barrett testified that he regarded an agency to be Brooke-managed when Brooke Franchise

claimed a monthly commission of one hundred percent of the commissions earned.  In that

situation, he reduced the monthly franchise fee back to 15%, and allowed the subsidies to

be calculated as if the agency had not been Brooke-managed.[364]

The Court finds NCMIC's criticism of Mr. Barrett's handling of Brooke-managed

agencies to be insufficient to invalidate his conclusions for several reasons.  First, Mr.

Barrett does not know how often this situation arose,[365] and NCMIC offered no evidence

to prove the frequency.  It appears that some agencies may have been placed under the

control of Brooke Franchise pursuant to a written Franchise Management Agreement.  But

---

[362] Doc. 229 at 17.

[363] *Id*. at 18.

[364] Doc. 226, Barrett Tr. 22:16-23:5, Apr. 25, 2016.

[365] *Id*. at 87:10-17.

102

a review of the sample Franchise Management Agreement included in the record[366] does not convince the Court that taking over an agency obligated Brooke Franchise to pay the agency's loans from its own funds. Brooke Franchise's liability was limited to expenses incurred on or after a date one month before the date of the agreement. The agency's obligations on the participated loans would have been previously incurred. The management agreement did not expressly relieve the agency of liability on its loans, and Brooke Franchise did not expressly assume such liability. NCMIC's questioning raises a cloud of doubt, but close scrutiny fails to substantiate the concern.

NCMIC's final argument, that the Revised Exhibit C calculations are unreliable because Mr. Barrett failed to account for working capital loans that NCMIC purchased,[367] likewise does not withstand close analysis. It is undisputed that Brooke Credit made working capital loans to agencies, particularly to start-up agencies, often in the amount of $30,000.[368] They were included as part of a single loan comprised of the initial franchise fee and the working capital component,[369] so the principal balance would usually be $195,000. Brooke Credit transferred the loan proceeds to Brooke Franchise, which transferred the franchise fee portion to its own account and placed the working capital

---

[366] Trial Ex. NFC-38.

[367] Doc. 229 at 17. This issue was the subject of post-trial briefing. Docs. 270 (NCMIC Finance Corporation's ("NCMIC") Brief Regarding Working Capital Loans), Doc. 271 (Response to NCMIC Finance Corp.'s Working Capital Loans Brief), and Doc. 273 (NCMIC Finance Corporation's ("NCMIC") Reply Brief Regarding Working Capital Loans).

[368] *E.g.*, Trial Ex. NFC_ Ex. 24.

[369] Doc. 123, Ex. 6, Michael Lowry, Deposition Tr. 50:9-25, Jan. 26, 2016.

portion in an off-statement balance for the agent.[370]  Brooke Franchise would later move a portion of that credit amount back into the agent's statement when there was a corresponding deficiency owed by the agent on its monthly statement.[371]  If NCMIC held an interest in a loan with a working capital component, it is possible that Mr. Barrett's analysis would have concluded that Brooke Franchise had subsidized a loan payment to NCMIC when the agent actually had a working capital loan balance from the very loan held by NCMIC that was sufficient to cover the monthly shortfall.  But NCMIC has not identified one example where this occurred.  Its objection is theoretical and hypothetical.

In addition, Mr. Barrett testified that if there were any working capital agency loans outstanding for agencies included on Revised Exhibit C for the time periods when a subsidization was identified, the impact was *de minimis*.[372]  He gave several reasons for this conclusion.  First, most of the working capital loans were made to start-up agencies, and NCMIC stopped purchasing start-up agency loans in 2006.  Second, initially, only interest (no principal) was paid on start-up loans for the first 18 months, and later for eight months.[373]  Third, generally until 2007, Brooke Credit held loans for some time, two months on average, before participation interests were sold.[374]  But working capital loan

---

[370] Doc. 226, Barrett Tr. 80:4-82:16, Apr. 25, 2016.

[371] *Id*.

[372] *Id*. at 61:13-62:2.

[373] *Id*. at 82:17-25; Doc. 260, Cole Tr. 42:6-20, June 5, 2016.

[374] Doc. 225, Barrett Tr. 136:19-136:5, Apr. 22, 2016.

104

amounts were dissipated within a few months.[375]  The Court concludes that if NCMIC

purchased loans having an outstanding working capital component, only a minimal

number of monthly statements would have been impacted.

The Court agrees with Mr. Barrett's assessment that the impact of his failure to

explicitly make adjustments to his calculations to remove from the subsidies the advances

that would be immediately satisfied by an agency's working capital loan balance is not

significant.[376]  The record as a whole leaves no doubt that NCMIC very carefully

scrutinized Mr. Barrett's calculations, but NCMIC has not presented one instance where a

payment was included on Revised Exhibit C for a loan where the agent had a balance left

on the working capital component of a loan when the payment was made to NCMIC.

Although the failure to expressly consider the impact of working capital loans is a

theoretical defect in Mr. Barrett's analysis, it appears highly unlikely that it occurred with

sufficient frequency to materially impact the result.

To summarize, the Court finds Mr. Barrett's analysis to be reliable and trustworthy.

His credentials are outstanding.  He conducted a very detailed analysis based on source

data, which included the contemporaneously-maintained financial records of Brooke

Franchise, Brooke Credit, and NCMIC.  He utilized the skills and knowledge of a former

---

[375] Doc. 226, Barrett Tr. 81:5-10, Apr. 25, 2016.

[376] Other areas of Mr. Barrett's calculations were conservative.  For instance, his grouping of subCONOs was conservative, meaning they appear to have resulted in an under-calculation of the subsidy amounts.  Including subsidies immediately covered by operating lines of credit would increase the subsidies, but there is no suggestion that this increase would exceed the under-calculation resulting from other assumptions.

105

Brooke programmer to assist with extraction of the data he needed from the overwhelming number of entries that were available. His calculations were transparent and thoroughly explained to the Court step by step. When more complete data became available, he revised his calculations. When anomalies were identified, he did not hesitate to investigate whether there was a problem and to make corrections if warranted.[377] His assumptions, such as the principles that subsidies should be calculated on a monthly basis and that the times of entries should be determined by the date checks cleared the bank, were reasonable.

For the foregoing reasons, the Court adopts Mr. Barrett's Revised Exhibit C, with the corrections shown on Trustee Exhibit T2878,[378] as the amount of the subsidized loan payments that Brooke Franchise made to NCMIC on behalf of Brooke agents whose notes NCMIC had purchased from Brooke Credit. That amount is $4,443,802.09.

### c. The Avoided Transfers Are Limited to Those for which Brooke Franchise Had Not Been Reimbursed as of the Date Brooke Franchise Filed for Relief under the Bankruptcy Code.

Mr. Barrett's report in rebuttal to Mr. Tittle's damage report includes Exhibit F,[379] which was later revised when refinements were made to Exhibit C. Revised Exhibit F is a version of Revised Exhibit C to which Mr. Barrett added columns he used to identify those

---

[377] *See* Trial Ex. T2877, T2778, T2779, and T2780 and related Barrett testimony on April 25, 2016 (Doc. 226).

[378] Trustee Exhibit T2878 calculates the reduction to the subsidized amounts shown on Revised Exhibit C resulting from the six instances of formula error identified by Mr. Barrett.

[379] Trial Ex. T1021 (Revised Exhibit F).

106

loan subsidies that the agents had not repaid to Brooke Franchise as of the date Brooke Franchise sought bankruptcy protection. The amount the agency owed was calculated by adding the amounts which Brooke Franchise forgave to the actual reported ending agent statement balances.[380]  As discussed above, during the trial, Mr. Barrett determined that the subsidies identified in Revised Exhibit C should be reduced by $4,709.14, from $4,448,511.23 to $4,443,802.09.  He also testified that the same correction should be made to Revised Exhibit F, reducing the amount from $3,386,399.75 to $3,381,690.61.[381]

The Court finds that the transfers avoided by the Trustee under § 548(a)(1)(B) should not include transfers that, as of the date of filing, had been satisfied by the agents. All of the subsidies identified on Revised Exhibit C were constructive fraudulent transfers when they were made — they were transfers of Brooke Franchise's property that were made within four years of Brooke Franchise's bankruptcy filing, while Brooke Franchise was insolvent, and Brooke Franchise received less than a reasonably equivalent value in return at the time of the transfers.  The agents for whose benefit the transfers were made had at least an implied obligation to repay Brooke Franchise.  With respect to the transfers to NCMIC that are included on Revised Exhibit C but not on Revised Exhibit F, sometime after the transfers, the agents for whose benefit the transfers were made reimbursed Brooke Franchise.  Those constructively fraudulent transfers were cured or

---

[380] Doc. 224, Barrett Tr. 73:5-17, Apr. 21, 2016.

[381] Doc. 226, Barrett Tr. 151:16-20, Apr. 26, 2016; Trial Ex. T2878.

extinguished.[382]

This limitation of the transfers subject to avoidance is supported by the purpose of §§ 548 and 550. "Section 548 and fraudulent transfer law generally attempt to protect creditors from transactions which are designed, or have the effect, of unfairly draining the pool of assets available to satisfy creditors' claims."[383] "The intent of 550 . . . is to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."[384] In this case, to allow the Trustee to avoid and recover transfers for which the estate received payment from the benefitted agents prepetition would enhance the estate, not restore it. As examined below, § 550(d) limits the trustee's recovery with respect to an avoided transfer to a single satisfaction. If the subsidized loan payments which the agents later repaid to Brooke Franchise were included in the avoided transfers, the result would be a double recovery.

Therefore, the total of the transfers which are avoidable as constructively fraudulent transfers is $3,381,690.61.

---

[382] *See In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. at 578 ("Consideration paid after the transfer must also be excluded [from the reasonably equivalent value calculation] unless it was part of the original bargain.").

[383] 5 *Collier on Bankruptcy*, ¶ 548.01[1][a] at 548-11.

[384] *Id.* at ¶ 550.02[3] at 550-10.

**d. Because of the Trustee's Settlements of Adversary Proceedings Against Agents, the Single Satisfaction Rule of § 550(d) Bars the Trustee's Recovery of $8,175 of the Transfers Included on Revised Exhibit F.**

To the extent that a transfer is avoided under § 548, § 550(a) allows the Trustee to recover the value of the property transferred from the initial transferee, the entity for whose benefit the transfer was made, or from any immediate or mediate transferee of such initial transferee. However, § 550(d) provides "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section." In other words, the Trustee cannot obtain more than the full value of a fraudulent transfer by recovering that value from the initial transferee and then recovering an additional amount from a subsequent transferee. The Trustee is limited to a single recovery for each transfer.

NCMIC contends in this case that the Trustee's recovery against it should be limited to the extent of the Trustee's recovery from former Brooke agents for the same loan subsidizations. NCMIC identifies eight main CONOs included in Revised Exhibit C who were defendants in adversary proceedings brought by the Trustee to recover the ending agent statement balances. Based on settlements and default judgments against these agents as reflected in Court documents, NCMIC argues that the impact of the single satisfaction rule is a credit for its benefit of $516,027. The following chart copied from NCMIC's brief on the subject[385] is offered in support of its argument:

---

[385] Doc. 213 at 10 (Defendant's Trial Brief on 11 U.S.C. § 550(d), Single Satisfaction Rule) (internal footnotes omitted).

109

| Main CONO | Agent Name | Trustee Claim Against Agent | $ Settlement Paid | Proof of Claim(s) Waived/ disallowed | Impact of Waived/ disallowed proof of claim | Trustee's Damages Against [NCMIC] Related to Agent | Impact of Single Satisfaction Rule |
|---|---|---|---|---|---|---|---|
| 1045 | GDC Management Inc. and WLM Management Group, Inc. | $331,146 | $25,000 | $3,896,956 | $294.450 | $13,462 | $13,462 |
| 330 | Randann Insurance Serv, Inc. | $12,572 | $2,500 | $150,000 | $13,275 | $8,465 | $8,465 |
| 359 | Dibs Enterprises Inc. | $59,006 | $10,000 | N/A | $0 | $8,551 | $8,551 |
| 452 | William C. Petty | $83,876 | $2,000 | N/A | $0 | $79,405 | $2,000 |
| 723 | Fausto Bucheli | $1,116,206 | $100,000 | N/A | $0 | $23,739 | $23,739 |
| 680 | RKC Financial Corp | $808,847 | $0 | $7,410,274 | $629,000 | $440,955 | $440,955 |
| 489 | Jeremy Pool Agency, Inc. | $363,938 | $0 | $1,810,057 | $159,828 | $16,229 | $16,229 |
| 921 | Brand Agency LLC | $30,082 | $0 | $750,242 | $57,544 | $2,626 | $2,626 |
|  |  | $2,805,673 | $139,500 | $14,017,529 | $1,154,097 | $593,432 | $516,027 |

The Court agrees that § 550(d) limits the Trustee's recovery, but for the reasons discussed below, not to the full extent argued by NCMIC. The Trustee's adversary proceedings against the foregoing agents sought to recover the full ending agent statement balances under six counts, including counts for an action on account, for money had and received, and for unjust enrichment.[386] The Trustee also asserted constructive fraudulent transfer claims under § 548 and related claims under § 550, seeking to recover from the agent the portion of the statement balance that arose from Brooke's subsidization payments. However, the complaints did not allege the amount of the loan subsidies that

---

[386] *E.g.*, Trial Ex. NFC-223.

were included in the balance or the loan holder to whom the payments were alleged to have been made.

The Trustee settled with the first six agents listed above and obtained default judgments against the last two. Settlements were agreed to an individual basis. There were not always written settlement agreements. Those agreements that were signed were not uniform,[387] did not allocate the settlement amount to specific counts,[388] and were not filed of record.[389] As part of the settlements, the Trustee attempted to obtain waivers of the agents' proofs of claim. The Trustee has determined that the default judgments are uncollectible and not marketable.[390]

NCMIC asserts that when the Court is calculating the impact of the foregoing settlements and defaults on the Trustee's claims, NCMIC should receive credit under the single satisfaction rule up to the amount of the Trustee's claim against NCMIC for the subsidizations paid on behalf of these agents for (1) the full amount of the cash settlements, and (2) the estimated amounts the estates would have paid on the proofs of claims if they had not been waived. NCMIC asserts that the Trustee has the burden of proof to show that this is not the correct amount and that he has failed to sustain that burden.

---

[387] Doc. 231, Redmond Tr. 96:22-97:5, Apr. 27, 2016.

[388] *Id.* at 101:19-102:3.

[389] *Id.* at 99:19-23.

[390] *Id.* at 89:7-25.

111

The Court rejects NCMIC's reliance on the burden of proof to achieve an unreasonable result. *U.S. Industries*,[391] the case on which NCMIC relies, arose in securities litigation involving multiple tort causes of action where the court applied the common law single satisfaction rule. This is not a tort case, and the single satisfaction rule to be applied is codified at § 550(d). In *Prudential of Florida Leasing*,[392] the Eleventh Circuit thoroughly examined how to apply the single satisfaction rule in avoidance actions brought by a bankruptcy trustee. It held that "[w]hen the amount for which a cause of action has been settled is unclear because the settlement involved multiple injuries, claims, and parties, section 550(d) requires a bankruptcy court to arrive at an equitable valuation of that cause of action as a percentage of the total settlement amount."[393] The process was found to be similar to the approval of a proposed settlement, or the valuing of an unliquidated or contingent claim, matters which bankruptcy courts address frequently.

In this case, the Court finds the undisputed facts in the record are sufficient to quantify a reasonable allocation. The facts on which NCMIC relies are evidenced by the

---

[391] *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1262 (10th Cir. 1988) (rejecting the general rule that a party seeking credit for an amount received in settlement bears the burden of proving that the damages sought from him have been previously paid in a prior settlement and holding "that where a plaintiff settles with some defendants, and the non-settling defendants are not parties to the settlement agreements, the non-settling defendants need show only that the plaintiff settled claims with other parties on which the non-settling defendants were found liable at trial. If the defendants make this showing, the burden shifts to the plaintiff to prove that, under the terms of its agreement with the settling defendants, the settlement did not represent common damages.").

[392] *Dzikowski v. N. Trust of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.)*, 478 F.3d 1291 (11th Cir. 2007).

[393] *Id*. at 1302.

Court's records.  The Trustee's testimony clarified the settlement process.  His testimony also established that the default judgments are uncollectible and have no value to the estate.  There is no evidence to the contrary.

The Court finds that the effect of § 550(d) is to bar recovery from NCMIC to the extent the cash settlements the Trustee received from the settling agents are attributable to the Trustee's § 548 avoidance claims against NCMIC.  The agents were entities for whose benefit the transfers were made under § 550(a)(1).  Section 550(d) limits the recovery from them and NCMIC to a single satisfaction of the avoided transfers.  When settling, the Trustee did not allocate the funds to the individual claims, so the Court must now make a reasonable allocation.  Because the Trustee settled each of the six cases for less than the total ending agent statement balance and the subsidized loan payments made to NCMIC were a portion of those balances, the Court will allocate the settlements to the § 548 claims according to the fraction of the total agent statement balance that is comprised of subsidized loan payments made to NCMIC.  For example, the Trustee's claim against main CONO 1045, GDC and WLM, was for $331,146, $13,462 of which was for subsidized loan payments made to NCMIC.  Therefore, the Court will allocate 4.07% ($13,462/$331,146) of the $25,000 settlement to the § 548(a) claim against the agent.  The Trustee may not recover this amount from both the agent and NCMIC.

Because the Trustee testified that the default judgments have no value and NCMIC offered no evidence to the contrary, the Court will not allocate any part of those judgments to reduce NCMIC's liability for the subsidized loan payments made on behalf of those

113

agents.

This leaves the question whether value should be assigned to the waivers of proofs of claim for purposes of § 550(d). NCMIC's calculation of the claimed value is based on the projected payments if the proofs of claim were all allowed in their face amounts as unsecured claims against Brooke Corp and Brooke Franchise, and the dividend to be paid on unsecured claims were based on the Trustee's current estimates of the total estate assets and the total allowed claims. But the Court's review of the proofs of claim leads it to conclude, based on its extensive experience in claims allowance and litigation, that such value is pure speculation. These proofs of claim exhibit the characteristics of inflated allegations of loss of business resulting from an unexpected bankruptcy; such claims, if they are allowed at all, are always greatly reduced from the amount asserted in the claim.[394] The Court therefore assigns no value to the waivers.

In conclusion, the Court finds, as shown in the following table, that because of the Trustee's settlement of constructively fraudulent transfer claims against six former Brooke

---

[394] The proofs of claim waived by GDC Management and WLM Management state they are for "commissions owed, franchise fees charged, vendor/lenders," Trial Ex. J0231.001, and exhibit A to the proofs of claim alleges "Debtor breached the terms of the [franchise] agreements by failing to perform its obligations and misrepresented the value of the agency purchased by" agent, Trial Exs. J0231.0004 and J0233.0004. Randy L. Monroe's proof of claim (apparently for main CONO 330) is for $150,000 for "loss of business, unpaid commissions, unpaid operating expenses, misappropri[ation]." Trial Ex. J0236.0001. RKC Financial Corp's claim for $7,410,274 is based on an arbitration award entered by default against multiple parties, including Brooke Corp and Brooke Franchise, on October 21, 2008, when the Special Master was in place, who is not mentioned in the award. Trial Ex. J0241.0002. Jeremy Pool's proof of claim is for "[s]ervices [r]endered/[g]oods sold" and states, "will provide proof as needed." Trial Ex. J0244.0001. The Brand Agency's proof of claim for $750,242 is for "Loss of Commissions, The amount of my original Book of Business & Franch[ise]." It states that the claim is secured and as the basis for perfection states "sold to DZ Bank." Trial Ex. J0247.0001.

114

agents, the single satisfaction rule of § 550(d) operates to bar the Trustee's recovery of $8,175 from NCMIC for the same avoided transfers.

| Main CONO | Agent Name | Trustee Claim Against Agent | Settlement Paid | Trustee's Claim Against NCMIC | Percent of settlement | Impact of Single Satisfaction Rule |
|---|---|---|---|---|---|---|
| 1045 | GDC Management Inc. and WLM Management Group, Inc. | $331,146 | $25,000 | $13,462 | 4.07% | $1,018 |
| 330 | Randann Insurance Serv, Inc. | $12,572 | $2,500 | $8,465 | 67.3% | $1,683 |
| 359 | Dibs Enterprises Inc. | $59,006 | $10,000 | $8,551 | 14.5% | $1,450 |
| 452 | William C. Petty | $83,876 | $2,000 | $79,405 | 94.7% | $1,894 |
| 723 | Fausto Bucheli | $1,116,206 | $100,000 | $23,739 | 2.13% | $2,130 |
| 680 | RKC Financial Corp | $808,847 | $0 | $440,955 | N/A | $0 |
| 489 | Jeremy Pool Agency, Inc. | $363,938 | $0 | $16,229 | N/A | $0 |
| 921 | Brand Agency LLC | $30,082 | $0 | $2,626 | N/a | $0 |
| | | $2,805,673 | $139,500 | $593,432 | | $8,175 |

When the Trustee's prior recovery of $8,175 from agents on whose behalf NCMIC received subsidized loan payments is subtracted from $3,381,690.61, the value of the avoided constructively fraudulent transfers, the net amount for which NCMIC is liable is $3,373,515.61.

### e.  The Trustee May Recover $3,373,515.61 from NCMIC.

To summarize the above analysis under § 550, the Court holds that the Trustee may recover $3,373,515.61 from NCMIC under § 550 and K.S.A. 33-208.  NCMIC is liabile to the Trustee for the value of the constructively fraudulent transfers as an initial transferee

115

because Brooke Credit was a conduit or, if Brooke Credit was not a conduit, because NCMIC received the transfers from an initial transferee and did not take for value in good faith without knowledge of the voidability of the transfers. The amount of the recovery is $3,373,515.61, the amount of the subsidies shown on Mr. Barrett's revised Exhibit F, less the amount attributed to those transfers already recovered by the Trustee in avoidance actions against agents to recover the same transfers.

### F. THE TRUSTEE'S REQUEST FOR PREJUDGMENT INTEREST IS DENIED.

The Trustee seeks an award of prejudgment interest retroactive to May 24, 2012, the date when he originally filed his complaint against NCMIC.[395] At the Kansas statutory rate of 10%, the Trustee calculates the interest on an award of $4,443,802.09 would be $1,838,394.80 through July 12, 2016, the date closing arguments were heard.[396] NCMIC opposes such an award based on this Court's denial of prejudgment interest in the Trustee's avoidance proceeding against SpiritBank.[397]

In *SpiritBank*, the Court noted that the Tenth Circuit has held that prejudgment interest has generally been awarded to a successful trustee in an avoidance action "from

---

[395] Doc. 180 at 6 (pretrial order); Trustee's closing arguments, July 12, 2016 (not transcribed).

[396] Trustee's closing arguments, July 12, 2016 (not transcribed).

[397] *In re Brooke Corp.*, 541 B.R. at 523-24. In the pretrial order, NCMIC contends that the Trustee "should not be permitted to further recover pre-judgment or post-judgment interest." Doc. 180 at 16. A federal statute, 28 U.S.C. § 1961, mandates the award of post-judgment interest on judgments entered in district court, and the statute applies in bankruptcy proceedings. *Pester Refining Co. v. Ethyl Corp. (In re Pester Refining Co.)*, 964 F.2d 842, 849 (8th Cir. 1992). NCMIC's request that the Trustee be denied postjudgment interest is denied.

the time demand is made or an adversary proceeding is instituted unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment."[398] However, this Court also noted that "prejudgment interest is not recoverable as a matter of right.  Instead, awards of prejudgment interest are governed by fundamental considerations of fairness."[399]  An award of prejudgment interest was denied in *SpiritBank*.  The Trustee had not prevailed on all of his claims and such an award would have been inequitable. SpiritBank had defended against the Trustee's claims in good faith, and the delay in the resolution of the claims resulted from the delay inherent in the litigation of avoidance claims in cases as large and complex as the Brooke bankruptcies, rather than the conduct of SpiritBank.

The Court finds that the rationale for denying the Trustee's request for an award of prejudgment interest in *SpiritBank* is applicable here.  The amount recoverable was not determined prior to this ruling.  The Trustee has not succeeded in recovering the full amount of the allegedly constructively fraudulent conveyances.  NCMIC defended the Trustee's claims in good faith.  It would be inequitable to impose four years of interest liability on NCMIC when the delay in the resolution of the Trustee's claims was a result of the complexity of the claims, not a desire by NCMIC to avoid a readily apparent liability.

---

[398] *In re Brooke Corp.*, 541 B.R. at 524 (quoting *Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 4 F.3d 1556, 1566 (10th Cir. 1993)).

[399] *Id.* (quoting *Diamond v. Bakay (In re Bakay)*, 454 Fed.App'x. 652, 654 (10th Cir. 2011)).

117

**CONCLUSION**.

For the foregoing reasons, the Court finds that: (1) NCMIC's motion for judgment under Rule 52(c) is denied; (2) the Trustee's motion for judgment under Rule 52(c) on NCMIC's counterclaims is granted; (3) the Trustee has sustained his burden of proof under §§ 544 and 548 and K.S.A.33-210 to -212 that $4,443,802.09 in transfers Brooke Franchise made to NCMIC in subsidized loan payments were constructively fraudulent transfers when they were made; (4) because some of the avoided transfers were satisfied by payment before Brooke Franchise filed for bankruptcy relief or by settlement of postpetition adversary proceedings, NCMIC's liability to the Trustee for the avoided transfers is $3,373,515.61; and (5) the Trustee is not entitled to prejudgment interest on the amount owed by NCMIC.

**IT IS SO ORDERED.**

# # #

118